## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| EDWARD KOMITO, Allentown, Lehigh County, Pennsylvania, Individually and on Behalf of All Others Similarly Situated,<br><br>                      Plaintiff,<br><br>        -against-<br><br>SINCLAIR BROADCAST GROUP, INC.<br>10706 Beaver Dam Road<br>Hunt Valley, Maryland 21030<br><br>CHRISTOPHER S. RIPLEY<br>10706 Beaver Dam Road<br>Hunt Valley, Maryland 21030<br><br>and<br><br>LUCY A. RUTISHAUSER<br>10706 Beaver Dam Road<br>Hunt Valley, Maryland, 21030<br><br>                    Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## Table of Contents

I. NATURE OF THE ACTION ................................................................................... 1

II. JURISDICTION AND VENUE ............................................................................... 3

III. PARTIES ................................................................................................................ 4

IV. SUBSTANTIVE ALLEGATIONS ......................................................................... 5

    A. Background ................................................................................................... 5

    B. Defendants' False and Misleading Statements ........................................... 6

        1. Sinclair Looks Forward to "Transformative" Mergers ................... 6

        2. Sinclair and Tribune Announce $3.9 Billion Merger ..................... 7

        3. The FCC Seeks More Information on Sinclair's Proposed Divestitures .... 9

    C. The Truth is Revealed ................................................................................ 11

V. CLASS ACTION ALLEGATIONS ....................................................................... 14

VI. UNDISCLOSED ADVERSE FACTS ................................................................... 16

VII. LOSS CAUSATION ............................................................................................. 17

VIII. SCIENTER ALLEGATIONS ............................................................................... 18

IX. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE ........................................................................................... 19

X. NO SAFE HARBOR ............................................................................................. 20

XI. COUNTS AGAINST DEFENDANTS .................................................................. 21

XII. PRAYER FOR RELIEF ....................................................................................... 26

XIII. JURY TRIAL DEMANDED ................................................................................ 26

Plaintiff Edward Komito ("Plaintiff"), by and through his attorneys, brings this federal securities class action on behalf of all persons or entities that purchased or otherwise acquired Sinclair Broadcast Group, Inc. ("Sinclair" or the "Company") common stock between February 22, 2017 and July 19, 2018, inclusive, (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et. seq.* (the "Exchange Act").   Plaintiff alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of public filings made by Sinclair, and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC") and with the Federal Communications Commission ("FCC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles, shareholder communications, conference call transcripts, and postings on Sinclair's website concerning the Company's public statements; and (d) review of other publicly available information concerning Sinclair and Defendants.

## I.     NATURE OF THE ACTION

1.     Sinclair, headquartered in Hunt Valley, Maryland, is the largest television station operator in the United States by both number of stations and total coverage.  The Company owns more than 193 stations across the country, covering nearly 40% of American households.

2.     The Company is controlled by four brothers, David D. Smith, Sinclair's Executive Chairman since January 2017, President and Chief Executive Officer from 1988 until January 2017, and Chairman of the Board since September 1990; Frederick Smith, Sinclair's Vice President and director; J. Duncan Smith, Sinclair's Vice President, Secretary and director since

1986, and Robert Smith, a director of Sinclair since 1986 (collectively, the "Smith Brothers"). Together, the Smith Brothers own a 75% interest in Sinclair, including all of the Company's Class B common stock.

3.      During the Class Period, Sinclair announced a proposed $3.9 billion merger with Tribune Media Co. ("Tribune"), which the Company called the "largest acquisition" in the Company's history. Throughout the Class Period, Defendants made materially false and misleading statements assuring investors and the FCC that it was using its "best efforts" to obtain regulatory approval and close the deal and that the Company would sell or divest certain stations as necessary "in order to comply with FCC ownership requirements and antitrust regulations."

4.      However, during the Class Period, Defendants engaged in a fraudulent scheme to deceive the FCC and the investing public by creating "sham" transactions with buyers intertwined with the Company and its controlling shareholders, the Smith Brothers, in an effort to misleadingly convince regulators that Sinclair's proposed merger was in compliance with FCC ownership regulations.

5.      The truth began to emerge on July 16, 2018, when it was reported that FCC Chairman Ajit Pai was internally circulating a draft order designating the Sinclair/Tribune merger proposal for a hearing in front of the FCC's administrative law judge – a designation widely considered to be a death sentence for proposed mergers – because of "serious concerns" that "Sinclair's actions here potentially involve deception."

6.      On this news, shares of Sinclair fell $3.85, or 11.6%, to close at $29.10 on July 16, 2018, wiping out more than $292 million in market capitalization. Sinclair's stock price continued to fall in the following days, closing on July 18, 2018 at $27.40, representing a three day drop of nearly 17%, wiping out a total of $425 million in market capitalization.

7.      Then, after the markets closed on July 18, 2018, despite the Company's last-ditch effort to avoid a hearing by withdrawing the improper sales, the FCC unanimously voted to send the proposed merger to a hearing.  The FCC publicly released the final HDO on July 19, 2018 in which the Commission stated that there was "a substantial and material question of fact as to whether Sinclair affirmatively misrepresented or omitted material facts" regarding whether Sinclair had "attempted to skirt the Commission's broadcast ownership rules."

8.      On this news, on July 19, 2018, Sinclair stock dropped again by $1.10, or 4%, wiping out an additional $84 million in market capitalization, and resulting in a total stock price decline over four days of more than 20%.

9.      On August 9, 2018, in an emailed statement, Tribune announced its withdrawal from the $3.9 billion merger and said that it had filed a lawsuit in the Delaware Chancery Court against Sinclair seeking $1 billion in damages for losses incurred as a result of Sinclair's "material breaches" of the merger agreement.

10.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and the other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

11.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

13.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).  A substantial portion of the acts in

furtherance of the alleged fraud, including the preparation and dissemination of materially false and misleading information and the effects of the fraud, have occurred in this Judicial District. In addition, the Company's headquarters is located in this District at 10706 Beaver Dam Road, Hunt Valley, Maryland, 21030.

14.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.     PARTIES

15.     Plaintiff Edward Komito, as set forth in the accompanying certification, attached hereto as Exhibit "A", purchased Sinclair common stock during the Class Period, and suffered damages as a result of the federal securities law violations and the false and/or misleading statements and/or material omissions alleged herein.  Plaintiff resides in Allentown, Lehigh County, Pennsylvania.

16.     Defendant Sinclair Broadcast Group, Inc. ("Sinclair" or the "Company") is a Maryland corporation with its headquarters located at 10706 Beaver Dam Road, Hunt Valley, Maryland 21030. Sinclair's common stock is traded on the NASDAQ under the symbol "SBGI."

17.     Defendant Christopher S. Ripley ("Ripley") has served as the Chief Executive Officer ("CEO") and President of Sinclair since January 2017.  Defendant Ripley's address is 10706 Beaver Dam Road, Hunt Valley, Maryland 21030.

18.     Defendant Lucy A. Rutishauser ("Rutishauser") has served as the Senior Vice President and Chief Financial Officer of Sinclair since January 2017.  Prior to that, she served as Senior Vice President of Corporate Finance and Treasurer from December 2013 to January 2017. Defendant Rutishauser's address is 10706 Beaver Dam Road, Hunt Valley, Maryland 21030.

19.     Defendants Ripley and Rutishauser are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, throughout the Class Period, because of their positions with the Company, possessed the power and authority to control the contents of Sinclair's reports to the SEC and public filings with the FCC, as well as its press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each Individual Defendant, while serving as a senior executive of Sinclair, was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, and were the result of the collective actions of the Individual Defendants.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Background

20.     Sinclair, headquartered in Hunt Valley, Maryland, is the largest television station operator in the United States, both by number of stations and total coverage.  The Company owns more than 193 stations across the country in 100 markets, covering 40% of American households.

21.     Like all television, wire, satellite and cable media companies, Sinclair's business is governed by the rules and regulations set by the FCC.

22.     The FCC's National TV Ownership Rule prohibits the transfer of a license for a commercial television broadcast station if the transfer will result in the transferee having an attributable interest in television stations that reach greater than 39% of the national audience.  In calculating an interest holder's total ownership, the FCC's rules reduce the population attributed to a UHF television station (stations broadcasting on channels 13 through 83) by 50% (the "UHF Discount").   During the Class Period, accounting for the UHF discount, Sinclair stations purportedly reached approximately 25% of U.S. households.

23.     Moreover, the FCC's Local TV Multiple Ownership Rule, or "Duopoly Rule" provides that an entity cannot own more than two stations in the same Designated Market Area.

**B.      Defendants' False and Misleading Statements**

**1.       Sinclair Looks Forward to "Transformative" Mergers**

24.     The Class Period starts on February 22, 2017, when Sinclair disclosed its financial results for the fourth quarter 2016.   During the Company's earnings call with investors, in response to a question by a Wells Fargo Securities LLC analyst about whether the Company expected any "transformative" merger deals at some point, Defendant Ripley stated:

> a lot of that will depend on what happens at the FCC and as I mentioned, we're quite optimistic about new leadership there and their plans to deregulate the industry and put us on an even playing field with other forms of communication. So we have to wait and see what will happen, ***but we think it will actually happen fairly quickly here and we'll start to see some movement this year. And if that happens, I do expect transformative deals to come on heels of that.***

25.     Shortly thereafter, on April 19, 2017, the FCC issued an order relaxing the FCC's National TV Ownership Rule by reinstating the UHF discount that was previously eliminated under the Obama administration.

26.     Simultaneously, citing anonymous sources familiar with the discussions, media reports, including Bloomberg, reported that Sinclair was working on a deal to acquire Tribune

"for a per-share price in the high 30s."  Although the deal was not yet final, Sinclair had already

been engaged in ongoing discussions about the terms of a merger and was aiming to announce

the deal on or before May 8, 2017, when Tribune was scheduled to announce its first quarter

2018 financial results.

27.     According to Bloomberg, a combined Sinclair and Tribune company would reach

more than 40% of U.S. households, in violation of FCC Ownership rules, and as a result, any

deal would require divestitures.

## 2.      Sinclair and Tribune Announce $3.9 Billion Merger

28.     On May 8, 2017, Sinclair and Tribune announced that they had entered into a

definitive agreement under which Sinclair would acquire 100% of the issued and outstanding

shares of Tribune for $43.50 per share, for an aggregate purchase price of approximately $3.9

billion, plus the assumption of approximately $2.7 billion in net debt.

29.     The Press Release announcing the merger stated that "*In order to comply with*

*FCC ownership requirements and antitrust regulations, Sinclair may sell certain stations in*

*markets where it currently owns stations.  Such divestitures will be determined through the*

*regulatory process*."

30.     Following the announcement, shares of Sinclair closed at $36.10 on May 8, 2017.

31.     On June 26, 2017, Sinclair and Tribune filed their Application for Approval of

Proposed Merger and "Comprehensive Exhibit" with the FCC which, among other things,

explained that Sinclair and Tribune would sell certain stations to comply with FCC regulations.

In doing so, the application stated that:

> The applicants will take such actions to the extent required *to comply with the*
> *terms of the Merger Agreement and the national television ownership limit*
> (including the UHF Discount), in order to obtain FCC approval of the
> Transaction.

32.     On July 3, 2017, Sinclair filed a Registration Statement in connection with the merger with the SEC on Form S-4, dated June 30, 2017.  The S-4 was signed by, among others, the Individual Defendants and all four Smith Brothers.  The S-4 stated that,

> ***Sinclair also agreed, subject to the terms of the agreement, to use reasonable best efforts to take all actions to avoid or eliminate any impediment that may be asserted by a governmental authority with respect to the transactions so as to enable the closing to occur as soon as reasonably practicable, including taking certain actions, each referred to as an "approval action," to obtain regulatory approval.***

> In that connection, Sinclair agreed to divest one or more television stations in certain specified markets as necessary to comply with the FCC's Local Television Multiple Ownership Rule (47 C.F.R. § 73.3555(b)), which we refer to as the "FCC duopoly rule," or to obtain clearance under the HSR Act, in each case as required by the applicable governmental authority in order to obtain approval of and consummate the transactions. Sinclair is required to designate either a Tribune station or Tribune stations or a Sinclair station or Sinclair stations for divestiture in each market, as required by and subject to approval by the relevant governmental authority. ***Sinclair has also agreed to designate, at its option, certain additional Tribune stations or Sinclair stations for divestiture and to divest such stations in order to comply with the FCC's National Television Multiple Ownership Rule (47 C.F.R. § 73.3555(e)), which we refer to as the "FCC national cap," as required by the FCC in order to obtain approval of and consummate the transactions***.

33.     On August 15, 2017, Sinclair filed Amendment No. 1 to the Registration Statement on Form S-4/A.  The S-4/A was signed by, among others, the Individual Defendants and all four Smith Brothers.  The S-4/A repeated the same misleading statements, again saying:

> ***Sinclair also agreed, subject to the terms of the agreement, to use reasonable best efforts to take all actions to avoid or eliminate any impediment that may be asserted by a governmental authority with respect to the transactions so as to enable the closing to occur as soon as reasonably practicable, including taking certain actions, each referred to as an "approval action," to obtain regulatory approval.***

> Sinclair is required to designate either a Tribune station or Tribune stations or a Sinclair station or Sinclair stations for divestiture in each overlap market, as required by and subject to approval by the relevant governmental authority. ***Sinclair has also agreed to designate, at its option, certain additional Tribune stations or Sinclair stations for divestiture and to divest such stations in order to comply with the FCC's National Television Multiple Ownership Rule (47***

*C.F.R. § 73.3555(e)), which we refer to as the "FCC national cap," as required by the FCC in order to obtain approval of and consummate the transactions.*

### 3.    The FCC Seeks More Information on Sinclair's Proposed Divestitures

34.    On January 11, 2018, the FCC issued a letter pausing the informal timeline for consideration of applications for transfers of licenses or authorizations related to complex mergers until Sinclair and Tribune submitted additional information related to what divestitures the Companies would make to comply with FCC ownership regulations.

35.    On February 21, 2018, Sinclair filed an application with the FCC detailing the purported divestiture of twenty-three television stations ostensibly to comply with FCC ownership rules.

36.    However, as was ultimately revealed at the end of the Class Period, many of the proposed "divestitures" were not divestitures at all but were instead insider deals with buyers connected to Sinclair and the Smith Brothers personally.  Moreover, these "divestitures" contained terms that allowed Sinclair to continue to exert its control over the stations in contravention of FCC ownership rules.

37.    For instance, Sinclair proposed the sale of two Texas television stations, KIAH in Houston and KDAF in Dallas, to Cunningham Broadcasting Corporation ("Cunningham") for approximately $60 million, more than $40 million below market price for the two stations.  The buyer, Cunningham, owned nearly twenty "sidecar" stations that were operated by companion Sinclair stations in the same market.

38.    As of December 31, 2017, the estate of Carolyn C. Smith, the mother of Sinclair's controlling shareholders, the Smith Brothers, owned all of the voting stock of Cunningham and the non-voting stock was owned by a trust benefiting the children of the Smith Brothers.   In January 2018, in apparent anticipation of the Sinclair/Tribune merger, the voting stock of

Cunningham was sold to Michael Anderson, David Smith's former banker, for just $400,000, far below market value for the nearly twenty stations that Cunningham owns.   Even following the sale of Cunningham, Sinclair continued to guarantee almost $53.4 million of Cunningham's debt.

39.     Moreover, the "sales" of both Texas television stations were accompanied by an option agreement giving Sinclair the right to buy back the stations at the same price within eight years and renewable five times over.

40.     Significantly, emphatically, Sinclair reassured the market that these were not improper deals, saying "***Cunningham is operated completely separately from Sinclair…Sinclair will have no involvement in the operations of the Dallas and Houston stations being sold to Cunningham***."

41.     Next, Sinclair sought approval of the sale of one of Tribune's largest assets, WGN-TV in Chicago for just $60 million, again for significantly below market price.   The buyer, WGN TV Licensee, LLC, was a newly formed company run by Steven Fader ("Fader"), the chief executive officer of Atlantic Automotive Corporation ("AAC"), which operates a chain of auto dealerships in Maryland.   Fader had no previous broadcasting experience and the controlling interest in AAC, according to Sinclair financial statements, belonged to David Smith.

42.     Even with the proposed sale, Sinclair would provide everything from programming to advertising sales to WGN TV Licensee, LLC, running the station through a services agreement in exchange for 30% of advertising sales and a $5.4 million monthly service fee, along with annual increases and performance bonuses.   The sale of WGN also came with an option agreement, giving Sinclair the opportunity to buy the station back at the same price anytime within the next 48 years.

43.     In response to the planned divestitures, market participants questioned whether the sales would satisfy the FCC rules. For example, Chris Ruddy, chief executive of Newsmax Media Inc., said on July 4, 2018, "They're not really arm's-length. They're not really divestitures…It's just really an insult to the public, to the rules, and to fairness."  The attorneys general of Illinois, Iowa and Rhode Island told the FCC that "massive consolidation proposed in these applications violates the law."

44.     In response to the critics, Sinclair vehemently defended the sales as fully appropriate, issuing a statement assuring the market that "***Ownership rules are not being evaded; they are being complied with.***"

45.     The above statements in paragraphs 21-26, 28-34, and 36 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose that: (i) the Sinclair/Tribune Merger was not in compliance with FCC rules and regulations; (ii) Sinclair was not using its best efforts to eliminate any impediment to regulatory approval; (iii) Sinclair was engaging in non-arm's length transactions with buyers connected to Sinclair's controlling shareholders in order to skirt FCC ownership rules; and (iv) that, as a result of the foregoing, Defendant's public statements were materially false and/or misleading and/or lacked a reasonable basis.

### C.     The Truth is Revealed

46.     On July 16, 2018, news reports disclosed that FCC Chairman Ajit Pai was circulating a draft Hearing Designation Order ("HDO") sending the Sinclair/Tribune deal to a hearing before the FCC's administrative law judge, a process widely considered to be a death sentence for merger approvals.

47.    Chairman Pai explained that "the evidence we've received suggests that certain station divestitures that have been proposed to the FCC would allow Sinclair to control those stations in practice, even if not in name, in violation of the law."  The draft HDO, seen by Reuters on July 16, 2018, stated that Chairman Pai had "serious concerns" about the proposed merger, finding that "Sinclair's actions here potentially involve deception."

48.    On this news, Sinclair's stock price declined precipitously, dropping $3.85, or 11.6%, from a closing price of $32.95 on July 13, 2018 to a closing price on July 16, 2018 of $29.10, wiping out almost $300 million in market capitalization.  As news reports of the FCC's anticipated HDO continued to enter the market, Sinclair's stock price continued to drop, losing another $1.70 per share over the next two days to close at $27.40 on July 18, 2018.

49.    Even still, Sinclair continued to reassure investors, issuing its own statement on July 16, 2018, telling the market that its proposed divestitures were both legal and consistent with sales the FCC has approved in the past:

> Throughout the FCC review process of this transaction, we have had numerous meetings and discussions with the FCC's Media Bureau to make sure that they were fully aware of the transaction's structure and basis for complying with FCC rules and meeting public interest obligations,…***These structures are consistent with structures that Sinclair and many other broadcasters have utilized for many years with the full approval of the FCC. During these discussions and in our filings with the FCC, we have been completely transparent about every aspect of the proposed transaction.***

50.    On July 18, 2018, in a last-ditch effort to stop the proposed merger from going to a hearing, Sinclair filed an Amended Application for Consent to Transfer Control of Licenses and Authorizations with the FCC, notifying the FCC that it was withdrawing its application to divest WGN-TV in Chicago, KIAH in Houston and KDAF in Dallas.

51.     The withdrawal did nothing to persuade the FCC who, after markets closed on July 18, 2018, voted unanimously to send the proposed merger to a hearing anyway.  The FCC's final HDO order, made public on July 19, 2018, stated that "there is a substantial and material question of fact as to whether Sinclair affirmatively misrepresented or omitted material facts" and questioned whether Sinclair had "attempted to skirt the Commission's broadcast ownership rules."

52.     The Order found that "the record raises significant questions as to whether those proposed divestitures were in fact '*sham*' transactions," and took particular issue with the proposed sale of WGN in Chicago:

> Sinclair would have owned most of WGN-TV's assets, and pursuant to a number of agreements, would have been responsible for many aspects of the station's operation. Finally, Fader would have purchased WGN-TV at a price that appeared to be significantly below market value, and Sinclair would have had an option to buy back the station in the future. Such facts raise questions about whether Sinclair was the real party in interest under Commission rules and precedents and attempted to skirt the Commission's broadcast ownership rules.

53.     Similarly, in describing the Cunningham transaction, the Order stated:

> [P]roblematic aspects of the proposed divestitures of the Texas stations include: the intertwined relationship between Sinclair and Cunningham, particularly in light of past Commission findings regarding the nature of the relationship; the recent acquisition of the voting shares of Cunningham by Michael Anderson, a Sinclair associate, for a $400,000 sales price that is far below market value; the fact that the children of Sinclair's controlling shareholders are beneficiaries of trusts controlling the non-voting shares of Cunningham with the parents holding options to buy the voting shares in the future; and Sinclair's apparent guarantee of $53.6 million of Cunningham's debt.

54.     On this news, Sinclair's stock price continued its decline, losing another $1.10 to close at $26.30 on July 19, 2018.  In total, over the course of just four trading days, Sinclair stock dropped more than 20%, wiping out more than $500 million in market capitalization, as the truth of its fraudulent, sham transactions was revealed.

55.     As a result of the forgoing, on August 9, 2018, Tribune announced its withdrawal from the $3.9 billion merger and said that it had filed a lawsuit in the Delaware Chancery Court against Sinclair seeking $1 billion in damages for losses incurred as a result of Sinclair's "spectacular" "material breaches" of their merger agreement.

56.     As the Tribune's Complaint alleges:

To prevent Sinclair from engaging in protracted negotiations or in any other behavior that would delay the Merger's closing, *the Merger Agreement required Sinclair to agree to divestures to avoid even the threat of any proceeding or order relating to regulatory review*.

However, from virtually the moment the Merger Agreement was signed, Sinclair repeatedly and willfully breached its contractual obligations in spectacular fashion. *In an effort to maintain control over stations it was obligated to sell if advisable to obtain regulatory clearance, Sinclair engaged in belligerent and unnecessarily protracted negotiations with DOJ and the FCC over regulatory requirements, refused to sell stations in the ten specified markets required to obtain approval, and proposed aggressive divestment structures and related-party sales that were either rejected outright or posed a high risk of rejection and delay – all in the service of Sinclair's self-interest and in derogation of its contractual obligations*.

## V.     CLASS ACTION ALLEGATIONS

57.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired Sinclair Broadcast Group, Inc. common stock during the Class Period and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of Sinclair and the directors, officers and employees of the Company or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

58.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time

and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Throughout the Class Period, Sinclair common stock was actively traded on the NASDAQ, an open and efficient market, under the symbol "SBGI." Millions of Sinclair shares were traded publicly during the Class Period on the NASDAQ.  Record owners and the other members of the Class may be identified from records maintained by Sinclair and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

59.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

60.     Plaintiff will fairly and adequately protect the interests of the other members of the Class, and has retained counsel competent and experienced in class and securities litigation. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

    a.  Whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

    b.  Whether Defendants participated in and pursued the common course of conduct complained of herein;

    c.  Whether documents, press releases, and other statements disseminated to the investing public and the Company's stockholders during the Class Period misrepresented material facts about the business, finances, and prospects of Sinclair;

  d. Whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose facts about the business, finance, value, and performance of Sinclair;

  e. Whether the market price of Sinclair common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

  f. The extent to which the members of the Class have been damaged and the proper measure of damages.

  61. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VI. UNDISCLOSED ADVERSE FACTS

  62. The market for Sinclair common stock was an open, well-developed and efficient market at all relevant times. As a result of these materially false and misleading statements and failures to disclose described herein, Sinclair common stock traded at artificially inflated prices during the Class Period.  Plaintiff and the other members of the Class purchased or otherwise acquired Sinclair shares relying upon the integrity of the market price of the Company's stock and market information relating to Sinclair, and have been damaged thereby.

  63. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Sinclair common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as

set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse non-public information and misrepresented the truth about the Company, as well as its business and operations, as alleged herein.

64.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and the other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and misleading statements about Sinclair's legal and regulatory compliance, financial well-being and prospects.

65.     These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's stock price to be overvalued and artificially inflated and/or maintained at all relevant times.  Defendants' materially false and misleading statements made during the Class Period resulted in Plaintiff and the other members of the Class purchasing the Company's stock at artificially inflated prices, thus causing the damages complained of herein.

## VII.   LOSS CAUSATION

66.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Sinclair stock and operated as a fraud or deceit on Class Period purchasers of Sinclair's stock by failing to disclose to investors that the Company was attempted to evade the FCC's ownership rules through a series of sham transactions. When Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Sinclair stock fell

precipitously as the prior inflation came out of the Company's stock price. As a result of their purchases of Sinclair stock during the Class Period, Plaintiff and the other Class members suffered economic loss.

67.     By failing to disclose the true state of the Company's proposed transactions in SEC and FCC public filings, investors were not aware of the true state of the Company's status. Therefore, Defendants presented a misleading picture of Sinclair's business practices and procedures. Thus, instead of truthfully disclosing during the Class Period the true state of the Company's business, Defendants caused the Company to conceal the truth.

68.     Defendants' false and misleading statements had the intended effect and caused Sinclair's common stock to trade at artificially inflated levels throughout the Class Period. The stock price drops discussed herein caused real economic loss to investors who purchased the Company's common stock during the Class Period.

69.     The decline in the price of Sinclair common stock after the truth came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of Sinclair's common stock price declines negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Sinclair's common stock and the subsequent decline in the value of Sinclair stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## VIII.  SCIENTER ALLEGATIONS

70.     As alleged herein, the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company

during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

71.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Sinclair, including communications concerning the interest-party transactions and fraudulent regulatory scheme, their control over, receipt and/or modification of Sinclair's allegedly materially misleading statements and omissions, and/or their position with the Company which made them privy to confidential information concerning Sinclair, participated in the fraudulent scheme alleged herein.

## IX.     APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

72.     At all relevant times, the market for Sinclair common stock was an efficient market for the following reasons, among others:

a.  Sinclair met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient market;

b.  As a public company, Sinclair filed periodic public reports with the SEC;

c.  Sinclair securities were followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and

d.  Sinclair regularly issued press releases which were carried by national newswires. Each of these releases was publicly available and entered the public marketplace.

73.     As a result of the foregoing, the market for Sinclair common stock promptly digested current information regarding Sinclair from all publicly available sources and reflected such information in Sinclair's stock price. Under these circumstances, all purchasers of Sinclair common stock during the Class Period suffered similar injury through their purchase of Sinclair common stock at artificially inflated prices and a presumption of reliance applies.

74.     A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because Plaintiff's fraud claims are grounded in Defendants' omissions of material fact of which there is a duty to disclose. As this action involves Defendants' failure to disclose material adverse information regarding Sinclair's business practices, financial results and condition, and the Company's internal financial controls—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered such information important in the making of investment decisions.

## X.     NO SAFE HARBOR

75.     The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

76.     In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Sinclair who knew that the statement was false when made.

## XI.     COUNTS AGAINST DEFENDANTS

### COUNT I
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
### Against All Defendants

77.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. This claim is asserted against all Defendants.

78.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Sinclair common stock; and (iii) cause Plaintiff and the other members of the Class to purchase Sinclair common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

79.     These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Sinclair's common stock in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants are sued as primary

participants in the wrongful and illegal conduct charged herein. The Individual Defendants are also sued herein as controlling persons of Sinclair, as alleged herein.

80.     In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-X (17 C.F.R. § 210.01, et seq.) and S-K (17 C.F.R. § 229.10, et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

81.     Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, operations and merger discussions of Sinclair as specified herein. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Sinclair's compliance with FCC ownership rules, which included the making of, or the participation in the making of, untrue statements of material facts, and omitting to state material facts necessary in order to make the statements made about Sinclair and its business, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which

operated as a fraud and deceit upon the purchasers of Sinclair common stock during the Class Period.

82.     The Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period; (ii) the Individual Defendants, by virtue of their responsibilities and activities as senior executive officers of the Company, were privy to and participated in the creation, development and reporting of the Company's public statements; (iii) the Individual Defendants participated in and had knowledge of the sham transactions described herein; (iv) the Individual Defendants enjoyed significant personal contact and familiarity with Sinclair's board of directors and the Smith Brothers, and was advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (v) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

83.     These Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them.

84.     Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly, and for the purpose and effect of concealing Sinclair's true business practices and future business prospects from the investing public and supporting the artificially inflated and/or artificially maintained price of its common stock. As demonstrated by their overstatements and misstatements of the Company's business activities throughout the Class

Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were severely reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

85.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Sinclair common stock was artificially inflated or maintained during the Class Period. In ignorance of the fact that the market price of Sinclair common stock was artificially inflated or maintained, and relying directly or indirectly on the false and misleading statements made by Defendants, upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by these Defendants during the Class Period, Plaintiff and the other members of the Class acquired Sinclair common stock during the Class Period at artificially inflated prices and were damaged thereby.

86.     At the time of said misrepresentations and omissions, Plaintiff and the other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known of the true truth of Sinclair's sham transactions, Plaintiff and the other members of the Class would not have purchased or otherwise acquired Sinclair common stock during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated or maintained prices which they paid.

87.     By virtue of the foregoing, Defendants each violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

88.     As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## COUNT II
### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

89.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

90.     The Individual Defendants were and acted as controlling persons of Sinclair during the Class Period within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

91.     In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

92.     As set forth above, Sinclair and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their

controlling positions, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for judgment as follows:

a. Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b. Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

c. Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d. Awarding such other relief as this Court deems appropriate.

## XIII.   JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: August 9, 2018                    Respectfully Submitted,

**GOLDMAN & MINTON, P.C.**

*/s/Thomas J. Minton*

Thomas J. Minton (03370)
3600 Clipper Mill Rd., Suite 201
Baltimore, MD 21211
Telephone: (410) 783-7575
tminton@charmcitylegal.com

***Liaison Counsel for Plaintiff Edward Komito***

26

**SAXENA WHITE P.A.**
Maya Saxena
Joseph E. White, III
Lester R. Hooker
150 East Palmetto Park Road, Suite 600
Boca Raton, FL 33432
Telephone: (561) 394-3399
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com

Steven B. Singer
10 Bank Street, 8th Floor
White Plains, New York 10606
Telephone: (914) 437-8551
ssinger@saxenawhite.com

*Counsel for Plaintiff Edward Komito*