**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| In re Sinclair Broadcast Group, Inc. Securities Litigation | Civ A. No. 1:18-cv-02445-CCB<br><br>**AMENDED CLASS ACTION CONSOLIDATED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS


I. NATURE OF THE ACTION ........ 1

II. INTRODUCTION ........ 2

III. JURISDICTION AND VENUE ........ 6

IV. PARTIES ........ 7

V. OVERVIEW OF THE FRAUD ........ 10

A. To Induce Shareholder Approval of the Merger, Sinclair Repeatedly Assured Investors It Would Divest All Stations Required to Comply With Federal Broadcast Ownership Limits ........ 10

B. Sinclair's Own Merger Partner Has Confirmed In the Delaware Action that Sinclair's Representations That It Would Agree to Divest "All Stations That We Need To" Were False ........ 14

C. After Failing to Coerce Regulators Into Bending Federal Ownership Rules, Sinclair Proposes Sham Divestitures In an Effort to Evade Those Rules—and the FCC Warns Sinclair to Propose "Clean Station Sales" ........ 18

D. Sinclair Responds to Critics of Its Proposed Divestitures By Emphatically Asserting Its Divestitures Were Arms' Length and Fully Complied With FCC Rules ........ 24

II. THE TRUTH EMERGES ........ 27

A. The FCC Concludes That Sinclair Attempted to Deceive Regulators By Proposing Sham Divestitures ........ 27

B. The FCC's HDO Makes Clear Sinclair Engaged in Fraud and Deception in an Attempt to Evade FCC Rules ........ 30

III. POST CLASS PERIOD EVENTS CONFIRM THE LASTING IMPACT OF SINCLAIR'S FRAUD ........ 34

IV. Plaintiff's CWs Unanimously Described Sinclair's Long History of Entering Sham LMAs With Shell Companies—Including Cunningham—For The Purpose of Evading FCC Ownership Rules ........ 37

V. Sinclair's Anticompetitive Conduct in Advertising—The DOJ Uncovers That Sinclair Was Colluding With Other Broadcasters to Illicitly Fix Prices for Spot Advertising Rates ........ 43

VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ........ 48

A. Fourth Quarter and Full Year 2016 ........ 48

B. Tribune Merger Announcement ........ 50

C. Application for Approval of Proposed Merger and Registration Statement ........ 52

D. Second Quarter 2017 ........ 54

E. Amendment No. 1 to Registration Statement ........ 55

F. Opposition to Petitions to Deny the Merger ........ 55

G. Prospectus ........ 56

H. Response to FCC's Request for Information ........ 58

I. February 2018 Divestiture Trust – WPIX and WGN-TV Divestitures ........ 59

J. Fourth Quarter and Full Year 2017 ........ 60

K. March 2018 Divestiture Trust Comprehensive Exhibit ........ 63

L. April 24, 2018 Divestiture Agreements Announcement and Amendment to Comprehensive Exhibit ........ 64

M. First Quarter 2018 ........ 66

N. JP Morgan Global Technology, Media and Communications Conference ........ 68

O. July 2, 2018 Bloomberg Responses ........ 69

P. Second Consolidated Opposition to Petitions to Deny ........ 69

Q. Code of Business Conduct and Ethics ........ 71

VII. ADDITIONAL SCIENTER ALLEGATIONS ........ 72

VIII. LOSS CAUSATION ........ 81

IX. CLASS ACTION ALLEGATIONS ........ 85

X. UNDISCLOSED ADVERSE FACTS ........ 87

XI. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE ........ 88

XII. NO SAFE HARBOR ........ 89

XIII. COUNTS AGAINST DEFENDANTS ........ 90

XIV. PRAYER FOR RELIEF ........ 94

XV. JURY TRIAL DEMANDED ........ 94

## I. NATURE OF THE ACTION

1. Lead Plaintiff City of Atlanta Pension Fund and the City of Atlanta Firefighters' Pension Fund ("Lead Plaintiff," "Plaintiff," or "Atlanta P&F"), brings this federal securities class action on behalf of itself and all persons or entities that purchased or otherwise acquired Sinclair Broadcast Group, Inc. ("Sinclair" or the "Company") common stock between February 22, 2017 and July 26, 2018, inclusive, (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et. seq*. (the "Exchange Act").

2. Lead Plaintiff alleges the following upon personal knowledge as to itself and its acts, and upon information and belief as to all other matters, based upon the ongoing investigation of its counsel. Many of the facts relevant to Lead Plaintiff's allegations are known only by Defendants or are exclusively within Defendants' custody or control. Lead Counsel's investigation included, among other things, review and analysis of: (i) materials and court rulings filed in the actions captioned *United States of America v. Sinclair Broadcast Group, Inc., et al.*, C.A. No. 18-cv-2609 (D.D.C.) and *Tribune Media Company v. Sinclair Broadcast Group, Inc*., C.A. No. 2018-0593-JTL (Del. Ch.) (the "Delaware Action"); (ii) interviews with former employees, top-ranking former FCC officials, and other knowledgeable persons; (iii) Sinclair's public filings with the Securities and Exchange Commission (the "SEC") and the Federal Communications Commission ("FCC"); (iv) in-depth research reports by securities and financial analysts; (v) transcripts of Sinclair's conference calls with analysts and investors; (vi) presentations, press releases, news and media reports regarding the Company and other facts related to this action; and (vii) data reflecting the price of Sinclair shares. Lead Plaintiff believes that substantial additional evidentiary support for its allegations will be developed after a reasonable opportunity for discovery.

## II. INTRODUCTION[1]

3. Sinclair is the largest owner of broadcast television stations in the United States. On May 8, 2017, Sinclair announced that it had agreed to acquire Tribune Media ("Tribune")—another major national broadcaster—in a $3.9 billion merger that would form one of the largest media companies in the United States, with a combined national reach of 72% of American households. Significantly, in order to obtain regulatory approval of the merger, Sinclair was required to comply with federal laws that limit a broadcaster's control and ownership of television markets. The most critical requirement to gaining regulatory approval of the merger was Sinclair's divestiture of multiple stations in various regional markets where the combined entity's stations either overlapped or caused Sinclair's national reach to exceed the national cap, thus triggering ownership thresholds prohibited under FCC ownership regulations and Department of Justice ("DOJ") antitrust laws.

4. Accordingly, throughout the Class Period, Sinclair repeatedly represented to investors that it was using its "best efforts" to obtain regulatory approval of the merger and comply with FCC and DOJ requirements by divesting stations in "certain specified markets as necessary," including ten markets where the Company's stations overlapped with Tribune's, and "as required in order to obtain FCC approval of the transaction." Indeed, during multiple investor conference calls during the Class Period, Defendant Christopher Ripley, CEO of Sinclair, assured investors that "we did agree to sell stations that we need to sell" in order to obtain regulatory approval, and that the FCC's ownership requirements would "not [] stand in the way of us closing the transaction." In April 2018, after a purportedly "very robust divestiture process," Sinclair announced a divestiture plan that featured the sale of twenty-three major

[1] Unless otherwise stated, all emphasis is added.

stations, including three of the most prominent stations in its inventory, thereby leading analysts and investors to believe that regulatory approval was imminent. In announcing these divestitures, Defendant Ripley told investors in no uncertain terms that they were legitimate, arm's-length deals that resulted in "healthy multiples," and that they were a "significant step forward" toward regulatory approval.

5. These statements were false. In reality, and as would later be revealed in evidentiary findings by the FCC and documented exchanges between Sinclair and regulators, Defendants sought to evade FCC and DOJ ownership and antitrust rules by any means necessary, including outright fraud. Indeed, in stark contrast to their Class Period representations, rather than using their "best efforts" to comply with regulatory requirements, Defendants actively thwarted numerous attempts by regulators and Tribune to secure Sinclair's reasonable agreement to divest itself of problematic stations in overlapping markets. Even more egregious, in a brazen attempt to defraud the U.S. Government, Sinclair's ultimate divestiture proposal in April 2018 consisted of multiple sham transactions designed to mask the Company's continued control and ownership of these stations, including related party sales to family members and long-time business associates of the Company's owners at absurdly below-market prices, with options for Sinclair to repurchase the stations at its discretion. Significantly, when analysts, competitors and other market participants criticized these deals during the FCC's subsequent open comment period, Sinclair emphatically and angrily rejected that there were any issues, stating unequivocally that the divestitures were fully "compliant with FCC rules and policy" and that Sinclair did "not control or hold" "an attributable interest in any of the stations to be divested."

6. The truth regarding Defendants' fraud began to emerge on July 16, 2018, when the FCC issued a statement confirming that it had "serious concerns about the Sinclair/Tribune

transaction," and that "[t]he evidence we've received suggests that certain station divestitures that have been proposed to the FCC would allow Sinclair to control those stations in practice, even if not in name, in violation of the law." Tellingly, just two days after the FCC's statement, and in an eleventh-hour gambit to avoid further FCC scrutiny of these sham transactions, Sinclair withdrew the divestiture applications rather than defend their propriety to the FCC.

7. Nevertheless, just one day later on July 19, 2018, and after an exhaustive review of Sinclair's merger application and documents submitted in support of Sinclair's proposed divestitures, the FCC issued a scathing 20-page Hearing Designation Order ("HDO") that made clear that Sinclair had attempted to defraud the Government into approving the merger by using sham transactions to make it appear that Sinclair was complying with FCC ownership rules. Specifically, the FCC found that there were "significant questions as to whether [the] proposed divestitures were in fact 'sham' transactions." Moreover, the FCC determined that Sinclair had willfully and deliberately withheld material information about these deals, and affirmatively misrepresented key facts (including, among other things, representations that the buyers were unrelated "third parties" when they were not). Indeed, as the HDO flatly stated, "material questions" existed about "whether Sinclair engaged in misrepresentation and/or lack of candor in its applications with the Commission." The FCC concluded that Sinclair "did not fully disclose facts such as the pre-existing business relationships" "nor the full entanglements" involved in the sham transactions.

8. In response to these stunning disclosures, Sinclair's stock price plummeted by over 20% in the course of four trading days from $32.95 on July 13, 2018 to $26.30 on July 19, 2018, wiping out more than $500 million in market capitalization, as the market realized that Defendants' misconduct and misrepresentations killed the Tribune merger.

9. Just three weeks later, Tribune announced that it was formally terminating the merger and that it had filed the Delaware Action against Sinclair, seeking $1 billion in damages for Sinclair's "spectacular" breaches of the merger agreement. As the detailed pleadings and contemporaneous documentation submitted by Sinclair's merger partner demonstrate, "from virtually the moment the Merger Agreement was signed," Sinclair and its most senior officers had no intention of complying with FCC and DOJ regulations or to legitimately divest themselves of the specified stations. Instead, Defendants "engaged in belligerent and unnecessarily protracted negotiations with the DOJ and the FCC" in an effort to coerce regulators into abandoning their requirement for Sinclair to divest stations—despite regulators' complete and clear rejection of that position. Indeed, the DOJ made it crystal clear to Sinclair on numerous occasions over a period of ten months that it would not approve the merger unless Sinclair divested stations in each of its ten overlap markets with Tribune—a condition to which Sinclair had expressly agreed (and represented to investors) that it would do if necessary to obtain regulatory approval under the merger agreement.

10. Thus, rather than abide by its contractual obligations and its representations to investors, Sinclair instead sought to deceive regulators and evade broadcast ownership limits by entering into what the FCC itself deemed "sham" divestitures, thereby scuttling the $3.9 billion Tribune merger. Indeed, Sinclair's fraudulent conduct was so egregious that it prompted Congressional rebuke, including a letter from Rep. Frank Pallone, Jr. (D-N.J.) and Rep. Mike Doyle (D-PA) to the FCC calling for immediate action against Sinclair. The Representatives' letter stated that, "[g]iven the severity of the allegations" included in the FCC's findings and in Tribune's filings in the Delaware Action concerning Sinclair's "misrepresentations and lack of candor," proceedings against Sinclair before the FCC's Chief Administrative Law Judge should

continue even though the Tribune merger was tabled. The letter emphasized that Sinclair's misconduct "may violate the Communications Act, and raises doubts as to whether Sinclair is sufficiently qualified to retain its FCC licenses." The Representatives' letter concluded that the proceedings were "important for the integrity of the institution," and that "[i]t must be clear to Sinclair . . . that there are severe consequences for lying to the FCC."

11. Finally, on July 26, 2018, investors learned that, in addition to improperly evading federal broadcast ownership limits, Sinclair had also been engaged in an illicit conspiracy with its main competitors to fix prices for television spot advertising, upon which its revenues relied. Indeed, that day, *The Wall Street Journal* revealed that the DOJ had uncovered the scheme in the course of its extensive review of the anticompetitive effects of the Tribune merger. This was directly contrary to Defendants' public statements throughout the Class Period, in which they repeatedly stated that Sinclair was "beating" its competitors in the "highly competitive" advertising market because of its "strategies and programming" and "management skills and experience." In reality, Sinclair's advertising sales were inflated by Defendants' illicit price-fixing scheme. On November 13, 2018, the DOJ sued Sinclair and its co-conspirators for this illegal anti-competitive conduct, resulting in Sinclair entering a settlement with the DOJ the same day.

12. As a result of Defendants' violations of the federal securities laws, investors who purchased Sinclair common stock at artificially inflated prices during the Class Period have suffered substantial losses. This action seeks redress on behalf of these aggrieved shareholders.

## III. JURISDICTION AND VENUE

13. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

14. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

15. Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). A substantial portion of the acts in furtherance of the alleged fraud, including the preparation and dissemination of materially false and misleading information and the effects of the fraud, have occurred in this Judicial District. In addition, the Company's headquarters is located in this District at 10706 Beaver Dam Road, Hunt Valley, Maryland, 21030.

16. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## IV. PARTIES

17. Plaintiff Atlanta P&F, as set forth in the accompanying certifications, attached hereto as Exhibit "A", purchased Sinclair common stock during the Class Period, and suffered damages as a result of the federal securities law violations and the false and/or misleading statements and/or material omissions alleged herein.

18. Defendant Sinclair Broadcast Group, Inc. is a Maryland corporation that was founded in 1986, went public in 1995 and is traded on the NASDAQ Global Select Market under the ticker symbol "SBGI".

19. Defendant Christopher S. Ripley ("Ripley") has served as the Chief Executive Officer ("CEO") and President of Sinclair since January 2017. From April 2014 to January 2017, he served as Chief Financial Officer ("CFO"). During the Class Period, Defendant Ripley made materially false and misleading statements and omissions during earnings calls and

investor conferences and in press releases, including on August 2, 2017, February 28, 2018, April 24, 2018, May 9, 2018, and May 15, 2018. During the Class Period, Defendant Ripley also reviewed, approved and signed and certified Sinclair's filings with the SEC, including the Company's filings on February 28, 2017, July 3, 2017, August 16, 2017, and March 1, 2018, which contained materially false and misleading statements and omissions.

20. Defendant Lucy A. Rutishauser ("Rutishauser") has served as the Senior Vice President and CFO of Sinclair since January 2017. Prior to that, she served as Senior Vice President of Corporate Finance and Treasurer from December 2013 to January 2017. Prior to that, she was Vice President/Corporate Finance/Treasurer since November 2002. From March 2001 until November 2002, she served as Treasurer and, from 1998 until March 2001, she served as Assistant Treasurer. During the Class Period, Defendant Rutishauser reviewed, approved and signed and certified Sinclair's filings with the SEC, including the Company's filings on February 28, 2017, July 3, 2017, March 1, 2018, which contained materially false and misleading statements and omissions.

21. Defendant David D. Smith ("Smith") is the Executive Chairman of Sinclair and has been in that role since January 2017. Smith, the son of the Company's founder Julian Sinclair Smith, was formerly President and CEO of Sinclair from September 1990 to January 2017. During the Class Period, Defendant Smith reviewed, approved and signed Sinclair's filings with the SEC, including the Company's SEC filings on February 28, 2017, July 3, 2017, March 1, 2018, which contained materially false and misleading statements and omissions.

22. Defendant Steven M. Marks ("Marks") has been the Chief Operating Officer and Executive Vice President for Sinclair Television Group, Inc. at Sinclair since January 1, 2017. Marks served as a Co-Chief Operating Officer of Sinclair's Television Group since 2013, and as

Vice President of Sinclair from May 2007 to June 24, 2016. He also served as Chief Operating Officer of Sinclair's Television Group from February 2003 to 2013. Prior to that, he served as Vice President and Regional Director of Sinclair Broadcast from March 2002 to February 2003, and was responsible for the Baltimore, Columbus, Pittsburgh, Flint, Tallahassee, Charleston, WV, Portland, Springfield, Minneapolis, Tampa, Syracuse, Norfolk, Richmond, Buffalo and Rochester markets. During the Class Period, Defendant Marks made materially false and misleading statements and omissions during earnings calls and investor conferences, including on February 22, 2017.

23. Defendants Ripley, Smith, Marks and Rutishauser are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, throughout the Class Period, because of their positions with the Company, possessed the power and authority to control the contents of Sinclair's reports to the SEC and public filings with the FCC, as well as its press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each Individual Defendant, while serving as a senior executive of Sinclair, was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, and were the result of the collective actions of the Individual Defendants.

## V. OVERVIEW OF THE FRAUD

### A. To Induce Shareholder Approval of the Merger, Sinclair Repeatedly Assured Investors It Would Divest All Stations Required to Comply With Federal Broadcast Ownership Limits

24. Sinclair is the largest television broadcast company in the United States. Sinclair was founded by Julian Sinclair Smith in 1971 as a small independent broadcasting company with a single local television station. In the early 1990s, Julian's Sinclair Smith's four sons—David Smith, Frederick Smith, J. Duncan Smith, and Robert Smith (the "Smith brothers")—took control of the company, with Defendant David Smith at the helm as President and Chief Executive Officer of Sinclair. Sinclair was known to be a conservative media company, often propagating the strong right-wing views of its owners, the Smith brothers, through newscasts on its local television stations. Under Defendant David Smith's leadership, Sinclair began aggressively acquiring new local television stations across the country, ultimately growing its nationwide reach from only one station to owning or operating nearly 200 stations nationwide.

25. In continuation of its aggressive acquisition strategy, on May 8, 2017, Sinclair announced that it had entered into a definitive agreement to acquire Tribune for $43.50 per share, for an aggregate purchase price of approximately $3.9 billion. On the Company's conference call announcing the merger, Defendant Ripley touted that Tribune was a "highly complementary footprint that delivers nationwide reach," and proclaimed that the combined entity would consist of a total of 233 stations, expanding Sinclair's national reach from 39% to "72% of the households in the U.S. across 108 markets, including 39 of the top 50 [designated marketing areas]," or DMAs, which are geographic areas where people get the same television options as determined by Nielsen Media Research ("Nielsen").

26. To consummate the merger, Sinclair was required to establish to regulators that the combined entity complied with federal rules that limit the national and local reach of any

single broadcast company. These rules are designed to promote competition and encourage diversity of viewpoints and programming in national and local markets. The two most significant FCC rules in this regard are the National Ownership Rule and the Duopoly Rule. The National Ownership Rule prohibits a single broadcast entity from owning commercial television stations that collectively reach more than 39% of U.S. households nationwide. The Duopoly Rule, or "top-four prohibition," prohibits a single broadcast entity from owning or controlling two of the four most widely watched stations—or two of the "top four" stations, which are generally affiliates of NBC, FOX, CBS or ABC—within the same DMA. DOJ antitrust regulations also limit media ownership, generally prohibiting a single broadcasting entity from having more than 40% market share in a given DMA.

27. Accordingly, in Sinclair's merger agreement with Tribune filed with the SEC the next day (the "Merger Agreement"), Sinclair explicitly agreed, under Section 7.1, to "use reasonable best efforts to take action to avoid or eliminate each and every impediment that may be asserted by any Governmental Authority . . . so as to enable the Closing to occur as soon as reasonably practicable"—including making "Station Divestitures" if "such action is necessary or advisable" to obtain regulatory approval. Sinclair also agreed under Section 7.1 to the "prompt use of its reasonable best efforts to avoid the entry of . . . any . . . Order that would delay, restrain, prevent, enjoin or otherwise prohibit consummation of the [merger]."

28. In subsequent documents filed with the FCC and SEC throughout the Class Period, Sinclair repeatedly reaffirmed its commitment to divest stations if necessary to obtain regulatory approval. For example, on June 26, 2017, Sinclair filed its initial applications to the FCC for approval of its merger with Tribune. In its "Comprehensive Exhibit" for the applications, Sinclair acknowledged that, "without divestiture, <u>the combined company would</u>

have an audience reach approximately 6.5% in excess of the 39% cap." Sinclair therefore expressly agreed that it would divest stations if necessary to comply with FCC ownership rules in overlap markets:

> [T]he applicants own stations in several markets where Sinclair's common ownership of the combined stations would exceed the current limits imposed by the Commission's local television ownership rules. Accordingly, the applicants intend to take actions in such markets as necessary to comply with the terms of the Merger Agreement and the Commission's local television ownership rules as required in order to obtain FCC approval of the transaction . . . To the extent that divestitures may be necessary, applications will be filed upon locating appropriate buyers and signing appropriate purchase agreements.

29. Then on July 3, 2017, Sinclair and Tribune filed their joint Registration Statement on Form S-4 with the SEC for the merger. The Registration Statement assured investors that Sinclair had agreed to use its "best efforts" to take "all actions" and do "all things necessary" to complete the merger—including taking "approval actions" to "avoid or eliminate any impediment that may be asserted by a governmental authority." Significantly, the Registration Statement stated that among the "approval actions" Sinclair had agreed to was the divestiture of stations in "certain specified markets as necessary" to comply with FCC ownership rules and DOJ antitrust rules:

> In that connection, Sinclair agreed to divest one or more television stations in certain specified markets as necessary to comply with the FCC's [Duopoly Rule], or to obtain clearance under the [Hard-Scott-Rodino Antitrust Improvements] Act, in each case as required by the applicable governmental authority in order to obtain approval of and consummate the transactions. Sinclair is required to designate either a Tribune station or Tribune stations or a Sinclair station or Sinclair stations for divestiture in each market, as required by and subject to approval by the relevant governmental authority. Sinclair has also agreed to designate, at its option, certain additional Tribune stations or Sinclair stations for divestiture and to divest such stations in order to comply with the FCC's [National Ownership Rule] . . . as required by the FCC in order to obtain approval of and consummate the transaction.

30. On September 6, 2017, Sinclair filed its Prospectus for the merger on Form 424BD. The Prospectus again stated that Sinclair had agreed to use its "best efforts" to obtain

regulatory approval, specifying that Sinclair had firmly agreed to make divestitures in ten specified "overlap" DMAs with Tribune, which the Prospectus identified as: (1) Seattle-Tacoma, Washington; (2) St. Louis, Missouri; (3) Salt Lake City, Utah; (4) Grand Rapids-Kalamazoo-Battle Creek, Michigan; (5) Oklahoma City, Oklahoma; (6) Wilkes-Barre-Scranton, Pennsylvania; (7) Richmond-Petersburg, Virginia; (8) Des Moines-Ames, Iowa; (9) Harrisburg-Lancaster-Lebanon-York, Pennsylvania; and (10) Greensboro-High Point Salem, North Carolina.

31. Sinclair similarly reassured investors that it had agreed to divest stations in order to obtain regulatory approval on its investor conference calls. For example, during Sinclair's August 2, 2017 second quarter earnings call, Defendant Ripley first asserted Sinclair's view that it should not be forced to divest any stations at all—but then assured investors that "we did agree to sell stations that we need to sell in order to get [regulatory approval of] the transaction," and that such regulatory requirements would "not [] stand in the way of us closing the transaction":

> ANALYST: I know you guys thought you wouldn't have to sell anything, I don't know if your stance has publicly changed.
>
> RIPLEY: Sure. So, there really is no economic or competitive basis for divestitures. But as we all know, old habits are hard to get rid of, and so the regulatory process has to take its course. And we did agree to sell stations that we need to sell in order to get the transaction. That's not going to stand in the way of us closing the transaction, and we factored in the worst case scenario in our analysis . . . [W]e really think we have a very, very strong case that nothing needs to be sold, but we did agree to sell to the extent we need[] to.

32. However, as set forth below, Sinclair's statements regarding its agreement to divest stations if required to do so by were false. In reality, Sinclair had no intention of complying with regulators' demands at all, much less using its "best efforts" to do so. Instead, as detailed by Tribune in the Delaware Action, Sinclair flatly refused to comply with the DOJ's repeated demands that it divest stations in the ten overlap markets listed in the Merger Agreement—despite the DOJ's "crystallized" position that such divestitures were absolutely

necessary for regulatory approval. Moreover, even when Sinclair finally relented and proposed divestitures to regulators, they were shams in which the Company sold stations for grossly below-market prices to related parties that served as fronts for Sinclair.

### B. Sinclair's Own Merger Partner Has Confirmed In the Delaware Action that Sinclair's Representations That It Would Agree to Divest All "Stations That We Need To" Were False

33. As explained above, three weeks after the Tribune merger failed, Tribune brought suit against Sinclair in Delaware Chancery Court, alleging $1 billion in damages for Sinclair's "spectacular" breaches of the Merger Agreement. In that action, Tribune stated that despite Sinclair's express agreement to use its "best efforts" to obtain regulatory approval of the deal—including by divesting stations in the ten specified overlap DMAs listed in the Merger Agreement—<u>Sinclair did the exact opposite and refused to comply with regulators' demands</u>. Specifically, Tribune stated that "from virtually the moment the Merger Agreement was signed" in May 2017, Sinclair engaged in "belligerent and unnecessarily protracted negotiations with DOJ and the FCC" over a period of ten months in an effort to divest no stations at all—even though regulators repeatedly made it crystal clear to Sinclair that station divestitures were necessary for regulatory approval.

34. Tribune's pleading makes clear that Sinclair had <u>not "agree[d] to sell stations that [it] need[ed] to sell in order to get the transaction</u>." Indeed, from the start of the DOJ's review of the merger in the summer of 2017, Sinclair steadfastly refused to divest the stations the DOJ required to be sold, even though from inception the DOJ made clear that it had "serious concerns" about Sinclair retaining both its stations and Tribune's stations in the ten overlap DMAs identified in the Merger Agreement. Moreover, despite numerous requests from Sinclair that the DOJ remove the ten overlap DMAs from its scope of review, the DOJ always refused to do so. Thus, on August 2, 2017, the DOJ issued a second request for information on all ten

overlap DMAs, and in early October 2017, reaffirmed that it was continuing to investigate all of them.

35. In response, Sinclair told Tribune it was going to wait for confirmation of the new Assistant Attorney General ("AAG") of the Antitrust Division, Makan Delrahim, who was recently appointed by President Trump. However, upon AAG Delrahim's confirmation in September 2017, he too made clear that he was focused on Sinclair making divestitures in the ten overlap DMAs listed in the Merger Agreement. Specifically, AAG Delrahim told Sinclair that divestitures in those ten DMAs would put a stop to the DOJ's investigation and facilitate a path to approval. Significantly, at this exact same time, Sinclair falsely represented to investors in the September 6, 2017 Prospectus that it had explicitly agreed under the Merger Agreement to divest stations in the ten overlap DMAs if necessary for regulatory approval. Yet, according to Tribune, Sinclair rejected the DOJ's request that it do so outright and became "confrontational with and belittling of DOJ staff and, indeed, AAG Delrahim himself."

36. On November 17, 2017, the DOJ sent Sinclair a letter stating that none of Sinclair's arguments had persuaded it that divestitures were unnecessary in any of the ten overlap DMAs. The same day, the DOJ called Sinclair's antitrust counsel, William Kolasky, and stated its official position that its concerns with the merger could be resolved if Sinclair agreed to divest stations in eight to ten of the overlap DMAs. Three days later on November 20, 2017, the DOJ rejected a request from Sinclair to pause the DOJ's investigatory depositions, which were set to begin that week, unless and until Sinclair put divestitures on the table.

37. On December 11, 2017, Sinclair sent a written settlement offer to the DOJ, in which it proposed to divest stations in six of the ten overlap DMAs, but with Local Marketing Agreements ("LMAs") for three of the divested stations—pursuant to which Sinclair would

largely control the station's programming and operations and collect the majority of the revenues. Only two days later, on December 13, 2017, the DOJ refused Sinclair's proposal based on its position, first articulated in 2013, that LMAs such as the ones Sinclair had proposed were often improperly used in the broadcast industry to skirt federal ownership rules.

38. On December 15, 2017, Tribune and Sinclair participated in a conference call with the DOJ. On that call, the DOJ stated its position that <u>it would pause its investigation if Sinclair agreed to make at least seven divestitures in the ten overlap DMAs</u>. The DOJ noted that <u>it had made the same offer "since before Thanksgiving</u>," and stated that if Sinclair made the requested divestitures: "<u>We would be done</u>."

39. In response, Sinclair's General Counsel, Barry Faber, insisted that the DOJ agree to divestitures in only three of the ten overlap DMAs, and threatened to litigate if the DOJ refused. By this time, the DOJ had deposed six Sinclair employees and two Tribune employees. After Sinclair refused the DOJ's offer to pause its investigation, the DOJ took another seventeen depositions of current or former Sinclair and Tribune employees through mid-January 2018, in preparation for the possibility of suing to block the merger.

40. On December 18, 2017, Tribune's General Counsel, Edward Lazarus, sent a letter to Sinclair's General Counsel, Barry Faber—copying Defendant Ripley—expressing his "<u>serious concern with Sinclair's approach to obtaining the [DOJ's] clearance" to close the merger</u>. In the letter, Tribune reminded Sinclair that, in the Merger Agreement, it had explicitly agreed to use its "best efforts" to obtain regulatory approval—<u>including by making divestitures in the exact same ten overlap DMAs in which the DOJ was demanding divestitures</u>:

> To this end, <u>Sinclair specifically agreed, among other actions, to divest stations in the ten [DMAs] listed in its Disclosure Letter to the Merger Agreement (the same DMAs that have been identified as problematic by the [DOJ]</u>) if '<u>necessary or advisable to avoid, prevent,</u> eliminate, or remove the <u>actual, anticipated or</u>

> threatened (x) commencement of any Proceeding . . . or (y) the issuance of any Order that would delay, restrain, prevent, enjoin or otherwise prohibit consummation of the transactions' contemplated by the Merger Agreement.

41. Tribune's letter also described Sinclair's steadfast refusal to comply with FCC and DOJ divestitures request since the announcement of the Merger Agreement, stating that, "[o]n at least four occasions dating to before Thanksgiving," the DOJ had made clear that it would pause its investigation if Sinclair agreed to divest only seven of the ten overlap DMAs it had already agreed to divest in the Merger Agreement—and clear the merger altogether if Sinclair made divestitures in all ten overlap DMAs—but Sinclair had refused at every turn:

> For months now, we have given you latitude to seek the most favorable terms possible from the Department, including waiting to get the views of the incoming Assistant Attorney General Makan Delrahim. The Department's views, however, have now crystallized. On at least four occasions dating to before Thanksgiving, including most recently on last Friday afternoon's phone call with [DOJ] and in the Department's December 13, 2017 letter to your counsel, the Department has made clear that the divestiture to independent buyers of stations in seven of the ten DMAs specified in our Merger Agreement would yield a pause in the investigation and a path to clearing the deal. **In Friday afternoon's conversation, the Department went even further and clearly stated that divestiture of stations in all ten of the DMAs specified in the Merger Agreement to independent buyers would yield immediate clearance. (In the Department's words, 'We would be done.').** Yet on that call, without any prior consultation with us and contrary to its obligations under the Merger Agreement, Sinclair rejected putting even seven stations on the table and threatened to litigate with the Department instead.

42. On January 5, 2018, Sinclair and Tribune met with the DOJ. Sinclair urged the DOJ to accept divestitures in just three overlap DMAs, stating that Sinclair had already agreed to sell stations for other reasons in four additional DMAs that were not among the ten overlap markets. The DOJ repeated its position that it was focused only on the ten overlap DMAs listed in the Merger Agreement. In mid-January 2018, the DOJ staff again told Sinclair that it was requesting divestitures in the ten overlap DMAs in order to clear the Tribune deal. On January 24, 2018—which was the day before what was intended to be Sinclair's final front office

meeting with the DOJ—Peter Kern, Tribune's CEO, emailed Defendant Ripley stating: "[I]n the event DOJ offers to end its investigation if Sinclair agrees to divest stations within the ten overlap DMAs spelled out in the merger agreement, you are contractually bound to accept."

43. On January 25, 2018, the DOJ again offered to end its investigation and approve the Tribune merger if Sinclair agreed to divest top-four stations in all ten overlap DMAs. Sinclair refused, offering instead to divest stations in just four overlap DMAs, and declared that it welcomed the opportunity to litigate with the DOJ. Specifically, Faber, Sinclair's General Counsel, told AAG Delrahim: "Sue me." Faber then told Lazarus, Tribune's General Counsel, that Tribune would have to sue Sinclair to get it to divest stations in all ten overlap DMAs.

44. Throughout early 2018, Sinclair continued to attempt to convince the DOJ to accept divestitures in only three or four of the ten overlap DMAs the DOJ had originally demanded. Ultimately, the DOJ did not change its position that it required divestitures of top-four stations in all ten overlap DMAs.

### C. After Failing to Coerce Regulators Into Bending Federal Ownership Rules, Sinclair Proposes Sham Divestitures In an Effort to Evade Those Rules—and the FCC Warns Sinclair to Propose "Clean Station Sales"

45. By early 2018, Sinclair still had not obtained regulatory approval for the merger from either the DOJ or the FCC. Indeed, on January 11, 2018, the FCC issued a letter pausing its informal 180-day timeline for consideration of applications in connection with the merger unless and until Sinclair proposed station divestitures. Determined to obtain approval for the Tribune merger while maximizing its national reach by any means necessary, Sinclair decided to propose sham divestitures designed to deceive regulators and evade federal broadcast ownership limits.

46. On February 21, 2018, Sinclair announced a divestiture plan, purportedly to comply with the FCC's national cap. Sinclair stated that it would divest certain of Tribune's most significant stations, namely Tribune's WPIX-TV New York station and its WGN-TV

Chicago station. Both stations were in the top three DMAs in the country in which Sinclair did not have any existing stations, meaning divesting them would reduce its national footprint under the 39% cap. Media reports commented, however, that Sinclair's divestitures of the New York and Chicago stations raised questions, as not only were they among the most lucrative stations in the Tribune deal—WGN, which Defendant Ripley had described as the main asset of the Tribune transaction, was a major cable network that reached 77 million households alone, while WPIX was a major station located in the largest DMA in the country—Sinclair had also stated that it intended to continue running the stations through LMAs. As a report in *Variety* published the same day commented:

> The decision to offload stations in the nation's No. 1 and No. 3 TV markets is a surprise, given that those are among the most lucrative and high-profile markets in the country. However, Sinclair doesn't plan to be too far removed from WPIX and WGN. The filing discloses that Sinclair already has buyers lined up for both stations and that Sinclair intends to continue running the stations through an 'options and services agreement' inked with the buyers. <u>That will raise some hackles among media watchdog groups that have long been critical of Sinclair's use of such shared-services agreements, which are seen as an end-run around the FCC's ownership rules</u>.

47. Indeed, as stated in Tribune's filings in the Delaware Action, the FCC had a strong and negative reaction to Sinclair's February 21, 2018 proposal to divest WPIX in New York and WGN in Chicago—because, in addition to Sinclair's questionable use of LMAs in these deals, the buyers Sinclair had identified were clearly related parties. First, Sinclair proposed divesting WPIX to Cunningham Broadcast Corporation ("Cunningham"), which had long been owned by the estate of Defendant David Smith's late mother. Second, Sinclair proposed divesting WGN to WGN-TV LLC, an entity that was newly established by Steven Fader, the CEO of a car dealership holding company in which Defendant Smith held a controlling interest who had no broadcast experience whatsoever. Sinclair's LMAs for the two stations further concerned the FCC, as Sinclair employees would effectively run both stations,

including advertising sales and retransmission consent negotiations, while Sinclair would reap most of the economic benefits and would have the option to repurchase the stations in the future.

48. According to Tribune, upon reviewing these "provocative" divestiture applications, the FCC viewed the divestitures as "sham[s]" and expressly warned Sinclair to "avoid related-party arrangements and instead propose clean station sales":

> Sinclair's proposal was so provocative that the FCC staff refused even to put Sinclair's proposed sales of WPIX to Cunningham and WGN to Fader out for public comment. In the staff's view, Sinclair's entanglements with the buyers and the terms of the operating agreements meant that the station sales could readily be viewed as 'sham' transactions. The FCC staff warned Sinclair to avoid related-party arrangements and instead propose clean station sales.

49. The following morning, Capital Forum reported that Sinclair's proposed remedy to the DOJ to settle antitrust concerns was insufficient, and that after failing to reach agreement with the DOJ, Sinclair was attempting to remedy the FCC's concerns. The report commented that the approval process would be complicated by Sinclair being forced to work with two regulators at one time.

50. In response to the news that its negotiations with the DOJ had hit a significant snag, the Company's stock price fell 2.7%, from $36.60 on February 21, 2018 to close at $35.60 the next day.

51. On February 27, 2018, additional news came out regarding Sinclair's regulatory issues. That day, *The New York Times* reported that Sinclair had been "locked in a prolonged battle" with the DOJ over station divestitures. The report stated:

> When [Sinclair] announced its intent to buy [Tribune] in a blockbuster merger last May, the Company predicted that regulators would quickly wave through the deal. But 10 months later, Sinclair remains locked in a prolonged battle with the [DOJ] over how many stations it must sell to get their approval. It is [the] latest cloud over Sinclair's $3.9 billion deal, coinciding with an internal investigation underway at the [FCC] into the agency's relationship with the company . . . Sinclair's new plan has not satisfied the [DOJ], which still seeks more divestitures, according to one of the people familiar with the investigation. The

> government's demands are an unexpected setback for Sinclair, which predicted its proposal would be met by more sympathy from regulators in the Trump administration.

52. In response to this news, Sinclair's stock price plummeted 6.2%, from $36.05 per share on February 27, 2018 to close at a price of $33.80 per share on February 28, 2018.

53. Despite the FCC's emphatic rejection of Sinclair's February 21, 2018 divestiture plan as including "sham" transactions and the DOJ's reported dissatisfaction with Sinclair's proposed divestitures, Sinclair continued to falsely represent to investors that regulatory approval of the deal by the FCC and the DOJ was imminent. Specifically, on the Company's February 28, 2018 fourth quarter earnings call, Defendant Ripley stated in response to an analyst question about the timing of the merger close that the Company's divestiture plan would "get the clock ticking at the FCC" and that DOJ and FCC approval were "close":

> So, as you probably saw, we announced last week our divestiture trust that is really to get the clock ticking at the FCC, the DOJ has not concluded its process, but we feel it's close, close enough that we could move forward with this divestiture trust plan. And in a situation where we can close as soon as divestiture trust is approved and not have to wait to figure out where the buyers will be for the various stations. So we still don't have technical approval from either the DOJ or the FCC, but we feel we're getting close.

54. On March 1, 2018, Sinclair filed its Form 10-K with the SEC. Significantly, in the Form 10-K, Sinclair announced that, in January 2018, the voting stock of Cunningham—which Sinclair had acknowledged in prior filings was a "related party," since its voting stock was owned by the estate of Carolyn Smith, the Smith brothers' mother—had been sold to a purportedly "unrelated party." As would soon be revealed, however, this was false. In reality, Sinclair had sold Cunningham's voting stock to Michael Anderson—a long-time associate of Defendant Smith, and the sole trustee of Defendant Smith's mother's estate—for a paltry $400,000, a clearly below-market price.

55. On April 24, 2018, Sinclair purportedly agreed to divest stations in order to comply with FCC ownership rules. On that day, Sinclair issued a press release announcing that it had entered into definitive agreements to sell 23 television stations "in order to obtain necessary governmental approval of the Tribune transaction." Significantly, despite the FCC's clear warning to Sinclair only two months prior to "avoid related-party arrangements and instead propose clean station sales," WGN remained on the list of divestitures, while WPIX had now been replaced by Sinclair's proposed sale of two Texas stations that ranked among the top ten DMAs in the country—KDAF in Dallas and KIAH in Houston—to Cunningham. Defendant Ripley specifically assured investors that the divestitures were legitimate transactions that were the result of an arm's length "very robust divestiture process" resulting in "healthy multiples on the stations we are divesting":

> After a very robust divestitures process, with strong interest from many parties, we have achieved healthy multiples on the stations we are divesting. While we continue to believe that we had a strong and supportable rationale for not having to divest stations, we are happy to announce this significant step forward in our plan to create a leading broadcast platform with local focus and national reach.

56. Analysts were highly encouraged by this news, assuming after such a lengthy regulatory process that this divestiture plan complied with the regulators' requirements, and therefore signaled that the Company would soon obtain regulatory approval of the Tribune merger. For example, an April 25, 2018 Stephens report stated that, based on Sinclair's disclosure of the divestiture plan, "the Company appears to have made significant progress in its efforts to meet the regulatory requirements for the completion of the TRCO acquisition." An April 25, 2018 Deutsche Bank report stated that the divestiture plan was "a positive step towards achieving DOJ approval and subsequently, FCC approval, even if it requires modest concessions." An April 25, 2018 Wells Fargo Securities report stated that "the final list of station divestitures suggests the TRCO deal is closer to closing . . . With regulatory approval

likely on the way, we think the overhang on both SBGI and the broadcast space in general will be removed SOON." An April 24, 2018 Jeffries report stated "we think the market will take a positive view [of the divestiture plan] given the perceived higher probability that the deal closes and recent weakness in the stock." Finally, an April 25, 2018 Benchmark report commented that the divestiture plan must have been "the final expected station divestiture list to satisfy the regulatory bodies" because "[w]e doubt Sinclair would publish this list without implicit approval from the DOJ."

57. On this news, Sinclair's stock price rose 3.2%, from $28.90 per share on April 24, 2018 to close at $29.85 the following day.

58. On the Company's May 9, 2018 first quarter earnings call, Defendant Ripley asserted again that Sinclair was "nearing the final stages on the Tribune closing." He stated that Sinclair had "reached agreements on the divestitures and are awaiting government approvals," with an expected close now slotted for "late Q2, early Q3." When asked by an analyst what the status was of the regulatory review, Ripley responded that the DOJ was "wrapping up the vetting of the buyers" and "we are going to go back in front of the FCC and hopefully get this on public file very shortly, which will start a 30-day comment period to approve the divestitures."

59. Analysts again reacted positively to this news. For example, a May 10, 2018 Benchmark report stated that "[t]he divestiture announcement provided some much-needed clarity on the pro forma outlook while also reassuring investors that the deal was, indeed, still going to close." A May 10, 2018 Jeffries report stated that "the TRCO deal continues to be the NT driver of the stock and chatter that the DOJ has approved the transaction, combined with non-advertising revenue growth, should mean the stock is close to a floor. We expect the FCC to begin to move in the near term." A May 11, 2018 RBC Capital Markets report stated that

"[p]rogress [is] being made on the TRCO front . . . Management expects the deal to close at the end of 2Q/early 3Q . . . Recent press reports suggest the DOJ is getting close to approving the deal."

60. Fueled by Defendants' false reassurances about the divestitures, Sinclair's stock price rose again, this time by over 9%, from $27.30 per share on May 8, 2018 to $29.85 on May 9, 2018.

### D. Sinclair Responded to Critics of Its Proposed Divestitures By Emphatically Asserting Its Divestitures Were Arms' Length and Fully Complied With FCC Rules

61. Significantly, and as the FCC would conclude at the end of the Class Period, the divestitures Sinclair proposed to the FCC in its April 2018 divestiture plan were not arm's length sales. To the contrary, they were "sham" arrangements with related parties who served as fronts for Sinclair that were designed to evade FCC ownership rules. Indeed, as the FCC would determine, with respect to Sinclair's proposed divestiture of WGN to Fader, Sinclair failed to disclose to the FCC a plethora of highly material facts about the deal, including that (i) Fader had "extensive business relationships with [Defendant] Smith," including that Fader was the CEO of an automobile dealership holding company of which Smith was a board member and controlling shareholder; (ii) the divestiture involved "atypical deal terms," including several shared-services agreements, or LMAs, "that delegate[ed] operation of many aspects of the station to Sinclair"; (iii) Fader was purchasing WGN-TV's broadcast license only, while Sinclair would hold nearly all of the station's other assets; and (iv) the $60 million purchase price for WGN-TV was "far below market value" by hundreds of millions of dollars, particularly considering Sinclair regarded WGN-TV as a station that was "uniquely valuable to the overall deal."

62. Similarly, with respect to Sinclair's proposed divestiture of KDAF and KIAH to Cunningham, Sinclair also failed to disclose to the FCC numerous highly material facts about the

deal, including that (i) Cunningham's voting stock was owned by the estate of Defendant Smith's late mother, until it was acquired by Michael Anderson in January 2018—who, rather than being an "unrelated party" as Sinclair's SEC filings stated, was the sole trustee of Carolyn Smith's estate and a former banker to Defendant Smith; (ii) Anderson purchased the voting shares for a "far below market value" price of only $400,000; (iii) each of the Smith brothers held options to repurchase Cunningham's voting stock in the future for below-market prices; (iv) Cunningham's non-voting shares were owned by trusts for the benefit of the Smith brothers' children; (v) the combined $60 million purchase price for KDAF and KIAH, both of which were in the top ten DMAs in the country, was "substantially below market value"; and that (vi) Sinclair had guaranteed $53.6 million of Cunningham's debt.

63. On May 21, 2018, the FCC began its formal review process of the Tribune deal, soliciting public comment on all of Sinclair's proposed divestitures. In response, petitions filed with the FCC raised red flags regarding Sinclair's divestitures of WGN, KDAF and KIAH, alleging that these sales were designed to circumvent FCC rules. Specifically, commenters—who included competitors, customer organizations, activist groups and state attorneys general—questioned several aspects of the divestitures, including: (i) the fact that Fader and Cunningham had multiple ties to David Smith; (ii) the seemingly below-market purchase prices; (iii) the shared-services agreements, or LMAs, that appeared to allow Sinclair to exercise complete control over the purportedly divested stations; and (iv) the fact that Sinclair would hold an option to repurchase the stations if the FCC ever relaxed its ownership rules, among other things.

64. Media reports similarly raised questions about Sinclair's proposed divestitures to Fader and Cunningham. For example, a July 2, 2018 *Bloomberg* report stated:

> In one case, two Texas stations are to be sold to a partner company [Cunningham] that until recently was controlled by the estate of the mother of Sinclair's

> controlling shareholders. And the flagship Tribune station in Chicago, WGN-TV, is going to an automobile executive who's a business partner of Sinclair Chairman David D. Smith.

65. Significantly, Sinclair's response to the petitions and media reports questioning its divestitures was to unequivocally deny any wrongdoing and emphatically assert that the divestitures fully complied with FCC rules. For example, in response to the *Bloomberg* report, Sinclair flatly asserted that it was fully complying with FCC regulations: "Ownership rules are not being evaded; they are being complied with." Furthermore, with respect to Cunningham specifically, Sinclair added: "Cunningham is operated completely separately from Sinclair. Sinclair will have no involvement in the operations of the Dallas and Houston stations being sold to Cunningham."

66. Moreover, on July 5, 2018, Sinclair filed a consolidated opposition to the petitions, in which it again emphatically claimed that its divestiture proposals were "compliant with FCC rules and policy." Specifically, Sinclair asserted that "the shared services arrangements to be entered into in connection" with the divestitures "comply with current law and are consistent with [FCC] precedent," and claimed that these agreements were "identical" to LMAs that had "been routinely approved by the FCC" for decades. Sinclair also insisted that it had "disclosed the details of [the] proposed divestitures to ensure compliance with the Commission's existing national and local ownership rules." Sinclair further asserted that petitioners' claims regarding the below-market purchase prices for the divestitures were "without merit or support." Additionally, Sinclair flatly disputed that it exercised any control over Cunningham, stating that, "[c]ontrary to erroneous and misleading claims" by petitioners, "Sinclair does not control or hold any attributable interest in Cunningham, nor do any of the Smith brothers own any stock, voting or non-voting, in Cunningham."

## II. THE TRUTH EMERGES

### A. The FCC Concludes That Sinclair Attempted to Deceive Regulators By Proposing Sham Divestitures

67. Less than two weeks after Sinclair's emphatic and unequivocal denials that it had engaged in sham divestitures, on July 16, 2018, the truth began to emerge. That day, in what to investors was a stunning turn of events, news reports disclosed that FCC Chairman Pai was circulating a draft Hearing Designation Order ("HDO") that would send the Sinclair/Tribune deal to a hearing before the FCC's Chief Administrative Law Judge—a process widely considered to be a death knell for merger approvals. Significantly, media outlets reported that the draft HDO stated that "Sinclair's actions here potentially involve deception." Chairman Pai also issued a statement in which he revealed that he had "serious concerns about the Sinclair/Tribune transaction":

> Based on a thorough review of the record, I have serious concerns about the Sinclair/Tribune transaction. The evidence we've received suggests that certain station divestitures that have been proposed to the FCC would allow Sinclair to control those stations in practice, even if not in name, in violation of the law.

68. Analysts reacted with trepidation and astonishment, fearing this development put the Tribune merger in serious jeopardy. For example, a Wells Fargo Securities report stated that it had lowered its price target for Sinclair by $10, from $50 to $40 per share. The report commented:

> The [HDO] is not an invitation to negotiate. While we haven't seen the order, we've heard enough to believe there is no 'quick fix' by way of changing the divestitures. Per our legal contacts, the reported 'lack of candor' allegation suggests the issues related to this deal may be broader than initially perceived.

69. A Benchmark report likewise stated that this "shocking turn of events" did not look good for the merger closing:

> [A]t the very least this decision will further delay a process with an already uncertain outcome, which could now range from a minor fix to a complete blow

> up of the deal . . . We continue to feel there is too much at stake by all parties involved to allow the deal to die, but we acknowledge that the chance of a positive outcome is probably closer to a coin flip.

70. Other media reports stated that this development doomed the merger. For example, *Politico* described the HDO procedure as a "lengthy administrative process often viewed as a deal-killer." Matt Wood, the Policy Director of Free Press, a media activist organization, likewise commented: "[i]t's extremely rare for transactions to be sent to a hearing in the first place, much less for parties to right it out and beat the FCC in that hearing. That's why analysts and investors rightly see today's news as potentially a fatal blow for this merger."

71. In response to this news, Sinclair's stock price plunged 11.6% in a single day, from $32.95 per share on July 13, 2018, to $29.10 per share on July 16, 2018, wiping out almost $300 million in market capitalization.

72. Sinclair issued a response to the news that the FCC had designated the merger for a hearing the same day, denying allegations that it had deceived the FCC "in the strongest possible manner" and asserting that it had "been completely transparent about every aspect of the proposed transaction."

73. On July 17, 2018, Tribune announced that it was studying the FCC's July 16, 2018 statement, and was disappointed by the order designating certain issues for consideration by an Administrative Law Judge. On this news, which suggested Tribune was contemplating pulling out of the deal, Sinclair's stock price dropped again by 3.6%, from $29.10 to $28.05.

74. Tellingly, on July 18, 2018, only two days after the FCC announced it would refer the Tribune merger to a hearing before its Chief Administrative Law Judge, Sinclair—in a last-ditch effort to cover up its sham divestitures and avoid formal action by the FCC—abruptly withdrew its divestiture applications for WGN, KDAF and KIAH. Sinclair stated:

> While neither Sinclair or Tribune have seen the draft HDO, Chairman Pai's comments and press reports indicate that the FCC is questioning proposed divestitures in Dallas, Houston and Chicago. Accordingly . . . Sinclair has withdrawn the pending divestitures of [those stations].

75. Analysts did not view Sinclair's desperate eleventh-hour attempt favorably, as they felt it failed to address the damning allegations the FCC had made against Sinclair. For example, a July 18, 2018 Benchmark report commented: "The real question, however, is whether or not this satisfies the character issues raised by Chairman Pai, which seems a large hurdle to overcome based on the strong language and timing of the ALJ order."

76. On this news, Sinclair's stock price dropped by another 2.3%, from $28.05 to $27.40 per share, a 2.3% decline.

77. That same day, Sinclair's General Counsel Barry Faber sent an email to Chairman Pai, who had called him that morning asking Sinclair to withdraw the Tribune application in its entirety. In the email, Faber told Chairman Pai that Sinclair was "not planning on withdrawing the entire Tribune application this morning" because it did not have Board approval to do so and did not have sufficient time to consider the matter. Faber stated that, instead, Sinclair had "filed to withdraw the sales of the stations in Chicago, Dallas and Houston." Faber stated that although Chairman Pai had told him that "the withdrawal of these three applications would not prevent you moving forward with the HDO," Faber hoped Chairman Pai would "reconsider that position." Faber added:

> [N]o evidence exists that Sinclair has misled the FCC or been anything other than completely candid . . . To designate our transaction for hearing based on the possibility that there may be more to the deals that meets the eyes based on the pricing and other terms that have been disclosed, would be extraordinary and unprecedented . . . Had we been so asked, we could have adequately explained to the FCC the underlying basis for the transaction terms, eliminating any concern that the deals were anything other than arm's length agreements that would have proceeded exactly as contemplated by the documentation that has been provided to the FCC.

78. Sinclair's last-ditch efforts to prevent an FCC hearing on its sham divestitures failed. After markets closed on July 18, 2018, the FCC announced that it had unanimously voted to send the proposed Tribune merger to a hearing.

**B. The FCC's HDO Makes Clear Sinclair Engaged in Fraud and Deception in an Attempt to Evade FCC Rules**

79. On July 19, 2018, the FCC's final 20-page HDO was made public and the truth fully emerged: namely, that Sinclair had been defrauding the FCC in an effort to evade its ownership rules in order to obtain approval of the Tribune merger without divesting stations.

80. Specifically, the HDO stated that, with respect to Sinclair's proposed divestitures of WGN, KDAF and KIAH, "<u>[t]he record raises significant questions as to whether those proposed divestitures were in fact 'sham' transactions</u>." Significantly, the HDO also confirmed that, contrary to Sinclair's denials, the FCC believed Sinclair had intentionally misled it: "[T]here is a substantial and material question of fact as to whether <u>Sinclair affirmatively misrepresented or omitted material facts with the intent to consummate this transaction without fully complying with our broadcast ownership rules</u>."

81. The HDO explained that the FCC's divestiture applications require disclosure of "the 'real party in interest' purchasing the stations at issue." The test for determining the real party-in-interest was "whether that entity has an ownership interest or is or will be in a position to actually or potentially control the operation of the station and/or applicant."

82. Applying this test, the HDO concluded that there were "<u>substantial and material questions as to whether Sinclair was the undisclosed real party-in-interest to the WGN-TV application proposing sale to Fader</u>," noting "<u>many atypical deal terms</u>"—including with respect to the proposed shared services agreements—despite Sinclair's prior assertion that those

agreements "mirrored" agreements the FCC had approved in the past. The HDO also referenced Fader's lack of broadcasting experience, and his multiple ties to David Smith:

> The sale of WGN-TV to Fader involves many atypical deal terms . . . . In particular, WGN TV, LLC, would have entered into a JSA, SSA, Option, and lease-back of non-license assets necessary for operation of the station. Sinclair would have sold advertising time, provided back office services, and programmed a significant portion of the station's weekly broadcast hours. Furthermore, pursuant to the proposed transaction, WGN TV, LLC would have purchased only the station license and certain other minimal assets . . . In addition, Fader not only lacked any prior broadcasting experience, but also has extensive business relationships with David Smith . . . This called into question Fader's independence from Sinclair.

83. The HDO also asserted that it was implausible that Sinclair would have divested "such a highly rated and profitable station in the nation's third-largest market to an individual with no broadcast experience." The HDO reasoned that, "[i]ndeed, one could argue that Sinclair's proposal to divest what has been described as one of the 'crown jewels' of Tribune makes no sense from a business perspective unless that divestiture permitted Sinclair to maintain effective control over the station."

84. Finally, the HDO also stated that "[t]he $60 million sales price for WGN-TV appears to be far below market value," noting that the 2002 sale of WPWR-TV in Chicago to Fox, a comparable station, was for $425 million, "over seven times the sales price for WGN-TV."

85. With respect to Cunningham, the HDO noted that Sinclair had known for years that the FCC had serious concerns about Sinclair's relationship with Cunningham, which the FCC had previously found was a company that was effectively controlled by Sinclair. Indeed, in a 2001 decision regarding a 1998 transaction between Sinclair and Glencairn, the predecessor to Cunningham, "[t]he Commission found that, with respect to the sale of the stations at issue, the record indicated that Sinclair had exercised *de facto* control over [Cunningham]." The HDO

stated that "[t]he terms of the deal for the purchase of the Texas stations KDAF and KIAH present new questions regarding whether Sinclair was the undisclosed real party-in-interest" for its current divestiture applications, stating that, "[i]n particular, we question the close relationship between Sinclair and Cunningham, an existing loan guarantee between Sinclair and Cunningham, and the proposed purchase price." The HDO flagged, among other things, Cunningham's 20-year relationship with Sinclair, the fact that it was owned by the estate of Carolyn Smith until its voting stock was recently sold to Anderson—who had multiple ties to Defendant Smith—for only $400,000, and the fact that its non-voting stock was held for the benefit of the Smith brothers' children:

> Sinclair and Cunningham have had an ongoing relationship that goes back at least 20 years, as noted above. Newsmax states that until January 2018, the estate of Carolyn Smith, the mother of the controlling shareholders of Sinclair, owned the voting shares of Cunningham. Even when the voting shares were acquired in 2018 by Michael Anderson, Cunningham's former banker, the sales price for the shares--$400,000—was far below market value . . . and the non-voting shares continue to be held by trusts for the benefit of Carolyn Smith's grandchildren. Each son (the Smith brothers), multiple commenters point out, holds options to buy the voting shares in the future, that other commenters have alleged are below market prices.

86. The HDO also flagged the below-market purchase price for the two top ten stations of $60 million, stating that it was "far below the expected market price for stations in markets of this size, suggesting that the transaction was not arms-length." The HDO explained:

> KDAF and KIAH are located in the fifth and seventh largest markets in the nation, respectively, yet the *combined* sales price was below the $65 million price that was agreed to by Meredith Corporation for station KPLR-TV, St. Louis, Missouri, which is located in the 21st largest market.

87. The HDO further flagged Sinclair's $53.6 million guarantee of Cunningham's debt, stating "[t]he guarantee suggests a layer of financial entanglement heretofore unexamined."

88. Significantly, the HDO stated that, contrary to Sinclair's repeated statements that it held no ownership interest in Cunningham, these facts supported a finding that all Cunningham stations should be attributed as ownership to Sinclair under FCC ownership rules:

> Even if control would have rested with Cunningham, substantial and material questions of fact exist as to whether the panoply of relationships and agreements between Sinclair and Cunningham would provide Sinclair with the incentive and means to exert influence over the core operations of Cunningham, which, under Commission precedent, could be the basis for a finding that its stations should be attributed to Sinclair for purposes of determining compliance with our ownership rules.

89. The HDO concluded by explaining why the FCC believed that Sinclair had intentionally deceived it, stating that Sinclair had failed to "fully disclose facts such as the pre-existing business relationships between Fader, Smith and Sinclair" and the "full entanglements between Cunningham, Smith and Sinclair":

> We note that a misrepresentation is a false statement of fact made with the intent to deceive the Commission. Lack of candor is concealment, evasion, or other failure to by fully informative, accompanied by an intent to deceive the Commission. We note that Sinclair represented to the Commission that it would comply with our broadcast ownership rules by seeking approval of its application—in part based on the proposed divestitures to Cunningham and Fader—and did not fully disclose facts such as the pre-existing business relationships between Fader, Smith and Sinclair nor the full entanglements between Cunningham, Smith and Sinclair. As such there is a substantial and material question of fact as to whether Sinclair affirmatively misrepresented or omitted material facts with the intent to consummate this transaction without fully complying with our broadcast ownership rules.

90. Analysts took this news to mean that the Tribune deal was unsalvageable, and that the HDO would materially impact Sinclair's business. For example, a July 20, 2018 Deutsche Bank report stated the deal was now "highly unlikely to close," and that "M&A opportunities for Sinclair might be limited for some time":

> We think Sinclair's deal to buy Tribune is now highly unlikely to close; the FCC's quick, unanimous decision to send the deal to an [ALJ], followed by language of potential misrepresentation and lack of candor, put to bed the idea that the FCC's concerns were quickly addressable. As a result, we don't see a

> path to salvage the deal and therefore we're now valuing Sinclair on a stand-alone basis, with the acknowledgement that the M&A opportunities for Sinclair might be limited for some time.

91. A July 20, 2018 Benchmark report similarly stated the deal was "dead," and that Sinclair's "bigger problem" was the "lingering character charges" that would limit its future M&A deals:

> The general consensus, and most likely outcome even if not official, is that Sinclair's deal to acquire Tribune is dead (after hours last night, Tribune was rumored to be considering a deal exit as well) . . . The bigger problem for Sinclair in our view, is the lingering character charges that would remain in place even should Sinclair walk away entirely from the Tribune deal on their own. Resolution of said issues would probably involve either a negotiated settlement (expensive) or an attempt to win the ALJ process . . . and punishments ranging from a fine to license forfeiture. Making matters worse, until the situation is resolved, we believe Sinclair is stuck in limbo, unable to participate in the M&A market or buy back stock, with shareholder lawsuits seemingly increasingly probable.

92. On this news, Sinclair's stock lost another $1.10 to close at $26.30 on July 19, 2018—meaning that, in the course of just four trading days, Sinclair's stock had plummeted over 20%, wiping out more than $500 million in market capitalization.

## III. <u>POST CLASS PERIOD EVENTS CONFIRM THE LASTING IMPACT OF SINCLAIR'S FRAUD</u>

93. On August 9, 2018, Tribune announced its withdrawal from the $3.9 million merger. Tribune also announced that it had filed the Delaware Action against Sinclair, seeking a staggering $1 billion in damages for losses incurred as a result of Sinclair's "spectacular" and "material" breaches of the Merger Agreement:

> [F]rom virtually the moment the Merger Agreement was signed, Sinclair repeatedly and willfully breached its contractual obligations in spectacular fashion. In an effort to maintain control over stations it was obligated to sell if advisable to obtain regulatory clearance, Sinclair engaged in belligerent and unnecessarily protracted negotiations with DOJ and the FCC over regulatory requirements, <u>refused to sell stations in the ten specified markets required to obtain approval, and proposed aggressive divestment structures and related-party sales that were either rejected outright or posed a high risk of rejection and</u>

> delay—all in the service of Sinclair's self-interest and in derogation of its contractual obligations.

94. Tribune also confirmed in the Delaware Action that Sinclair had misled the FCC and Tribune regarding the proposed divestitures to WGN, KDAF and KIAH, stating:

> When Sinclair's applications were subject to public comment, opponents of the divestitures revealed facts that Sinclair had failed to disclose to the FCC and that underscored Sinclair's capacity to control the stations it was purportedly divesting. For example, Sinclair had not told the FCC, in its applications, that Smith owned the controlling interest in Fader's car dealership company, and that Cunningham's controlling shares had been sold at a suspiciously low price only months earlier to a Sinclair associate with repurchase options held by Smith's family members. These facts were not disclosed to Tribune and were not addressed by Sinclair in its reply to the public comments.

95. On August 27, 2018, Rep. Frank Pallone, Jr. (D-N.J.) and Rep. Mike Doyle (D-PA) sent a letter to Chairman Pai, seeking to ensure that Sinclair would still be obligated to attend a hearing before the Administrative Law Judge even though the merger was now off the table, "[]given the severity of the allegations":

> The [FCC] has found there are substantial and material questions as to whether [Sinclair] made misrepresentations or lacked candor in its applications to the [FCC]. [Tribune]'s allegations in its complaint further validate and expand upon those claims. Given the severity of the allegations, we believe that the FCC's Chief Administrative Law Judge (ALJ) should not terminate the proceeding and should instead investigate and resolve the allegations of misrepresentation. If the ALJ decides to terminate the hearing proceeding, it is incumbent on the Commission to get to the bottom of these allegations.

96. The letter further stated that, if the FCC's and Tribune's allegations regarding Sinclair's conduct in connection with the Tribune merger were accurate, "such conduct may violate the Communications Act, and raises doubts as to whether Sinclair is sufficiently qualified to retain its FCC licenses . . . [I]t is important for the integrity of the institution that an investigation into Sinclair's alleged misrepresentations and lack of candor be conducted. It must be clear to Sinclair, and other licensees, that there are severe consequences for lying to the FCC."

97. On September 7, 2018, Chairman Pai responded to the Congressmen by stating that the "hearing proceeding is still pending in front of the [ALJ]":

> As you note, the evidence the Commission received suggested that certain station divestitures that had been proposed to the FCC would have allowed Sinclair to control those stations in practice, even if not in name, in violation of the law . . . Given the seriousness of the issues presented, the order directed the Media Bureau to hold in abeyance all other pending applications and amendments thereto related to the overall proposed Sinclair-Tribune transaction until the issues that are the subject of this order have been resolved by the [ALJ]. That hearing proceeding is still pending in front of the [ALJ]. Once he finishes with this matter, we will consider next steps depending on that resolution.

98. In the months that followed, public outrage over the deal did not diminish. Indeed, industry stakeholders began filing petitions with the FCC urging it to conduct the ALJ hearing or, in the alternative, asking it to require Sinclair to file early renewal applications for certain of its major stations—so that the FCC could deny them by finding Sinclair unfit to hold a broadcast license. For example, on November 26, 2018, the American Cable Association filed a petition that stated:

> [T]he Commission found 'substantial and material questions of fact' regarding whether Sinclair had lied about being the 'real party in interest' in three stations that it proposed to divest. Misrepresentation and lack of candor rank among the most serious violations a licensee can commit. A party that engages in such conduct can be found to lack the basic character qualifications to hold *any* FCC licenses.

99. On December 3, 2018, Nexstar, a major competitor of Sinclair's, announced that it had agreed to buy Tribune for $4.1 billion. Media reports commented that "[t]he deal stands to create a new king of local TV, unseating [Sinclair.]"

## IV. Plaintiff's CWs Unanimously Described Sinclair's Long History of Entering Sham LMAs With Shell Companies—Including Cunningham—For The Purpose of Evading FCC Ownership Rules[2]

100. As set forth above, the FCC ultimately determined that Sinclair improperly used shared-services agreements known as LMAs to evade FCC ownership rules in connection with its sham divestitures to Cunningham and Fader. Used legitimately, LMAs were meant to benefit struggling stations by permitting two stations in the same DMA to share operating, sales and programming resources, thereby reducing costs. While the FCC generally permitted the legitimate use of LMAs, FCC rules—even as articulated in Sinclair's own SEC filings—were crystal clear that: "The FCC requires the owner/licensee of a [LMA] station to maintain independent control over the programming and operations of the station." However, Plaintiff's Confidential Witnesses ("CWs")—former employees of Sinclair and Tribune—confirmed that Sinclair routinely used LMAs to improperly skirt the FCC's ownership limits by divesting stations in name only to shell companies that served as fronts for Sinclair in order to rapidly grow its national reach.

101. For example, CW 1, who began working at Sinclair in 1999 and became Hub Operations Manager for Sinclair before leaving the Company in August 2017, described how Sinclair had a long-running growth strategy of signing so-called "Local Marketing Agreements" with affiliates in markets where Sinclair already owned a station—and then would take over the LMA station entirely. "The LMAs theoretically meant [Sinclair would] handle [the LMA station's] advertising sales, but in reality, it was Sinclair management running the place. It's 100 percent a Sinclair station when it is not meant to be a Sinclair station." CW 1 explained that Sinclair "would walk into a[n] [LMA] station, and tell them: 'We are going to take care of your

[2] Former Sinclair and Tribune employees are referenced in the feminine form to maintain their confidentiality.

sales. We will put in a couple of engineers from Sinclair, your actual boss will work for the cover company, but all profits will run down to Sinclair." Thus, "whatever subsidiary owned the [LMA] station owned it in name only." CW 1 stated this was the case at WTTA, the Tampa station where CW 1 worked. The WTTA station was nominally owned by David Smith, CEO of Sinclair at the time, in his personal capacity, but the paychecks CW 1 received said "Sinclair."

102. CW 1 stated that the LMAs were also known as "sidecar agreements," but "it is not really a sidecar at all, it is more like the engine that pulls it." CW 1 said that Sinclair would fly CW 1 around the country to manage software for about 30 different Sinclair stations—many of which were not owned by Sinclair but had entered into LMAs with it. CW 1 stated that, across the LMA stations, the way in which the LMAs had been used by Sinclair to take control without anyone saying as much was a "running joke." CW 1 said it was common to go to a city where there were two Sinclair-owned stations and then a third operated by Sinclair through an LMA—but all three stations were run out of the same building, and "everyone would get paychecks that said Sinclair." Employees at the LMA stations would tell CW 1: "Yeah, yeah, we work for Sinclair, we get it." CW 1 explained that once Sinclair had acquired enough affiliates in one region, it would establish a regional hub from which all of the stations would be run, whether Sinclair-owned or an LMA station nominally owned by someone else. It was CW 1's job to visit the hubs and ensure they were running smoothly. "They were running LMA stations [from the Sinclair hubs], absolutely."

103. CW 1 stated that Defendant Marks, COO of Sinclair, was directly and personally involved in making sure there were no misunderstandings among employees in taking over stations in this manner. "Steve Marks would say, 'This is how it is going to be.' He would walk into those stations and lay out the blue print about how [the LMA] stations were going to

function." CW 1 stated Marks would tell the LMA stations that they were owned by someone else "in name only."

104. CW 2, a former Business Systems Coordinator at Sinclair headquarters in Hunt Valley from late 2013 until July 2016, stated that her time at Sinclair coincided with a time of "massive acquisitions" by Sinclair. She stated the Company was "buying local TV stations all across the nation . . . [a]ll I could see was acquire, acquire, acquire." CW 2 explained that Sinclair used LMAs as a "workaround for purchasing television stations in markets where they were already exceeding the cap." CW 2 stated that Sinclair had long operated "shell companies" for this purpose. CW 2 stated that there was no practical difference between the LMA stations and the Sinclair stations, which were "exactly the same." "We would handle [the LMA stations'] financials and cut deals for programming on the [LMA] station's behalf. I don't understand how it was any different from all the other stations, the fully owned Sinclair stations."

105. CW 3, who worked for two Sinclair stations from 2012 to 2014—one fully owned Sinclair station, KPTH 44, and one LMA station, KMEG 14—stated that KMEG 14 was a CBS affiliate technically owned by Waitt Broadcasting but in fact fully controlled by Sinclair. CW 3 explained that Waitt Broadcasting only held the broadcasting license, but KMEG 14 nonetheless had a single employee at the station from Waitt Broadcasting—whose sole purpose was to sign FCC paperwork.

106. CW 4, who worked as a business manager from 2014 to 2017 at WDKY, a Sinclair-owned station in Lexington, Kentucky, similarly stated that, with respect to FCC regulations, Sinclair had long been "working around the whole market-share thing within cities." CW 4 stated that this "workaround" involved setting up a "joint sharing agreement"—another

term for LMA—whenever Sinclair "had another station that would have increased the market share over 50 percent in one city."

107. CW 5, who served as Sinclair's Washington Bureau Chief from March 2015 to 2016, and then became the Chief Programming Producer for Circa, Sinclair's digital news service, until early 2018, stated that she too was "under the impression that Sinclair [] was dabbling in sham partnerships . . . I can't say which partnerships were sham but I remember thinking they were [] doing things to skirt the ownership rules." CW 5 was also aware of "sidecar agreements," which CW 5 defined as "putting companies in other people's names."

108. CW 6, a former Regional Controller for Sinclair in Springfield, Illinois, until September 2016—who supervised Sinclair accountants in 16 different markets across several states, and directly reported to Dave Bochenek, Sinclair's CAO—compared Sinclair's "sidecar" arrangements, the purpose of which was to "get around" FCC ownership restrictions, with a rental arrangement. "[Sinclair] basically take[s] over the station, and then monthly, quarterly or yearly [it would pay] the station-owner money" for holding the broadcast license. CW 6 stated that Sinclair had a "sidecar" relationship with WSRP, a Fox affiliate in Springfield. It was nominally owned by GOCOM Media, but operated by Sinclair, even to the point of WSRP jointly sharing studio space with Sinclair-owned WICS (the Sinclair station where CW 6 mainly worked). WRSP was also run by Sinclair employees, but "according to the rules," there also had to be a couple of GOCOM employees there.

109. Tellingly, Plaintiff's confidential witnesses separately identified Cunningham as a long-time Sinclair shell entity to whom the Company routinely divested stations in order to evade FCC ownership rules.

110. For example, CW 1 stated: "Cunningham is a Sinclair property if not in name," because it was frequently meant to be the nominal owner of stations that entered LMA deals with Sinclair. CW 1 said she was dispatched by Sinclair to many Cunningham affiliates to help streamline operations from an engineering perspective, and "they were all Sinclair employees." CW 1 stated: "That is a normal thing for [Sinclair] to do—set up a dummy company [like Cunningham] that is still Sinclair." CW 1 also stated that Sinclair's HR department tasked CW 1 with interviewing candidates for jobs at Cunningham stations, and specifically instructed CW 1 to follow a "script" informing prospective candidates that, "[t]echnically, you are not going to be working for Sinclair Broadcasting, you are going to be working for Cunningham Broadcasting." Thus, when the candidates "signed the paperwork it said they would be working for Cunningham even though Sinclair paid them and [provided] all their benefits, but Cunningham was their official employer." Sinclair's HR department made clear to CW 1 that whatever else she was going to tell the candidates, she had to "preface it with a paragraph saying technically you work for Cunningham, not Sinclair."

111. CW 2 similarly stated that Sinclair had long operated "shell companies" to evade FCC rules—of which CW 2 referenced Cunningham as being among the main ones.

112. CW 7—a news anchor for Sinclair's flagship station, WBFF in Baltimore, from 1991 to 1995, and then a political correspondent for Sinclair until she left the Company at the beginning of 2017—stated that she had long been aware of Sinclair owning "shadow companies" such as Cunningham and another company called Howard Stirk Holdings. "<u>They were shadow companies but [Sinclair] was making all the profits</u>. Cunningham was making money but it was all under Sinclair, so the money was all coming into the same place." CW 7 clearly recalled that in the early 1990s, Sinclair and Cunningham shared the same building, which also housed

WBFF. CW 7 stated there were two nameplates on the building: Sinclair and Cunningham, with two sets of glass doors at the entrance for each company. Indeed, today, FCC documents list Cunningham as being headquartered at the same address as WBFF in Baltimore, which is where Cunningham's station WNUV also operates from.

113. CW 8, who also worked as the Assistant News Director at WBFF in Baltimore from February 2017 until March 2018, likewise mentioned Cunningham when she stated that she "knew of these shell corporations that owned some other stations or still do to this day. They are owned by the Smith family."

114. Finally, CW 9, who was the Director of Technical Operations at Tribune's station KDAF in Dallas from 2009 through November 2018, confirmed that Sinclair's attempted sale of KDAF to Cunningham in connection with the Tribune merger was a sham. CW 9 stated that when it surfaced that Sinclair hoped to appease the FCC by selling KDAF to Cunningham, there was disbelief at the station—it immediately seemed "dodgy" and "there were some raised eyebrows." CW 9 explained: "Everyone was like, 'I don't understand.' They were still saying we are Cunningham, Cunningham. And I'd say, 'But aren't you Sinclair basically?'" CW 9 stated that she could not take the supposed distinction seriously, and it was rendered even more absurd by the fact that, as part of the merger, Sinclair would obtain a morning show program called *Morning Dose* that was run out of KDAF. CW 9 opined that the idea of Sinclair using "Cunningham's" equipment at KDAF to produce the show would be "too obvious" for regulators to ignore. CW 9 added that *Morning Dose* was broadcast daily in six markets, two of which—Dallas and Houston—were singularly large, stating "[t]hat is a huge amount of reach." CW 9 added: "How is Sinclair going to get its product [*Morning Dose*] out of that station without Cunningham equipment? It's a hundred percent wrong. That is not how it's meant to work."

## V. Sinclair's Anticompetitive Conduct in Advertising—The DOJ Uncovers That Sinclair Was Colluding With Other Broadcasters to Illicitly Fix Prices for Spot Advertising Rates

115. In addition to entering sham LMAs to evade FCC and DOJ ownership limits, during the Class Period, Sinclair engaged in another fraud unearthed by the DOJ in its review of the anticompetitive impact of the Tribune merger. Specifically, according to a complaint filed by the DOJ on November 13, 2018, Sinclair conducted a collusive scheme during the Class Period with its main broadcasting competitors—Tribune, Raycom Media, Inc. ("Raycom"), Meredith Corporation ("Meredith"), Griffin Communications, LLC ("Griffin"), and Dreamcatcher Broadcasting, LLC ("Dreamcatcher") (together, the "Broadcasters")—to exchange revenue pacing information in an effort to illicitly fix supra-competitive rates for spot advertising sales.

116. Broadcast stations sell advertising "spots" during breaks in programming. Sinclair's sale of spot advertising was critical to the Company's revenues. Indeed, as stated in the Company's 2016 Form 10-K, Sinclair's "primary source of revenue is the sale of commercial inventory on our television stations to our advertising customers." Broadcast stations typically divide their sale of spot advertising into two categories: local sales and national sales. While local sales are made through a station's own local sales staff, national sales are made through national sales representation firms ("Sales Rep Firms"). Indeed, as stated in the Company's 2016 Form 10-K, the Company "attract[ed] most of [its] national television advertisers through national marketing representation firms which have offices in New York City, Los Angeles, Chicago and Atlanta."

117. When a Sales Rep Firm represents two or more competing stations in the same DMA, it is supposed to erect firewalls to prevent coordination and information sharing between sales teams representing competing stations. However, according to the DOJ's complaint, Sinclair and its competitors engaged in a collusive scheme to use Sales Rep Firms as a conduit to

regularly and illicitly exchange sensitive revenue pacing information with each other, enabling the Company to obtain supra-competitive prices for television spot advertising in DMAs where it purported to compete with its co-conspirators head-to-head. As stated by the DOJ, "[t]hese exchanges occurred with Defendants' knowledge and frequently at Defendants' instruction, and occurred in DMAs across the United States."

118. Revenue pacing compares a broadcast station's revenues booked for a certain time period to the revenues booked for that same time period in the previous year, providing insight into each stations' remaining spot advertising inventory for the period. By exchanging revenue pacing data, Sinclair was able to better anticipate whether competitors were likely to raise, maintain, or lower spot advertising prices, allowing Sinclair to fix higher rates for the sale of its spot advertising.

119. Defendants' collusive scheme was confirmed by Plaintiff's CWs. For example, CW 10, a former outside consultant for Sinclair who worked for the Company from December 2016 through March 2017, stated that when she arrived at Sinclair, the Company was attempting to create a joint venture with Fox Television and Tribune to harness the advertising sales departments of the three companies. The joint venture was to be called "OxMyx Media Group." The mission of the new entity would be to sell and schedule advertising inventory for all the stations of all three participating companies. Indeed, Defendant David Smith had expressly referenced the OxMyx joint venture in his letter to shareholders in the Company's 2016 Annual Report, stating that it involved "partnering with other broadcasters" to purportedly offer advertisers a "greater national footprint." However, CW 10 stated that in March 2017, the whole project had run off the rails. When CW 10 was asked whether the joint venture might have triggered alarm bells with regulators, she replied: "Collusion, that was the fear."

120. Other CWs described how, after the Tribune merger was announced but before it was consummated, Sinclair and Tribune improperly attempted to coordinate their ad sales. For example, CW 11, a Director of National Digital Sales Strategy at Tribune from 2010 to mid-2017, described how, two days after the Tribune merger was announced, she was part of an email chain initiated by Affino, a digital sales vendor that was already doing business with Sinclair and was working on closing a deal with Tribune also. Affino introduced the Sinclair sales team to CW 11 and her team via email, and then suggested that everyone on the chain meet for coffee. The meeting, which CW 11 attended along with Tribune's National Sales Director, happened in a "third-floor bakery in the Time Warner Center" in Manhattan. CW 11 could not identify anyone who attended from Sinclair, but stated there were at least three individuals from the Sinclair sales team there. CW 11 stated: "It was a very, very awkward and weird coffee conversation. The merger had just been announced. It felt out of order, it felt weird. I know I didn't want to be there. It all developed very strangely. It didn't feel right."

121. CW 12, a former senior account executive for Sinclair from February 2015 to February 2016, stated that her team was in charge of trying to sell "national spot" advertising. CW 12 stated that the national spot sales model partly explained why purchasing Tribune was so appealing to Sinclair. Suddenly, Sinclair would have gone from selling 39% of the country's unwired broadcasting property to 72%. However, CW 12 mentioned that, even prior to the merger, there had been at least some informal discussion with Tribune of trying to bundle all of the Sinclair and Tribune properties together to create the kind of scale advertisers were looking for. "There might have been a moment—I do mean a moment—where we would try to include a Tribune piece, with their participation. And Tribune and Sinclair might have shared the revenue from that shared sale . . . It was casually discussed."

122. However, despite this reality, throughout the Class Period, Defendants actively concealed Sinclair's price-fixing scheme from investors, repeatedly claiming in its public statements that it vigorously competed against its co-conspirators for advertising revenue, that it was "beating" the competition, and that its success in the "highly competitive" advertising sales markets was due to its "sales and programming strategies" and "management skill and experience."

123. For example, the Company's Form 10-Ks filed during the Class Period stated that Sinclair's "television stations are located in highly competitive DMAs," and that Sinclair's television stations competed for "advertising revenue with other television stations in their respective DMAs." The 10-K further asserted that Sinclair's success in the "highly competitive" advertising sales market was attributable to its "sales and programming strategies" and "management skill and experience," among other things:

> We believe that our sales and programming strategies allow us to compete effectively for advertising revenues within our DMAs . . . We believe we compete favorably against other television stations because of our management skill and experience, our ability historically to generate revenue share greater than our audience share, our network affiliations and program service arrangements and our local program acceptance. In addition, we believe that we benefit from the operation of multiple broadcast properties, affording us certain non-quantifiable economics of scale and competitive advantages in the purchase of programming.

124. Additionally, on the Company's earnings calls during the Class Period, Defendant Marks stated that Sinclair's advertising "numbers beat the marketplace," that Sinclair was "beating [its competition] consistently and we're showing positive numbers," and that Sinclair was consistently gaining significant advertising market share against its competitors.

125. In reality, Sinclair was not "beating" its competitors with respect to core advertising sales, because it was not competing with its competitors at all. Instead, Sinclair was doing the exact opposite by actively colluding with its competitors in order to profit off of supra-

competitive prices for spot advertising rates. Additionally, Sinclair's success in its advertising sales, rather than being attributable to "sales and programming strategies" or "management skill and experience," were in fact attributable to Sinclair's anti-competitive scheme.

126. On July 26, 2018, the truth about Sinclair's collusive price-fixing scheme was revealed. *The Wall Street Journal* reported that the DOJ was investigating whether Sinclair, Tribune, and other local television station owners unlawfully shared information and coordinated efforts to artificially raise prices for television commercials. Specifically, the article stated the DOJ was investigating whether local television station owners "coordinated efforts when their ad sales teams communicated with each other about their performance, potentially leading to higher rates for TV commercials" in violation of federal antitrust laws. Significantly, the article stated that "[t]his investigation grew out of the DOJ's examination of Sinclair's acquisition of Tribune."

127. In response to this news, Sinclair's stock price plummeted by 3.4% over the course of the next two trading days, from $26.65 on July 26, 2018 to close at $25.75 on July 27, 2018.

128. On November 13, 2018, the DOJ filed a formal complaint against the Broadcasters and announced that it had reached a settlement with them the same day, to resolve allegations that the Broadcasters "engaged in unlawful agreements to share non-public competitively sensitive information with their broadcast television competitors." The settlement, which has a seven-year term, prohibits the direct or indirect sharing of competitively sensitive information, and requires Defendants to cooperate in the DOJ's ongoing investigation and to adopt rigorous antitrust compliance and reporting measures to prevent similar anticompetitive conduct in the future.

129. As stated by AAG Delrahim of the Justice Department's Antitrust Division upon announcement of the settlement: "Advertisers rely on competition among owners of broadcast television stations to obtain reasonable advertising rates, but this unlawful sharing of information lessened that competition and thereby harmed the local businesses and the consumers they serve." Accordingly, Sinclair's conduct violated Section 1 of the Sherman Act, 15 U.S.C. § 1, as Defendants' exchange of ad revenue pacing information resulted in anticompetitive effects in the broadcast television spot advertising markets in DMAs throughout the United States.

## VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

130. Defendants made materially false and misleading statements or omitted to state material facts during the Class Period in violation of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

### A. Fourth Quarter and Full Year 2016

131. On February 22, 2017, the first day of the Class Period, Defendants caused the Company to issue a press release announcing financial results for the fourth quarter and full year 2016 and held the Company's earnings call with investors. On the February 22, 2017 earnings call, in response to analyst inquiry regarding the national and local ad markets, Defendant Marks stated that Sinclair was "beating our peer group" and "beating our competition":

> I'm very encouraged on what I see on the core. And what shouldn't be lost on anybody on this call, in fourth quarter, our numbers beat the marketplace in the audits on both political and political excluded, and you could expect the same in first quarter. So our performances there, we're beating our competition. We're beating them consistently and we're showing positive numbers. So the audits show we beat the field in first and fourth and we will beat the field in first.

132. Defendant Marks' statement identified above in ¶131 was materially false and misleading, and omitted material facts when made. Specifically, Sinclair was not "beating [the Company's] competition." To the contrary, it was actively colluding with its main competitors

in a concerted effort to fix supra-competitive spot advertising rates in DMAs Sinclair and its competitors purportedly competed head to head.

133. On February 28, 2017, Defendants Ripley and Rutishauser caused the Company to file its Form 10-K with the SEC for the year ended December 31, 2016 ("2016 Form 10-K"). The 2016 Form 10-K was signed by Defendants Smith, Ripley and Rutishauser. The 2016 Form 10-K contained certifications signed by Defendants Ripley and Rutishauser.

134. The 2016 Form 10-K described competition in advertising and specifically stated that Sinclair was able to "compete effectively" because of its sales and programming strategies, as well as its "management skills and experience."

> **COMPETITION**
>
> Our television stations compete for audience share and advertising revenue with other television stations in their respective DMAs…Some competitors are part of larger organizations with substantially greater financial, technical and other resources than we have. Other factors that are material to a television station's competitive position include signal coverage, local program acceptance, network affiliation or program service, audience characteristics and assigned broadcast frequency.
>
> Competition in the television broadcasting industry occurs primarily in individual DMAs. Generally, a television broadcasting station in one DMA does not compete with stations in other DMAs. Our television stations are located in highly competitive DMAs...
>
> * * *
>
> Television advertising rates are based upon factors which include the size of the DMA in which the station operates, a program's popularity among the viewers that an advertiser wishes to attract, the number of advertisers competing for the available time, the demographic makeup of the DMA served by the station, the availability of alternative advertising media in the DMA, the aggressiveness and knowledge of the sales forces in the DMA and development of projects, features and programs that tie advertiser messages to programming. We believe that our sales and programming strategies allow us to compete effectively for advertising revenues within our DMAs.
>
> * * *

> We believe we compete favorably against other television stations because of our management skill and experience, our ability historically to generate revenue share greater than our audience share, our network affiliations and program service arrangements and our local program acceptance. In addition, we believe that we benefit from the operation of multiple broadcast properties, affording us certain non-quantifiable economies of scale and competitive advantages in the purchase of programming.

135. The statements identified above in ¶134 were materially false and misleading, and omitted material facts when made. Specifically, it was misleading for Defendants to state that Sinclair's "sales and programming strategies" and "management skill and experience" allowed the Company "to compete effectively for advertising revenues within [its] DMAs," because, in reality, Sinclair owed its success to a price-fixing conspiracy that violated federal antitrust laws. Indeed, as alleged above and as detailed by the DOJ in its November 13, 2018 complaint, Sinclair, Raycom, Tribune, Meredith, Griffin and Dreamcatcher "agreed in many DMAs across the United States to reciprocally exchange revenue pacing information" as part of an illicit conspiracy to fix supra-competitive rates for spot advertising sales. Sinclair was therefore not "compet[ing] favorably," but engaging in anti-competitive "information exchanges" in violation of federal antitrust laws.

**B. Tribune Merger Announcement**

136. On May 8, 2017, Sinclair and Tribune announced that they had entered into a definitive agreement under which Sinclair would acquire 100% of the issued and outstanding shares of Tribune for $43.50 per share, for an aggregate purchase price of approximately $3.9 billion. Ripley called the Merger "a transformational acquisition for Sinclair that will open up a myriad of opportunities for the company." Further, Defendant Smith called the acquisition "the largest acquisition in our company's history" and "turning point for Sinclair."

137. On May 9, 2017, Sinclair publicly filed its Form 8-K announcing the Merger Agreement with the SEC. The Form 8-K attached as exhibits the Agreement and Plan of Merger and Voting Agreement.

138. The Merger Agreement stated that Sinclair would "use its reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable under applicable Law to consummate and make effective the Merger and the other transactions contemplated by this Agreement as promptly as reasonably practicable after the date of this Agreement."

139. The Merger Agreement also contained specific obligations requiring Sinclair to make station divestitures to secure regulatory approval:

> [Sinclair] shall use reasonable best efforts to take action to avoid or eliminate each and every impediment that may be asserted by any Governmental Authority with respect to the transactions contemplated by this Agreement so as to enable the Closing to occur as soon as reasonably practicable, including . . . the proffer and agreement by [Sinclair] of its willingness to sell, lease, license or otherwise dispose of, or hold separate pending such disposition, and promptly to effect the sale, lease, license, disposal and holding separate of, such assets, rights, product lines, categories of assets or businesses or other operations or interests therein of [Sinclair] or any of its Subsidiaries [ ] (hereinafter referred to as the "Station Divestitures") and . . . the proffer and agreement by [Sinclair] of its willingness to take such other actions, and promptly to effect such other actions (and the entry into agreements with, and submission to orders of, the relevant Governmental Authority giving effect thereto, including the entry into hold separate arrangements, terminating, assigning or modifying Contracts (or portions thereof) or other business relationships, accepting restrictions on business operations and entering into commitments and obligations) (each an "Approval Action").

140. The statements identified above in ¶¶138-139 were materially false and misleading, and omitted material facts when made. Specifically, the statements set forth above regarding Sinclair's commitment to use "reasonable best efforts to take action to avoid or eliminate each and every impediment that may be asserted by any Governmental Authority," including by making "Station Divestitures," were materially false and misleading. In reality,

Sinclair had no intention to make station divestitures needed to obtain prompt regulatory approval. As Tribune stated, "from virtually the moment the Merger Agreement was signed, Sinclair. . . engaged in belligerent and unnecessarily protracted negotiations with DOJ and the FCC over regulatory requirements" and "refused to sell stations . . . required to obtain approval." Indeed, Sinclair "reject[ed] clear paths to regulatory approval" and instead "fought, threatened, insulted, and misled regulators in a misguided and ultimately unsuccessful attempt to retain control over stations that it was obligated to sell." Moreover, as alleged above and as confirmed by the FCC, Sinclair attempted to deceive regulators by proposing "sham" divestitures in which it sold stations in name only to related parties that served as fronts for Sinclair in an effort to evade federal broadcast ownership limits.

### C. Application for Approval of Proposed Merger and Registration Statement

141. On June 26, 2017, Sinclair and Tribune filed their Application for Approval of Proposed Merger and "Comprehensive Exhibit" with the FCC which, among other things, explained that Sinclair and Tribune would sell certain stations to comply with FCC regulations. In doing so, the application stated that:

> The applicants will take such actions to the extent required to comply with the terms of the Merger Agreement and the national television ownership limit (including the UHF Discount), in order to obtain FCC approval of the Transaction.

142. The Comprehensive Exhibit stated that "[t]o the extent that divestitures may be necessary, applications will be filed upon locating appropriate buyers and signing appropriate purchase agreements."

143. On July 3, 2017, Sinclair filed a Registration Statement in connection with the merger with the SEC on Form S-4, dated June 30, 2017. The S-4 was signed by, among others, Defendants Smith, Ripley and Rutishauser. The S-4 stated:

> Sinclair also agreed, subject to the terms of the agreement, to use reasonable best efforts to take all actions to avoid or eliminate any impediment that may be asserted by a governmental authority with respect to the transactions so as to enable the closing to occur as soon as reasonably practicable, including taking certain actions, each referred to as an "approval action," to obtain regulatory approval.
>
> In that connection, Sinclair agreed to divest one or more television stations in certain specified markets as necessary to comply with the FCC's Local Television Multiple Ownership Rule (47 C.F.R. § 73.3555(b)), which we refer to as the "FCC duopoly rule," or to obtain clearance under the HSR Act, in each case as required by the applicable governmental authority in order to obtain approval of and consummate the transactions. Sinclair is required to designate either a Tribune station or Tribune stations or a Sinclair station or Sinclair stations for divestiture in each market, as required by and subject to approval by the relevant governmental authority. Sinclair has also agreed to designate, at its option, certain additional Tribune stations or Sinclair stations for divestiture and to divest such stations in order to comply with the FCC's National Television Multiple Ownership Rule (47 C.F.R. § 73.3555(e)), which we refer to as the "FCC national cap," as required by the FCC in order to obtain approval of and consummate the transactions.

144. The statements identified above in ¶¶141-143 were materially false and misleading, and omitted material facts when made. Specifically, the statements set forth above regarding Sinclair's agreement to divest stations and comply with regulatory requirements were materially false and misleading. In reality, Sinclair had no intention to make station divestitures needed to obtain prompt regulatory approval, and had not agreed to divest stations to obtain regulatory approval. As Tribune stated, "from virtually the moment the Merger Agreement was signed, Sinclair. . . engaged in belligerent and unnecessarily protracted negotiations with DOJ and the FCC over regulatory requirements" and "refused to sell stations . . . required to obtain approval." Indeed, Sinclair "reject[ed] clear paths to regulatory approval" and instead "fought, threatened, insulted, and misled regulators in a misguided and ultimately unsuccessful attempt to retain control over stations that it was obligated to sell." Moreover, as alleged above and as confirmed by the FCC, Sinclair attempted to deceive regulators by proposing "sham" divestitures

in which it sold stations in name only to related parties that served as fronts for Sinclair in an effort to evade federal broadcast ownership limits.

**D. Second Quarter 2017**

145. On August 2, 2017, the Company issued its earnings press release announcing financial results for the second quarter 2017 ended June 30, 2017 ("Q2 2017"). Also on August 2, 2017, the Company held its Q2 2017 earnings call. During the call, in response to an analyst inquiry regarding divestitures, Defendant Ripley stated that Defendants had "agree[d] to sell stations that we need to sell" in order to obtain regulatory approval:

> So, there really is no economic or competitive basis for divestitures. But as we all know, old habits are hard to get rid of, and so the regulatory process has to take its course. And we did agree to sell stations that we need to sell in order to get the transaction. That's not going to stand in the way of us closing the transaction, and we factored in the worst case scenario in our analysis. But when you really look at the marketplace today and the concentrations that you already see of market share or that already exist in many, many markets today, the types of market shares that we have in the overlap markets are standard course of business for most markets. So, we really think we have a very, very strong case that nothing needs to be sold, but we did agree to sell to the extent we needed to. So, that's why there's a process that we may launch in anticipation of that.

146. The statements identified above in ¶145 were materially false and misleading, and omitted material facts when made. Specifically, the statements set forth above regarding Sinclair's expected closure of the merger by year-end and its agreement to divest stations were materially false and misleading. In reality, as the allegations in ¶¶33-44 make clear, at the time this statement was made Sinclair had not "agree[d] to sell stations that [it] need[ed] to sell in order to get the transaction." To the contrary, Sinclair absolutely refused to divest these stations and even told the government to "sue me" when Sinclair refused to divest. As Tribune stated, "from virtually the moment the Merger Agreement was signed, Sinclair. . . engaged in belligerent and unnecessarily protracted negotiations with DOJ and the FCC over regulatory requirements" and "refused to sell stations in the ten specified markets required to obtain

approval." Indeed, Sinclair "reject[ed] clear paths to regulatory approval" and instead "fought, threatened, insulted, and misled regulators in a misguided and ultimately unsuccessful attempt to retain control over stations that it was obligated to sell." Moreover, as alleged above and as confirmed by the FCC, Sinclair attempted to deceive regulators by proposing "sham" divestitures in which it sold stations in name only to related parties that served as fronts for Sinclair in an effort to evade federal broadcast ownership limits.

**E. Amendment No. 1 to Registration Statement**

147. On August 16, 2017, Sinclair filed Amendment No. 1 to the Registration Statement on Form S-4/A dated August 15, 2017. The S-4/A was signed by, among others, Defendant Ripley. The S-4/A repeated the same misleading statements, as described above in ¶143 regarding divestitures and using best efforts to obtain regulatory approval. These statements continued to be materially false and misleading for the reasons described above in ¶144.

**F. Opposition to Petitions to Deny the Merger**

148. On July 6, 2017, the FCC opened Sinclair's proposed merger with Tribune for public comment. By August 7, 2017, the FCC had received numerous petitions to deny based on the size of the combined entity and petitioners' assertions that it did not comply with federal broadcast ownership rules. On August 22, 2017, Sinclair filed its opposition to the petitions with the FCC. In the opposition, Sinclair asserted that it had "committed in the Applications to ensure that the Transaction will comply with the applicable FCC rules, and have more than demonstrated that the grant of the Applications is in the public interest. In that regard, the Applicants have agreed to voluntarily divest as necessary to comply with the local and national ownership cap rules."

149. Sinclair further stated:

> Contrary to the protestations of many of the Petitioners, Applicants are not asking the Commission to approve a transaction that violates the FCC's ownership rules. Rather, Applicants make clear their intention to comply with both the FCC's local and national ownership rules. The Applications state that the Applicants will "take actions in [overlap markets] as necessary to comply with . . . the Commission's local television ownership rules." Applicants also acknowledge that, absent divestiture, the combined company would exceed the national audience reach limitation by approximately 6.5%, and further state that "[t]o the extent that divestitures may be necessary, applications will be filed upon locating appropriate buyers . . . ."

150. The statements identified above in ¶¶148-149 were materially false and misleading, and omitted material facts when made. Specifically, the statements set forth above regarding Sinclair's commitment to ensuring that the Tribune merger would comply with the applicable FCC rules and its agreement to divest stations as required by regulators were materially false and misleading. In reality, Sinclair had not agreed to make, and had no intention to make, station divestitures needed to obtain prompt regulatory approval. As Tribune stated, "from virtually the moment the Merger Agreement was signed, Sinclair. . . engaged in belligerent and unnecessarily protracted negotiations with DOJ and the FCC over regulatory requirements" and "refused to sell stations in the ten specified markets required to obtain approval." Indeed, Sinclair "reject[ed] clear paths to regulatory approval" and instead "fought, threatened, insulted, and misled regulators in a misguided and ultimately unsuccessful attempt to retain control over stations that it was obligated to sell." Moreover, as alleged above and as confirmed by the FCC, Sinclair attempted to deceive regulators by proposing "sham" divestitures in which it sold stations in name only to related parties that served as fronts for Sinclair in an effort to evade federal broadcast ownership limits.

## G. Prospectus

151. On September 6, 2017, Sinclair filed its Prospectus on Form 424B3 which was deemed effective by the SEC on September 7, 2017. The Prospectus made similar misleading

statements regarding Sinclair's agreement to make divestitures and use its "best efforts" to obtain regulatory approval. Specifically, the Prospectus stated:

> Sinclair also agreed, subject to the terms of the agreement, to use reasonable best efforts to take all actions to avoid or eliminate any impediment that may be asserted by a governmental authority with respect to the transactions so as to enable the closing to occur as soon as reasonably practicable, including taking certain actions, each referred to as an "approval action," to obtain regulatory approval.
>
> In that connection Sinclair agreed to divest one or more television stations in the following Nielsen "Designated Market Areas": (i) Seattle-Tacoma, Washington, (ii) St. Louis, Missouri, (iii) Salt Lake City, Utah, (iv) Grand Rapids-Kalamazoo-Battle Creek, Michigan, (v) Oklahoma City, Oklahoma, (vi) Wilkes Barre-Scranton, Pennsylvania, (vii) Richmond-Petersburg, Virginia, (viii) Des Moines-Ames, Iowa, (ix) Harrisburg-Lancaster-Lebanon-York, Pennsylvania and (x) Greensboro-High Point Salem, North Carolina, which we refer to as the "overlap markets", as necessary to comply with the FCC's Local Television Multiple Ownership Rule (47 C.F.R. § 73.3555(b)), which we refer to as the "FCC duopoly rule," or to obtain clearance under the HSR Act, in each case as required by the applicable governmental authority in order to obtain approval of and consummate the transactions. Sinclair is required to designate either a Tribune station or Tribune stations or a Sinclair station or Sinclair stations for divestiture in each overlap market, as required by and subject to approval by the relevant governmental authority. Sinclair has also agreed to designate, at its option, certain additional Tribune stations or Sinclair stations for divestiture and to divest such stations in order to comply with the FCC's National Television Multiple Ownership Rule (47 C.F.R. § 73.3555(e)), which we refer to as the "FCC national cap," as required by the FCC in order to obtain approval of and consummate the transactions.

152. The statements identified above in ¶151 were materially false and misleading, and omitted material facts when made. Specifically, the statements set forth above regarding Sinclair's commitment to ensuring that the Tribune merger would comply with the applicable FCC rules and its agreement to divest stations in ten specified overlap DMAs if required by regulators to do so were materially false and misleading. In reality, Sinclair had not agreed to divest the ten stations, and had no intention of doing so. Indeed, as Tribune stated, at this exact same, Sinclair flatly refused AAG Delrahim's clear offer to approve the merger if Sinclair divested stations in the ten overlap DMAs as agreed under the Merger Agreement and instead

"became confrontational with and belittling of DOJ staff, and indeed, AAG Delrahim himself." Sinclair continued to repeatedly refuse the DOJ's request that it make these divestitures on numerous occasions over a period of ten months, despite the DOJ making clear to Sinclair that its position would not change. Sinclair therefore "reject[ed] clear paths to regulatory approval" and instead "fought, threatened, insulted, and misled regulators in a misguided and ultimately unsuccessful attempt to retain control over stations that it was obligated to sell."

### H. Response to FCC's Request for Information

153. On October 5, 2017, Sinclair responded to the FCC's September 14, 2017 Request for Information. In its response, Sinclair stated its intention to "undertake license divestitures as necessary to comply with the Commission's Rules."

> As stated in the Opposition and the Applications, Sinclair intends to undertake license divestitures as necessary to comply with the Commission's Rules, and as noted above, Moelis has already engaged numerous potential buyers. Further, as noted above, the Transaction is currently under review by the DOJ, which may require divestitures for reasons unrelated to the FCC's rules.

154. The statement identified above in ¶153 was materially false and misleading, and omitted material facts when made. Specifically, the statement that Sinclair would "undertake license divestitures as necessary to comply with the Commission's Rules" was materially false and misleading. In reality, Sinclair had no intention to make station divestitures needed to obtain prompt regulatory approval. Indeed, as Tribune stated, beginning in September 2017, Sinclair flatly refused AAG Delrahim's clear offer to approve the merger if Sinclair divested stations in the ten overlap DMAs as agreed under the Merger Agreement and instead "became confrontational with and belittling of DOJ staff, and indeed, AAG Delrahim himself." Sinclair continued to repeatedly refuse the DOJ's request that it make these divestitures on numerous occasions over a period of ten months, despite the DOJ making clear to Sinclair that its position would not change. Sinclair therefore "reject[ed] clear paths to regulatory approval" and instead

"fought, threatened, insulted, and misled regulators in a misguided and ultimately unsuccessful attempt to retain control over stations that it was obligated to sell."

**I. February 2018 Divestiture Trust – WPIX and WGN-TV Divestitures**

155. On February 21, 2018, Sinclair filed applications to assign the licenses of certain stations to divestiture trusts, purportedly to comply with FCC ownership rules. Indeed, in the Company's February 2018 Comprehensive Exhibit regarding the Divestiture Trust Applications, Sinclair stated that "The Divestiture Trust Applications comply with the National Cap Rule." Further, Sinclair stated that a Divestiture Trust Application was also being filed with respect to WPIX "in order to facilitate the Transaction's compliance with the National Cap Rule."

156. Sinclair's Amendment to FCC Form 315, or its Amendment to the June 26, 2017 Comprehensive Exhibit, further stated that the Company had "executed asset purchase agreements with third parties and will shortly hereafter file applications" to divest "WGN-TV, Chicago, Illinois, and WPIX-TV, New York, New York, to such third parties in order to come into compliance with the National Cap Rule."

157. Sinclair's February 2018 Amendment to the June Comprehensive Exhibit dedicated a section to the WGN-TV and WPIX divestitures, stating:

> Sinclair will divest stations in in the following markets to comply with the National Cap Rule. Upon divestiture of these stations, following consummation of the Transaction, Sinclair will have a national audience reach of approximately 37.3%, including the UHF discount, which will be in compliance with the National Cap Rule.

158. Regarding WGN-TV, Sinclair stated that "an agreement to sell WGN to a third party has been executed."

159. On March 3, 2018, an application was filed to divest station WPIX(TV), New York, NY to Cunningham. The Asset Purchase Agreement for the sale of WPIX was signed by Defendant Rutishauser. WGN TV's First Amendment to its Asset Purchase Agreement for the

sale of WGN-TV to WGN, LLC, owned by Steven Fader, was also signed by Defendant Rutishauser.

160. The statements identified above in ¶¶155-159 were materially false and misleading, and omitted material facts when made. Specifically, the statements set forth above regarding the WGN-TV and WPIX divestitures being made to "third parties" in order to comply with the FCC's "National Cap Rule" were materially false and misleading. In reality, and as the FCC informed Sinclair in response to these divestiture applications, the WGN-TV and WPIX divestitures were "sham" divestitures to related parties that were intended to circumvent the FCC's national broadcast ownership rules. Indeed, Sinclair proposed divesting WPIX to Cunningham, which was owned by the estate of Defendant Smith's late mother. Sinclair proposed divesting WGN to Steven Fader, who the FCC ultimately determined had no broadcasting experience and "extensive business relationships with [Defendant] Smith," including that Fader was the CEO of an automobile dealership holding company for which Defendant Smith was "a board member and ha[d] a controlling interest."

161. The FCC's ultimate findings confirm Sinclair's representations were false, stating:

> Sinclair represented to the Commission that it would comply with our broadcast ownership rules by seeking approval of its application—in part based on the proposed divestitures to Cunningham and Fader—and did not fully disclose facts such as the pre-existing business relationships between Fader, Smith, and Sinclair nor the full entanglements between Cunningham, Smith, and Sinclair.

**J. Fourth Quarter and Full Year 2017**

162. On February 28, 2018, the Company released its earnings press release announcing financial results for fourth quarter 2017 ("Q4 2017") and full year 2017 and held its earnings call the same day. Significantly, according to Tribune, by this time, the FCC had responded very negatively to Sinclair's February 21, 2018 proposed divestitures of WPIX to

Cunningham and WGN-TV to Steven Fader. Specifically, the FCC told Sinclair that because Fader and Cunningham were related parties, and because Sinclair had entered LMAs to run the operations and programming of these stations post-transfer, the FCC viewed the divestitures as potentially "sham" transactions with related parties. As a result, the FCC warned Sinclair point blank to "avoid related-party arrangements and propose clean station sales."

163. Notwithstanding this, during the earnings call, Defendant Ripley claimed that, after having filed the February 21, 2018 divestiture plan which would "get the clock ticking at the FCC," Sinclair expected that regulatory approval was "close":

> [W]e announced last week our divestiture trust that is really to get the clock ticking at the FCC, the DOJ has not concluded its process, but <u>we feel it's close, close enough that we could move forward with this divesture trust plan</u>. And in a situation where we can close as soon as divesture trust is approved and not have to wait to figure out where the buyers will be for the various stations. So we still don't have technical approval from either the DOJ or the FCC, <u>but we feel we're getting close.</u>

164. The statements identified above in ¶163 were materially false and misleading, and omitted material facts when made. Specifically, the statements set forth above regarding Sinclair "getting close" to regulatory approval and being able to "move forward with this divesture trust plan" were clearly false. In reality, according to Tribune's pleading in the Delaware Action, the FCC had empathically rejected Sinclair's February 21, 2018 divestiture plan, which it alleged included "sham" transactions to Fader and Cunningham, and expressly warned Sinclair to "avoid related-party arrangements and propose clean station sales." In light of this, Defendants had no reasonable basis to state that the merger was expected to close in the second quarter of 2018, or at all.

165. On March 1, 2018, Defendants Ripley and Rutishauser caused the Company to file its Form 10-K with the SEC for the year ended December 31, 2017 ("2017 Form 10-K"). The 2017 Form 10-K was signed by Defendants Smith, Ripley and Rutishauser. The 2017 Form

10-K contained certifications signed by Defendants Ripley and Rutishauser. In the Company's 2017 Form 10-K, Defendants made the same misrepresentations as in the Company's 2016 Form 10-K, as described above in ¶134, regarding the competition in advertising. These statements continued to be materially false and misleading for the reasons described above in ¶135.

166. The 2017 Form 10-K also asserted that the voting stock of Cunningham, which was previously owned by the estate of Defendant Smith's mother, had been sold to an "unrelated party" in 2018. This statement was materially false and misleading and omitted material facts when made. In reality, Sinclair sold the voting stock of Cunningham to Michael Anderson who, as the FCC determined, rather than being an "unrelated party," had multiple ties to Defendant Smith, having served as his long-time banker and as the sole trustee of the estate for Defendant Smith's mother. Moreover, this purported "sale" was anything but a legitimate arms' length transaction, as Anderson had purchased the voting stock of Cunningham for only $400,000, a price that was grossly below-market. Indeed, as the FCC would ultimately conclude, this was not a true sale between "unrelated parties," but a "sham" designed to evade FCC ownership rules.

167. Additionally, the 2017 Form 10-K stated the following regarding divestitures and the potential for a second quarter of 2018 close to the merger:

> It is likely that we will need to divest of certain stations to comply with regulatory approval. In the event we have not been able to complete all necessary divestitures by the time of the merger closing, we have filed applications at the FCC to place the stations in a divestiture trust pending divestiture after closing. We expect the transaction will close in the second quarter of 2018, pending customary closing conditions, including antitrust clearance and approval by the FCC.

168. The statements identified above in ¶167 were materially false and misleading, and omitted material facts when made. In reality, according to Tribune's pleading in the Delaware Action, the FCC had empathically rejected Sinclair's February 21, 2018 divestiture plan, which it

alleged included "sham" transactions to Fader and Cunningham, and expressly warned Sinclair to "avoid related-party transactions and propose clean station sales." In light of this, Defendants had no reasonable basis to state that the merger was expected to close in the second quarter of 2018, or at all.

**K. March 2018 Divestiture Trust Comprehensive Exhibit**

169. In March 2018, Sinclair withdrew its previous divestiture applications and filed new applications to assign the licenses of certain stations to divestiture trusts. In the Company's March 2018 Comprehensive Exhibit regarding the Divestiture Trust Applications, Sinclair stated that its divestiture of WPIX in New York was intended to comply with the FCC's national ownership rule:

> The Divestiture Trust Applications comply with the National Cap Rule. Divestiture Trust Applications are being filed with respect to Tribune television stations WPIX(TV), New York, New York, and KSWB-TV, San Diego, California, in order to facilitate the Transaction's compliance with the National Cap Rule.

170. The statements identified above in ¶169 were materially false and misleading, and omitted material facts when made. Specifically, the statements set forth above regarding the WPIX divestiture being made in order to comply with the FCC's "National Cap Rule" were materially false and misleading. In reality, and as the FCC informed Sinclair in response to its divestiture application for WPIX, the WPIX divestiture was a "sham" divestiture to a related party that was intended to circumvent the FCC's national broadcast ownership rules. Specifically, the sale of WPIX was for a below-market price to Cunningham, which by this time had been sold to Michael Anderson, a long-time associate of Defendant Smith.

171. Indeed, the FCC found Sinclair's representations to be clearly false, stating:

> Sinclair represented to the Commission that it would comply with our broadcast ownership rules by seeking approval of its application—in part based on the proposed divestitures to Cunningham and Fader—and did not fully disclose facts

such as the pre-existing business relationships between Fader, Smith, and Sinclair nor the full entanglements between Cunningham, Smith, and Sinclair.

**L. April 24, 2018 Divestiture Agreements Announcement and Amendment to Comprehensive Exhibit**

172. On April 24, 2018, Sinclair announced that "it ha[d] entered into definitive agreements to sell television stations to Standard Media Group LLC (an affiliate of Standard General LP), Meredith Corporation (NYSE: MDP) ("Meredith"), Howard Stirk and Cunningham Broadcasting Corporation and another party to be announced, upon consummation of Sinclair's acquisition of the stock of Tribune." The press release stated that Sinclair had made these divestitures "in order to obtain necessary governmental approval of the Tribune transaction." Notably, the press release stated that WGN-TV would be divested to WGN-TV, LLC, the newly formed entity owned by Steven Fader, and that Texas stations KDAF and KIAH would be divested to Cunningham. Defendant Ripley claimed that Sinclair had submitted this list of divestitures to the FCC "after a very robust divestiture process, with strong interest from many parties" and asserted that Sinclair "achieved healthy multiples on the stations we are divesting," Defendant Ripley also called the divestiture plan "a significant step forward" toward obtaining regulatory approval for the merger.

173. Regarding Tribune's Dallas (KDAF(TV)) and Houston (KIAH(TV)) stations, Sinclair stated that it had "entered into a purchase agreement to sell [them] to Cunningham" in order "to comply with the National Cap Rule," stating:

> In connection with the Transaction, Sinclair will divest stations in the markets listed below. Because Sinclair will not own any stations in these markets following consummation of the Transaction, divestiture of these stations will reduce Post-Transaction Sinclair's national audience reach to approximately 38.86%, including the UHF discount, which is in compliance with the National Cap Rule.

174. Further, regarding WGN-TV, Sinclair stated the following:

> Tribune has entered into a purchase agreement and filed an application to sell WGN-TV to WGN TV LLC, a company controlled by Steven Fader. Since Sinclair owns no stations in this market and Sinclair's other proposed divestitures will bring it in compliance with the National Cap Rule, sale of WGN-TV is not required in order to comply with the Duopoly Rule or the National Cap Rule, but will further reduce Sinclair's post-Transaction audience share from 38.86% to 37.39%.

175. The statements identified above in ¶¶172-174 were materially false and misleading, and omitted material facts when made. Specifically, the statements set forth above regarding Sinclair's purportedly legitimate arms' length divestitures of WGN, KDAF and KIAH to Fader and Cunningham in order to comply with FCC ownership rules were materially false and misleading. In reality, and as the FCC ultimately determined, the divestitures of WGN, KDAF and KIAH—rather than resulting from an arm's length "very robust divestiture process" resulting in "healthy multiples"—were phony sales made to the exact same related parties that had caused the FCC to object to those transactions as "shams" only two months prior. Sinclair's divestiture plan was therefore not a "significant step forward" toward regulatory approval. To the contrary, and as the FCC would ultimately determine, the plan—which proposed "sham" divestitures to related parties who served as fronts for Sinclair for below-market prices—was designed to deceive regulators and evade FCC ownership rules.

176. Analysts remained unaware of these facts, however, and were therefore highly encouraged by this news, assuming that Sinclair's latest divestiture plan must have been sanctioned by regulators and therefore signaled that the Company would soon obtain regulatory approval for the Tribune merger. For example, an April 25, 2018 Stephens report stated that, based on Sinclair's disclosure of the divestiture plan, "the Company appears to have made significant progress in its efforts to meet the regulatory requirements for the completion of the TRCO acquisition." Similarly, an April 25, 2018 Deutsche Bank report stated that the

divestiture plan was "a positive step towards achieving DOJ approval and subsequently, FCC approval, even if it requires modest concessions."

### M. First Quarter 2018

177. In May 2018, Defendants continued to assure investors that the divestitures were legitimate transactions that fully complied with FCC rules, and that the merger remained on track for an imminent closing. Thus, for example, on May 9, 2018, Sinclair issued a press release announcing that Fox and Cunningham, among other previously announced purchasers, would purchase "certain television stations Tribune and Sinclair expect to sell as a condition to the consummation of Sinclair's acquisition of the stock of Tribune…in an accretive transaction valued at $4.6 billion after divestitures." The press release added:

> As previously announced, the sales are part of Sinclair's larger acquisition of Tribune, in order to obtain necessary governmental approval of the Tribune transaction…and are expected to close immediately prior to or immediately after the Tribune transaction. Sinclair anticipates closing to occur near the end of the second quarter/beginning of the third quarter of 2018, pending customary closing conditions, including approval by the Federal Communications Commission ("FCC") and antitrust clearance, as applicable.

178. In addition to the press release touting the sales amount for the divested stations, Defendant Ripley stated: "After a very robust divestiture process, with strong interest from many parties, we have achieved healthy multiples on the stations being divested." Ripley added: "While we continue to believe that we had a strong and supportable rationale for not having to divest stations, we are happy to announce this significant step forward in our plan to create a leading broadcast platform with local focus and national reach."

179. Also on May 9, 2018, the Company issued its earnings press release announcing financial results for the first quarter 2018 ("Q1 2018"). In the press release, Defendant Ripley commented: "[O]ur acquisition of Tribune Media is now approaching the final stages with an anticipated closing in late second quarter/early third quarter of 2018, as we await governmental

approvals." The press release reiterated that "[t]he Company expects to close its announced acquisition of 100% of the issued and outstanding stock of Tribune late in the second quarter or early in the third quarter of 2018, subject to customary closing conditions, including approval by the FCC and antitrust clearance."

180. On the May 9, 2018 Q1 2018 earnings call, Defendant Ripley stated: "We are nearing the final stages on the Tribune closing." Ripley added: "We have reached agreements on the divestitures and are awaiting government approvals. We expect to close the Tribune acquisition and related station divestitures in late Q2, early Q3. As previously announced, there will be a total of 23 stations sold, consisting of 14 Tribune stations and 9 stations that we own, operate or provide services."

181. Analysts again reacted positively to this news, which they took to mean regulatory approval was imminent. For example, a May 10, 2018 Benchmark report stated that "[t]he divestiture announcement provided some much-needed clarity on the pro forma outlook while also reassuring investors that the deal was, indeed, still going to close." Similarly, a May 11, 2018 RBC Capital Markets report stated that "[p]rogress [is] being made on the TRCO front . . . Management expects the deal to close at the end of 2Q/early 3Q . . . Recent press reports suggest the DOJ is getting close to approving the deal."

182. The statements identified above in ¶¶177-180 were materially false and misleading, and omitted material facts when made. Specifically, the statements set forth above regarding Sinclair's station divestitures after a "very robust" process yielding "healthy multiples" in order to comply with federal regulations were materially false and misleading. In reality, and as the FCC ultimately determined, Sinclair had proposed "sham" divestitures to related parties who served as fronts for Sinclair for significantly below-market prices. In light of this,

Defendants had no reasonable basis to claim that the Tribune merger would close in the second or third quarter of 2018, or at all.

**N. JP Morgan Global Technology, Media and Communications Conference**

183. On May 15, 2018, Defendants Ripley and Rutishauser participated in the JP Morgan Global Technology, Media and Communications Conference. During the conference, Defendant Ripley stated that "the divesture plan is complete on the Tribune acquisition…. we would expect that to go out for public comment shortly for a 30-day comment period and close shortly after that. So as we indicated last week, timing for the close should be end of Q2, early Q3, and that is very much intact. And we're exceptionally pleased with the outcome of the divestiture plan."

184. Defendant Ripley added: "So, very pleased with the outcome, can't wait to get this closed and get on with the integration… We really do expect years and years of opportunity to come out of this Tribune acquisition… So, we're very pleased with where we sit. It's been a long road and I think we're finally getting to the end here and reaping the benefits."

185. The statements identified above in ¶¶183-184 were materially false and misleading, and omitted material facts when made. Specifically, the statements set forth above regarding Sinclair's completion of the divestiture plan and its expectation of regulatory approval in the first or second quarter of 2018 were materially false and misleading. As the FCC ultimately determined, Sinclair attempted to deceive the FCC by proposing "sham" divestitures to related parties who served as fronts for Sinclair for significantly below-market prices in an effort to evade federal ownership rules. In light of this, Defendants had no reasonable basis to believe that the Tribune merger would obtain regulatory approval and close by the first or second quarter of 2018, or at all.

**O. July 2, 2018 Bloomberg Responses**

186. On July 2, 2018, Bloomberg noted that Sinclair's proposals to sell stations were drawing scrutiny. Significantly, in response, Sinclair vehemently defended its divestitures as fully appropriate, issuing a statement assuring the market that "Ownership rules are not being evaded; they are being complied with." Additionally, with respect to Cunningham, Sinclair insisted that "Cunningham is operated completely separately from Sinclair…Sinclair will have no involvement in the operations of the Dallas and Houston stations being sold to Cunningham."

187. The statements identified above in ¶186 were materially false and misleading, and omitted material facts when made. Specifically, Sinclair's statements that it was complying with federal ownership rules, and that Cunningham was a separate entity from Sinclair, were materially false and misleading. As the FCC ultimately determined, Sinclair attempted to deceive the FCC by proposing "sham" divestitures to related parties who served as fronts for Sinclair—including Cunningham—for significantly below-market prices in an effort to evade federal ownership rules. Indeed, the FCC "question[ed] the close relationship between Sinclair and Cunningham, an existing loan guarantee between Sinclair and Cunningham, and the proposed purchase price." The FCC added that "substantial and material questions of fact exist as to whether the panoply of relationships and agreements between Sinclair and Cunningham [] provid[ed] Sinclair with the incentive and means to exert influence over the core operations of Cunningham, which, under Commission precedent, could be the basis for a finding that its stations should be attributed to Sinclair for purposes of determining compliance with our ownership rules."

**P. Second Consolidated Opposition to Petitions to Deny**

188. On July 5, 2018, Sinclair filed a Second Consolidated Opposition to Petitions to Deny. In its response, Sinclair contended that petitioners' claims that the divestitures to

Cunningham and Fader were not at arms' length were unsubstantiated. Sinclair further asserted that "[e]ach of the agreements at issue here mirrors those the Commission has approved in multiple transactions over the last decade for a variety of broadcasters."

189. Sinclair's opposition also claimed that "the shared services arrangements to be entered into in connection with four of the transaction's 21 proposed divestitures (or options relating to these stations and two additional divestiture stations) comply with current law and are consistent with precedent," and that it had "disclosed the details of [the] proposed divestitures to ensure compliance with the Commission's existing national and local ownership rules and have filed all the applications necessary to effectuate those divestitures—each of which also complies with the Commission's rules."

190. Sinclair also disputed petitioners' claims that it had divested stations for below-market prices, stating that these claims were "unsubstantiated" and "without merit or support."

191. Finally, with respect to Cunningham specifically, Sinclair stated: "Contrary to erroneous and misleading claims in some of the Petitions…Sinclair does not control or hold any attributable interest in Cunningham, nor do any of the Smith brothers own any stock, voting or non-voting, in Cunningham. Rather, Michael E. Anderson holds 100% of the voting shares of Cunningham."

192. The statements identified above in ¶¶188-191 were materially false and misleading, and omitted material facts when made. Specifically, Sinclair's statements that its divestitures complied with FCC ownership rules, that it had disclosed the details of its divestitures to the FCC, and that the divestitures were not for below-market prices, were materially false and misleading. As the FCC would determine only two weeks later, in reality, Sinclair had proposed sham divestitures of WGN, KDAF and KIAH to Fader and Cunningham,

who were related parties that served as fronts for Sinclair, for significantly below-market prices. Moreover, the FCC determined there were "material questions" regarding whether Sinclair had engaged in a "misrepresentation and/or lack of candor" in its dealings with the FCC because it "did not fully disclose facts such as the pre-existing business relationships between Fader, Smith and Sinclair, nor the full entanglements between Cunningham, Smith and Sinclair."

193. Sinclair's statements that it did not hold an attributable interest in Cunningham, nor own the voting stock of Cunningham, were also false and misleading. In reality, and as the FCC would ultimately determine, the voting stock of Cunningham was sold to Michael Anderson, a long-time associate of David Smith, for below market value, while the non-voting stock was held by trusts for the Smith brothers' children. Sinclair therefore exercised control over 100% of the stock of Cunningham, both voting and non-voting. Additionally, as the FCC determined, there were "substantial and material questions of fact" as to "whether the panoply of relationships and agreements between Sinclair and Cunningham" resulted in Sinclair exerting enough control over Cunningham such that it held an attributable interest in Cunningham under FCC ownership rules.

**Q. Code of Business Conduct and Ethics**

194. In the Company's Code of Business Conduct and Ethics, Sinclair stated that it "aim[ed] to succeed through fair and honest competition" and "never through unethical or illegal business practices." The document further asserted that its employees were required to comply with all laws, including "antitrust laws" and "FCC rules and regulations."

195. The statements identified above in ¶194 were materially false and misleading, as the exact opposite was true. As stated by the DOJ in its November 13, 2018 complaint, Sinclair did not aim to succeed through "fair and honest competition," but rather by engaging in an anticompetitive scheme with its main competitors to illicitly fix higher prices for spot advertising

rates in violation of federal antitrust laws. Sinclair's employees therefore were not required to comply with "antitrust laws," as in reality, they were actively breaching them. Moreover, as alleged above and as confirmed by the FCC, Sinclair attempted to deceive regulators by proposing "sham" divestitures in which it sold stations in name only to related parties that served as fronts for Sinclair in an effort to evade federal broadcast ownership rules.

## VII. ADDITIONAL SCIENTER ALLEGATIONS

196. As alleged above, numerous facts raise a strong inference that Defendants knew, or were severely reckless in disregarding, the true facts regarding Sinclair's illicit practices to evade FCC and DOJ media ownership limits, and its collusive anticompetitive scheme with its competitors in violation of federal antitrust laws. These facts include, in addition to the allegations set forth above, the following:

197. *The Individual Defendants, who were fully familiar with FCC rules, were directly involved in discussions with the FCC with respect to the Tribune merger and in staging the "sham" divestitures.* The Individual Defendants were the most senior officers of Sinclair and personally negotiated the Tribune merger, which they themselves called the most important deal in the Company's history. Moreover, the Individual Defendants personally negotiated, structured and approved the proposed divestitures of WGN-TV, KDAF and KIAH—which the FCC specifically found to be "shams," and, in fact, these so-called "divestitures" were "sold" to parties directly related to the Individual Defendants. As Sinclair's most senior officers, the Individual Defendants were also fully familiar with FCC broadcast ownership limits, and indeed, were directly involved in discussions with the FCC regarding those limits throughout the Class Period. Indeed, the Individual Defendants were unequivocally told by the FCC what they needed to do to comply with federal broadcast ownership rules (divest "clean"), as well as by Sinclair's merger partner, who told them they were breaching the Merger Agreement by not complying

with the FCC. Notwithstanding that, not only did the Individual Defendants fail to comply with the FCC, but they intentionally tried to deceive the FCC by deliberately withholding highly material information regarding these deals. As the FCC stated in its HDO, there were "material questions" as to whether Sinclair "engaged in misrepresentation and/or lack of candor" because it "did not fully disclose such facts as the pre-existing business relationships between Fader, Smith and Sinclair, nor the full entanglements between Cunningham, Smith and Sinclair." These facts unequivocally establish a strong inference of scienter for pleading purposes.

198. *The FCC's findings in the HDO that Sinclair engaged in sham divestitures and intentionally misled it are highly probative of scienter.* The FCC, after considering all of the record evidence, determined that there were "significant questions" as to whether Sinclair's proposed divestitures "were in fact 'sham' transactions." The FCC further determined that there were "material questions" as to whether Sinclair had engaged in "misrepresentation and/or lack of candor" with respect to its divestiture applications. Indeed, the HDO stated that Sinclair had deliberately failed to disclose "facts such as the pre-existing business relationships between Fader, Smith and Sinclair, nor the full entanglements between Cunningham, Smith and Sinclair." The HDO concluded that, "as such, there is a substantial material question of fact as to whether Sinclair affirmatively misrepresented or omitted material facts with the intent to consummate this transaction without fully complying with our broadcast ownership rules." The fact that the FCC determined that there were "material questions" about whether Sinclair had engaged in sham divestitures—and whether it had lied to the FCC about it—is highly probative of Defendants' scienter.

199. *Sinclair repeatedly promised that it would use its "best efforts" to comply with regulators to close the merger—including by making divestitures—then did the exact opposite.*

Throughout the Class Period, Sinclair repeatedly promised investors, Tribune and the FCC that it would use its "best efforts" to obtain regulatory approval for the merger, including by divesting stations. In fact, in the Merger Agreement, Sinclair had explicitly agreed to divest stations in ten specific "overlap" markets if deemed necessary by regulators. Yet, according to Tribune's pleadings in the Delaware Action, when the DOJ demanded that Sinclair make those divestitures, Sinclair refused to make any divestitures at all, became belligerent, and dared the DOJ to "sue me." Sinclair's actions in this regard, which were directly contrary to its public statements, are highly probative of scienter.

200. *Even after the FCC specifically warned Sinclair in response to its proposed February 2018 divestitures to clearly related parties to proffer "clean station sales," Sinclair did the exact opposite.* On February 21, 2018, Sinclair proposed certain divestitures to the FCC, which included divesting WGN in Chicago to Steven Fader and WPIX in New York to Cunningham. According to Tribune's pleading in the Delaware Action, the FCC reacted to Sinclair's proposal with exasperation, noting that both buyers were related parties and therefore the transactions did not appear to be arm's length. The FCC then specifically instructed Sinclair to "avoid related-party arrangements and instead propose clean station sales." Sinclair did not do so. In fact, it did the exact opposite. Indeed, on April 24, 2018, Sinclair proposed a new divestiture plan—in which it still planned to divest WGN in Chicago to Steven Fader, and two Texas stations that were in the top ten DMAs—KDAF and KIAH—to Cunningham. Sinclair's brazen disregard of the FCC's clear warning is highly probative of scienter.

201. *Sinclair issued a series of false denials that it was engaging in sham divestitures with related parties.* As the truth emerged about Sinclair's sham divestitures, Sinclair did not come clean, but rather flatly and unequivocally denied it was engaging in any sham divestitures

while insisting it was fully complying with FCC rules. However, as the FCC would ultimately detail in its 20-page HDO, the evidence to the contrary was damning. Sinclair's divestitures included "atypical deal terms"—including shared-services agreements that allowed Sinclair to control the purportedly divested station's advertising sales, operations and programming—and were for prices that were "substantially below market value" to related parties who had "extensive business relationships with David Smith." Sinclair's unequivocal denials in the face of clear evidence to the contrary is highly probative of Defendants' scienter.

202. *Sinclair's abrupt withdrawal of divestiture applications for WGN, KDAF and KIAH after emphatically claiming those divestitures were legitimate is probative of scienter.* Defendants emphatically claimed that Sinclair's divestitures were legitimate after news broke that FCC Chairman Pai had "serious concerns" about them. However, Defendants' actions show that they knew Sinclair's divestitures were not legitimate. Specifically, on July 18, 2018, just two days after media outlets leaked that FCC Chairman Pai was circulating the draft HDO, Sinclair abruptly withdrew its divestiture applications for WGN, KDAF and KIAH. Had Sinclair truly believed its divestitures of these stations were bona fide arms' length transactions, it would have had no reason to do so.

203. *Former employees confirm that Sinclair had long been engaged in an illicit practice of entering sham LMAs to evade FCC ownership rules, which was a well-known strategy at Sinclair stations across the country.* Plaintiff's confidential witnesses, who consist of former employees of Sinclair stations and Sinclair LMA stations across the country, unanimously described Sinclair's long-held strategy of entering sham LMAs for the purpose of evading FCC ownership rules. For example, CW 1, a former Hub Operations Manager at Sinclair until August 2017, stated that Sinclair would routinely sign LMAs with affiliates in

markets where Sinclair already owned a station and then take over the LMA station completely, such that the station would be "100 percent a Sinclair station when it is not meant to be a Sinclair station." CW 1 further described how this strategy was so well-known throughout the Company that Sinclair's *de facto* control of those stations was a "running joke." CW 2, a former Business Systems Coordinator at Sinclair headquarters in Hunt Valley, Maryland, similarly stated that Sinclair used LMAs as a "workaround for purchasing television stations in markets where they were already exceeding the cap." CW 4, who was a former Business Manager at Sinclair-owned WDKY in Kentucky from 2014 to 2017, also stated that Sinclair had a "workaround" to set up a "joint sharing agreement" whenever the Company "had another station that would have increased the market share over 50 percent in one city." Finally, CW 6, a former Regional Controller for Sinclair in Springfield, Illinois, stated that the purpose of Sinclair's LMA agreements was to "get around" FCC ownership restrictions. The fact that former Sinclair employees who worked in different positions at different stations across the country unanimously described Sinclair's illicit strategy of entering sham LMAs to skirt FCC ownership rules is highly probative of Defendants' scienter.

204. *Numerous former Sinclair employees specifically identified Cunningham as a "shell" corporation Sinclair would use to circumvent FCC rules—including with respect to Sinclair's divestiture of KDAF and KIAH.* Plaintiffs' CWs unanimously identified Cunningham as a "shell" company with whom Sinclair would routinely enter sham LMAs. For example, CW 1 stated that Sinclair and Cunningham were effectively the same entity, stating that when she visited Cunningham stations across the country, "they were all Sinclair employees." CW 2 specifically identified Cunningham when describing how Sinclair used "shell companies" to evade FCC rules. CW 7, a former news anchor for Sinclair's flagship station in Baltimore and a

political correspondent for Sinclair until 2017, likewise referenced Cunningham when discussing Sinclair's use of "shadow companies" for which "Sinclair would "mak[e] all the profits." CW 8, who also worked at WBFF in Baltimore as an Assistant News Director until March 2018, similarly referenced Cunningham when she stated she knew of "these shell corporations" that are "owned by the Smith family." Moreover, CW 9, former Director of Technical Operations at Tribune's station KDAF through November 2018, stated that Sinclair's sale of KDAF to Cunningham in connection with the Tribune merger was a sham—illustrated by the fact that Sinclair intended to run a morning show program it was acquiring as part of the merger that would reach lucrative Dallas and Houston markets through "Cunningham's" station KDAF. Sinclair's routine use of Cunningham as a "shell" company to whom it would divest stations to evade FCC ownership rules—including with respect to the Tribune merger—is highly probative of Defendants' scienter.

205. *The manner in which Sinclair's sham divestitures came to light supports scienter.* Significantly, Sinclair at no point revealed the truth of its sham divestitures to investors. Rather, the truth leaked out through a series of corrective disclosures, and Sinclair affirmatively denied that there were any issues with the divestitures. Indeed, the FCC specifically found "material questions" as to whether Sinclair had concealed the truth of the sham divestitures in its dealings with the Commission.

206. *Defendant Ripley was directly involved in Sinclair's refusal to comply with DOJ demands to divest stations—yet repeatedly told investors the exact opposite.* Defendant Ripley was directly aware of Sinclair's obstinate refusal to comply with DOJ demands to divest stations in order to obtain regulatory approval of the Tribune merger. Indeed, Ripley was copied on Tribune's December 18, 2017 correspondence to Sinclair, in which it urged Sinclair to agree to

the DOJ's demands and reminded it that it had agreed to make the requested divestitures in the Merger Agreement itself. Additionally, in January 2018, Peter Kern, Tribune's CEO, directly emailed Defendant Ripley again requesting that Sinclair comply with the DOJ's divestiture demands, as it was required to do under the Merger Agreement. Despite Defendant Ripley's direct involvement in Sinclair's refusal to comply with regulators' requests, Defendant Ripley simultaneously assured investor: "We did agree to sell stations that we need to sell in order to get the transaction. That's not going to stand in the way of us closing the transaction." The fact that Defendant Ripley's public statements were directly contrary to his own actions is highly probative of Defendant Ripley's scienter.

207. *Defendant David Smith's direct ties to the related parties in the sham divestitures are highly probative of his scienter.* Significantly, Sinclair's proposed sham divestitures to the FCC were objectionable largely because the "related parties" in question—Fader and Cunningham—had direct and significant ties to Defendant David Smith. Fader was a long-time business associate of Defendant Smith, and served as the CEO of an auto dealership company in which Smith held a controlling interest and sat on the board. Cunningham had long been owned by Smith's mother, and then her estate upon her death, before it was sold in January 2018 to Anderson, a personal banker to Defendant Smith and the sole trustee of Defendant Smith's mother's estate. Moreover, Sinclair's proposed divestitures to these related parties of major stations in lucrative markets—WGN in Chicago, and KDAF and KIAH in Dallas and Houston—were for absurdly below-market prices. These facts suggest that Defendant Smith was directly involved in arranging the sham divestitures, which is highly probative of Defendant Smith's scienter.

208. *The Tribune merger was critical to Sinclair's business strategy and overall success.* Sinclair repeatedly touted during the Class Period the significance of the Tribune merger to its business, stating that the merger would cause it to own a total of 233 stations in 108 markets, including 39 of the top 50 DMAs, expanding Sinclair's nationwide reach substantially from 39% to 72% and thereby significantly increasing its ability to attract national advertising revenues. The fact that the Tribune merger was critical to Sinclair's business strategy and overall success is highly probative of Defendants' scienter.

209. *Sinclair's core advertising sales were critical to its success.* Sinclair's Form 10-Ks filed during the Class Period stated that Sinclair's "primary source of revenue is the sale of commercial inventory on our television stations to our advertising customers." The fact that Sinclair was reliant upon advertising revenues, and that Sinclair's collusive scheme with its competitors concerned fixing higher prices for advertising sales in order to inflate those revenues, is highly probative of Defendants' scienter.

210. *The manner in which Sinclair's illicit price-fixing scheme came to light supports scienter.* Significantly, Sinclair did not disclose its price-fixing scheme to investors. Rather, the DOJ uncovered the scheme by happenstance, in connection with its extensive review of the Tribune merger. The news of the DOJ's investigation was also not reported by Sinclair, but *The Wall Street Journal*, and later confirmed by the DOJ's formal complaint against, and settlement with, Sinclair and its co-conspirators. The manner in which Sinclair's illicit price-fixing scheme came to light is highly probative of Defendants' scienter.

211. *Plaintiff's CWs' accounts of executive-level participation in the price-fixing scheme supports scienter.* Significantly, Plaintiff's CWs' accounts of actions Sinclair took in furtherance of the price-fixing scheme took place at the executive level. For example, CW 10

stated that she was brought in as an outside consultant for Sinclair to create a joint venture with Fox and Tribune called "OxMyx Media Group," which was meant to coordinate advertising sales across all of the stations of all three participating companies—a joint venture CW 10 stated the Company abruptly discontinued due to fear of "collusion." This joint venture was directly sanctioned by management, as evidenced by Defendant David Smith's express mention of OxMyx—which he stated would involve "partnering with other broadcasters"—in his letter to shareholders in the Company's 2016 annual report. CW 11 also described collusion between Sinclair and Tribune, stating that she had attended a secret meeting with high-ranking Sinclair sales executives and her own boss, Tribune's National Director of Sales, shortly after the Tribune merger was announced. These CWs' accounts indicating that senior level management was directly involved in the illicit price-fixing scheme are highly probative of Defendants' scienter.

212. *Defendant Marks made public statements asserting that Sinclair was "beating" its competitors with respect to advertising sales supports scienter.* During the Class Period, Defendant Marks, who served as the Chief Operating Officer for Sinclair during the Class Period, made statements about how Sinclair's core advertising sales were "beating [Sinclair's] competition consistently," Sinclair's "numbers beat the marketplace," and Sinclair was consistently gaining market share against its competitors. Defendant Marks' statements that Sinclair's core advertising sales were "beating" the competition when in fact Sinclair was engaged in a collusive anti-competitive scheme with its main competitors to fix advertising rates is highly probative of Defendant Marks's scienter.

213. As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Sinclair, including communications concerning the interest-party transactions and fraudulent regulatory scheme, their control over, receipt and/or

modification of Sinclair's allegedly materially misleading statements and omissions, and/or their position with the Company which made them privy to confidential information concerning Sinclair, participated in the fraudulent scheme alleged herein.

## VIII. LOSS CAUSATION

214. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and engaged in a course of conduct that artificially inflated the prices of Sinclair stock. Defendants' actions operated as a fraud on Class Period purchasers of Sinclair's stock by failing to disclose to investors that the Company was attempting to evade the FCC's ownership limits and the DOJ's antitrust regulations. When Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Sinclair stock fell precipitously, as the prior inflation came out of the Company's stock price. Indeed, during the Class Period, Sinclair's common stock reached a price as high as $42.90 on March 9, 2017. At the end of the Class Period, Sinclair's common stock traded at a price of $25.75, meaning the stock lost approximately 60% of its value during the Class Period. As a result of their purchases of Sinclair stock during the Class Period, Plaintiff and the other Class members suffered economic loss.

215. On August 3, 2017, Sinclair filed a Form 8-K with the SEC disclosing that, a day prior, it had received a second request for information from the DOJ in connection with the Tribune merger and Sinclair's proposed divestitures. The same day, *Bloomberg* issued a report commenting on how the DOJ's second request signified that "regulators might think [Sinclair's] proposed sales don't go far enough to mitigate market effects," and that "[t]he merger will undergo a more rigorous review by the [DOJ] that could last months."

216. In response to this news, Sinclair's stock price fell 8.6%, from $34.90 per share on August 2, 2017, to close at $31.90 per share on August 3, 2017.

217. On September 14, 2017, the FCC issued a request for additional information from Sinclair and Tribune regarding the merger and planned divestitures. In the request, the FCC stated that, despite Sinclair's promises in its applications filed with the FCC that it would "take such actions to the extent required to comply with the terms of the Merger Agreement and the national television ownership limit (including the UHF Discount), in order to obtain FCC approval of the transaction," including divestitures, Sinclair had failed to "indicate what steps, if any [it has] already taken or what specific steps [it] plan[s] to take Post-Transaction to comply" with the FCC's ownership limits.

218. On this news, Sinclair's stock dropped 4.4%, from $28.45 per share on September 13, 2017, to $27.20 per share on September 14, 2017.

219. On February 22, 2018, Capital Forum reported that Sinclair's recently proposed remedy to the DOJ to settle its antitrust concerns was insufficient, and that as a result the regulatory process would be further complicated by Sinclair being forced to work with two regulators at one time.

220. In response to this news, the Company's stock price fell 2.7%, from $36.60 on February 21, 2018, to close at $35.60 on February 22, 2018.

221. On February 27, 2018, *The New York Times* reported that Sinclair was "locked in a prolonged battle with the [DOJ] over how many stations it must sell to get their approval." The report added that Sinclair's new divestiture plan, which it had filed the prior week, "has not satisfied the [DOJ], which still seeks more divestitures."

222. In response to this news, Sinclair's stock price fell 6.2%, from $36.05 per share on February 27, 2018, to $33.80 on February 28, 2018.

223. On July 16, 2018, media outlets reported that Chairman Pai was circulating a draft HDO that would send the Tribune merger to a hearing before the FCC's Chief Administrative Law Judge—a process widely considered to be a death knell for mergers. Significantly, the media reports stated that the draft HDO alleged that Sinclair had deceived the FCC in connection with its divestiture applications. Chairman Pai also issued a statement in which he revealed that he had "serious concerns" about the merger because "[t]he evidence we've received suggests that certain station divestitures that have been proposed to the FCC would allow Sinclair to control those stations in practice, if not in name, in violation of the law."

224. In response to this news, Sinclair's stock price plummeted 11.6% in a single day, from $32.95 on July 13, 2018, to $29.10 on July 16, 2018, wiping out almost $300 million in market capitalization on unusually high trading volume of over 6 million shares.

225. On July 17, 2018, Tribune announced that it was disappointed by news that the FCC planned to issue an order designating certain issues for consideration by an Administrative Law Judge. On this news, which suggested that Tribune was contemplating pulling out of the merger, Sinclair's stock price dropped again by 3.6%, from $29.10 on July 16, 2018 to $28.05 on July 17, 2018, on unusually high trading volume of 4.7 million shares.

226. On July 18, 2018, Sinclair engaged in a last ditch effort to attempt to avoid the HDO. It abruptly withdrew its proposed divestitures that media reports and commenters had labeled as "shams"—namely, its proposed divestiture of WGN in Chicago to Steven Fader and its proposed divestitures of KDAF and KIAH in Texas to Cunningham. In response to this news, Sinclair's stock price declined again by another 2.3%, from $28.05 per share on July 17, 2018 to $27.40 per share on July 18, 2018, on unusually high trading volume of 5.4 million shares.

227. On July 19, 2018, after unanimously voting that the Tribune merger would be sent to a hearing before an Administrative Law Judge, the FCC publicly disclosed the 20-page HDO. In the HDO, the FCC stated that "[t]he record raises significant questions as to whether [Sinclair's proposed divestitures of WGN, KDAF and KIAH] were in fact 'sham' transactions." The HDO additionally stated that there were "material questions" about whether Sinclair had engaged in "misrepresentation and/or lack of candor" with respect to its divestiture applications filed with the FCC.

228. In response to this news, Sinclair's stock price fell again, from $27.40 on July 18, 2018 to $26.30 on July 19, 2018, on unusually high trading volume of over 5.3 million shares.

229. Thus, in the course of just four trading days from July 16, 2018 to July 19, 2018, Sinclair's stock price plummeted over 20%, wiping out more than $500 million in market capitalization.

230. Finally, with respect to Sinclair's misstatements regarding its collusive scheme with its competitor broadcast companies to fix advertising rates in violation of antitrust laws, the truth was revealed on July 26, 2018, when *The Wall Street Journal* published an article stating that the DOJ had been investigating anticompetitive conduct by Sinclair. The article stated that the DOJ was probing whether Sinclair, Tribune, and other broadcasters "coordinated efforts when their ad sales teams communicated with each other about their performance, potentially leading to higher rates for TV commercials."

231. On this news, Sinclair's stock price dropped another 3.4% over the next two trading days, from $26.65 on July 26, 2018, to close at $25.75 on July 27, 2018.

232. The drastic and continuing decline in Sinclair's stock price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.

The timing and magnitude of the decline in the Company's share price negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

## IX. CLASS ACTION ALLEGATIONS

233. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired Sinclair common stock between February 26, 2017 and July 26, 2018, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Sinclair at all relevant times, members of their immediate families, and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

234. The members of the Class are so numerous that joinder of all members is impracticable. As of February 23, 2018, there were over 100 million shares of Sinclair common stock outstanding. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Throughout the Class Period, Sinclair common stock was actively traded on the NASDAQ, an open and efficient market, under the symbol "SBGI." Millions of Sinclair shares were traded publicly during the Class Period on the NASDAQ. Record owners and the other members of the Class may be identified from records maintained by Sinclair and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

235. Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

236. Plaintiff will fairly and adequately protect the interests of the other members of the Class, and has retained counsel competent and experienced in class and securities litigation. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. Whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b. Whether Defendants participated in and pursued the common course of conduct complained of herein;

c. Whether documents, press releases, and other statements disseminated to the investing public and the Company's stockholders during the Class Period misrepresented material facts about the business, finances, and prospects of Sinclair;

d. Whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose facts about the business, finance, value, and performance of Sinclair;

e. Whether the market price of Sinclair common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f. The extent to which the members of the Class have been damaged and the proper measure of damages.

237. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X. UNDISCLOSED ADVERSE FACTS

238. The market for Sinclair common stock was an open, well-developed and efficient market at all relevant times. As a result of these materially false and misleading statements and failures to disclose described herein, Sinclair common stock traded at artificially inflated prices during the Class Period. Plaintiff and the other members of the Class purchased or otherwise acquired Sinclair shares relying upon the integrity of the market price of the Company's stock and market information relating to Sinclair, and have been damaged thereby.

239. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Sinclair common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse non-public information and misrepresented the truth about the Company, as well as its business and operations, as alleged herein.

240. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the

damages sustained by Plaintiff and the other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and misleading statements about Sinclair's legal and regulatory compliance, financial well-being and prospects.

241. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's stock price to be overvalued and artificially inflated and/or maintained at all relevant times. Defendants' materially false and misleading statements made during the Class Period resulted in Plaintiff and the other members of the Class purchasing the Company's stock at artificially inflated prices, thus causing the damages complained of herein.

## XI. INAPPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

242. At all relevant times, the market for Sinclair common stock was an efficient market for the following reasons, among others:

a. Sinclair met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient market;

b. As a public company, Sinclair filed periodic public reports with the SEC;

c. Sinclair securities were followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and

d. Sinclair regularly issued press releases which were carried by national newswires. Each of these releases was publicly available and entered the public marketplace.

243. As a result of the foregoing, the market for Sinclair common stock promptly digested current information regarding Sinclair from all publicly available sources and reflected such information in Sinclair's stock price. Under these circumstances, all purchasers of Sinclair common stock during the Class Period suffered similar injury through their purchase of Sinclair common stock at artificially inflated prices and a presumption of reliance applies.

244. A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because Plaintiff's fraud claims are grounded in Defendants' omissions of material fact of which there is a duty to disclose. As this action involves Defendants' failure to disclose material adverse information regarding Sinclair's business practices and the Tribune merger—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered such information important in the making of investment decisions.

## XII. NO SAFE HARBOR

245. The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

246. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Sinclair who knew that the statement was false when made.

## XIII. COUNTS AGAINST DEFENDANTS

### COUNT I
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

247. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

248. This Count is asserted on behalf of all members of the Class against all Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

249. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or they deliberately disregarded as, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

250. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a

fraud or deceit upon Plaintiff and other investors similarly situated in connection with their purchases of Sinclair common stock during the Class Period.

251. Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the other members of the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Sinclair common stock, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiff and the other members of the Class, regarding, among other things, Sinclair's business and operations; (b) artificially inflate and maintain the market price of Sinclair common stock; and (c) cause Lead Plaintiff and the other members of the Class to purchase the Company's common stock at artificially inflated prices, and to suffer losses when the true facts became known.

252. Defendants are liable for all materially false and misleading statements made during the Class Period, as alleged above.

253. As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Sinclair common stock, were either known to the Defendants, or were so obvious that the Defendants should have been aware of them.

254. Plaintiff and the other members of the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Sinclair common stock, which inflation was removed from its price when the true facts became known. Plaintiff and the other members of the Class would not have purchased Sinclair common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements.

255. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of Sinclair common stock during the Class Period.

256. .

**COUNT II**
**Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

257. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

258. This Count is asserted on behalf of all members of the Class against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

259. During their tenures as officers and/or directors of Sinclair, each of these Defendants was a controlling person of the Company, within the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as officers and/or directors of Sinclair, these Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. These Defendants were able to and did control, directly and indirectly, the content of the public statements made by Sinclair during the Class Period, including its

materially misleading statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

260. In their capacities as senior corporate officers of the Company, and as more fully described above, Defendants Ripley and Rutishauser had direct involvement in the day-to-day operations of the Company, in reviewing and managing its regulatory and legal compliance, and in its accounting and reporting functions. Defendants Smith, Ripley and Rutishauser signed the Company's SEC filings during the Class Period, and were directly involved in providing false information, and in certifying and approving the false statements disseminated by Sinclair during the Class Period. Defendants Smith, Ripley, Rutishauser, and Marks were also directly involved in providing false information, and Defendants Ripley and Rutishauser certified and approved the false statements disseminated by Sinclair during the Class Period. As a result of the foregoing, Defendants Smith, Ripley, Rutishauser and Marks, together and individually, were controlling persons of Sinclair within the meaning of Section 20(a) of the Exchange Act.

261. As set forth above, Sinclair violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

262. By virtue of their positions as controlling persons of Sinclair, and as a result of their own aforementioned conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Plaintiff, and the other members of the Class, who purchased or otherwise acquired shares of Sinclair common stock. As detailed above during the respective times these Defendants served as officers and/or directors of Sinclair, each of these Defendants was culpable for the material misstatements and omissions made by the Company.

263. As a direct and proximate result of these Defendants' conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchase or other acquisition of Sinclair common stock.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for judgment as follows:

a. Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b. Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

c. Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d. Awarding such other relief as this Court deems appropriate.

## XV. JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: March 1, 2019

Respectfully Submitted,

**SAXENA WHITE P.A.**

*/s/Joseph E. White, III*

Maya Saxena (*admitted pro hac vice*)
Joseph E. White, III (*admitted pro hac vice*)
Lester R. Hooker (*admitted pro hac vice*)
Dianne M. Anderson (*admitted pro hac vice*)
150 East Palmetto Park Road, Suite 600
Boca Raton, FL 33432
Telephone: (561) 394-3399
msaxena@saxenawhite.com
jwhite@saxenawhite.com

lhooker@saxenawhite.com
danderson@saxenawhite.com

Steven B. Singer (*admitted pro hac vice*)
Kyla Grant (*admitted pro hac vice*)
10 Bank Street, 8th Floor
White Plains, New York 10606
Telephone: (914) 437-8551
ssinger@saxenawhite.com
kgrant@saxenawhite.com

***Counsel for Lead Plaintiff***

**GOLDMAN & MINTON, P.C.**

Thomas J. Minton (03370)
3600 Clipper Mill Rd., Suite 201
Baltimore, MD 21211
Telephone: (410) 783-7575
tminton@charmcitylegal.com

***Liaison Counsel for Lead Plaintiff***

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served by CM/ECF on March 1, 2019 on all counsel or parties of record. Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.

*/s/ Joseph E. White, III*
Joseph E. White, III