# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

IN RE SINCLAIR BROADCAST GROUP,     *
INC. SECURITIES LITIGATION    *      Civil No. CCB-18-2445
   *

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

This is a class action securities case brought by lead plaintiffs City of Atlanta Police

Pension Fund and the City of Atlanta Firefighters' Pension Fund (collectively "Atlanta P&F")

against Sinclair Broadcast Group, Inc., Christopher S. Ripley, Lucy A. Rutishauser, Steven M.

Marks, and David D. Smith (collectively "Sinclair"). On behalf of itself and all persons or

entities that acquired Sinclair common stock between February 22, 2017, and July 26, 2018,

Atlanta P&F alleges numerous violations of the Securities Exchange Act of 1934 (the "Exchange

Act"), 15 U.S.C. § 78a *et seq.*, stemming from a failed merger between Sinclair and Tribune

Media ("Tribune"). (Am. Compl. ¶ 1, ECF 45). Now pending is Sinclair's motion to dismiss.

The motion is fully briefed, and no oral argument is necessary. For the reasons explained in this

Memorandum, the motion will be granted in part and denied in part.

## BACKGROUND[1]

Sinclair, a publicly traded company, is a telecommunications conglomerate and the

largest owner of local television stations in the country. On May 8, 2017, Sinclair announced its

plan to acquire Tribune, another large media company, for $3.9 billion dollars. (Am. Compl. ¶ 3,

ECF 45). Federal Communications Commission (FCC) and Department of Justice (DOJ)

---

[1] Atlanta P&F's 100-page amended complaint, (ECF 45), contains a lengthy statement of facts, not all of which are relevant to resolution of Sinclair's motion to dismiss. The court will recite the minimum facts necessary. In its recitation of facts, the court relies on Atlanta P&F's Amended Complaint and documents "integral to and explicitly relied on in the complaint." See *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606–07 (4th Cir. 2015).

approval of the proposed merger (the "Merger"), however, was necessary before the transaction could become final, due to FCC and DOJ limits on the amount of control one entity may have over the broadcast television market. (*Id.*). Specifically, regulatory approval of the Merger required compliance with the FCC's National Cap (or "National Ownership") Rule, which prohibits a single entity from having television stations that reach more than 39 percent of U.S. households; the FCC's Duopoly Rule, which prohibits a single entity from owning two of the "top four" stations in the same "designated market area," ("DMA");[2] and DOJ antitrust regulations that prohibit a single entity from owning more than 40 percent of the market share in a DMA. (*Id.* ¶ 26).

Accordingly, in Sinclair's merger agreement with Tribune, (the "Merger Agreement"), filed publicly with the Securities and Exchange Commission ("SEC") on May 9, 2017, Sinclair agreed to divest its ownership in television stations as necessary to obtain regulatory approval of the Merger. (Am. Compl. ¶ 27). In public statements and filings throughout the summer and fall of 2017, Sinclair repeated its commitment to make station divestitures as required by the Merger Agreement. (*Id.* ¶¶ 28–30, 137–48, 153). Negotiations with regulators during this time period, however, were contentious. According to Tribune in its complaint filed after the Merger failed, "from virtually the moment the Merger Agreement was signed," Sinclair was engaged in an effort to obtain regulatory approval without making station divestitures. (*Id.* ¶ 33). In the fall of 2017, Assistant Attorney General ("AAG") Makan Delrahim told Sinclair that divestitures in the ten DMAs specified in the Merger Agreement would facilitate a path to regulatory approval. (*Id.* ¶ 35). In response, according to Tribune, Sinclair became "confrontational" with DOJ staff and AAG Delrahim. (*Id.*). Throughout the remainder of 2017 and into early 2018, Sinclair continued

---

[2] A "designated market area" is a geographic area that receives the same television options. (Am. Compl. ¶ 25). The "top four" stations in a DMA are usually affiliates of NBC, FOX, CBS, and ABC. (*Id.* ¶ 26).

its attempts to convince the DOJ that divestitures in the ten specified DMAs were unnecessary. (*Id.* ¶¶ 36–39, 42–45).

On February 21, 2018, Sinclair announced a plan to divest stations in order to comply with the National Cap Rule (the "February 2018 Divestiture Plan"). (Am. Compl. ¶¶ 46, 155). The February 2018 Divestiture Plan included proposals to the FCC to divest Tribune's WPIX-TV New York station and its WGN-TV Chicago station. Sinclair proposed to divest WPIX and WGN, however, to entities with close ties to the family of Sinclair's founder (the "Smith family"): Cunningham Broadcast Corporation ("Cunningham") and WGN-TV LLC.[3] (*Id.* ¶ 47). Moreover, the proposed divestitures of WPIX and WGN included "local marketing agreements" ("LMAs"), pursuant to which Sinclair could control station operations and collect revenue. (*Id.* ¶¶ 37, 47). According to Tribune, the FCC reacted negatively to the February 2018 Divestiture Plan, taking specific issue with Sinclair's relationships with the buyers and the terms of the LMAs. (*Id.* ¶¶ 47–48). The FCC decided not to put the February 2018 Divestiture Plan out for public comment, and Tribune stated the FCC "emphatic[ally] reject[ed]" the plan. (*Id.* ¶ 53).

On April 24, 2018, Sinclair announced another plan to divest stations in order to obtain regulatory approval of the Merger (the "April 2018 Divestiture Plan"). (Am. Compl. ¶ 55). While the proposed divestitures in this plan differed somewhat from those proposed in the February 2018 Divestiture Plan, Sinclair still proposed divesting certain stations to Cunningham and WGN-TV LLC. (*Id.*). The FCC did, however, put the April 2018 Divestiture Plan out for public comment and began its formal review process of the Merger on May 21, 2018. (*Id.* ¶ 63).

---

[3] Cunningham is an entity long owned by the estate of defendant David E. Smith's mother, and WGN-TV LLC is an entity owned by Steven Fader, the CEO of a car dealership holding company in which Smith held a controlling interest. (Am. Compl. ¶ 47).

The proposed divestitures drew scrutiny from media outlets and from outside commenters who petitioned the FCC to deny approval of the Merger. (Am. Compl. ¶¶ 63–64). In response to a July 2, 2018, *Bloomberg* report questioning the legitimacy of the divestitures, Sinclair stated that its proposals complied with FCC regulations, adding that "Cunningham is operated completely separately from Sinclair." (*Id.* ¶ 65). On July 5, 2018, Sinclair filed with the FCC an opposition to the petitions to deny, arguing that the proposed divestitures complied with FCC regulations and noting that "Sinclair does not control or hold any attributable interest in Cunningham." (*Id.* ¶ 66).

On July 16, 2018, FCC Chairman Ajit Pai issued a statement expressing "serious concerns about the Sinclair/Tribune transaction," due to the FCC's receipt of "evidence . . . suggest[ing] that certain station divestitures that have been proposed to the FCC would allow Sinclair to control those stations in practice, even if not in name, in violation of the law." (Am. Compl. ¶ 67). News outlets also reported that Chairman Pai was circulating a draft Hearing Designation Order ("HDO") referring the question of whether to approve the Merger to an FCC Administrative Law Judge ("ALJ"). (*Id.*). On July 17, 2018, Tribune confirmed the reports, announcing that it was "disappointed," which suggested it was "contemplating pulling out of the merger." (*Id.* ¶¶ 73, 223–25). Various media outlets noted that a hearing in front of an ALJ would likely result in a denial of the Merger. (*Id.* ¶¶ 67–70, 223). On July 18, 2018, the FCC announced its final decision to send the Merger to an ALJ hearing. (*Id.* ¶ 78).

The FCC released the HDO on July 19, 2018. (Am. Compl. ¶ 79; *see also* HDO, Mot. Ex. 31, ECF 49-33). The HDO stated in part that "[t]he record raises significant questions as to whether [the proposed divestitures to Cunningham and WGN-TV LLC] were in fact 'sham' transactions," (*id.* ¶ 80), and that there were "substantial and material questions as to whether

4

Sinclair was the undisclosed real party-in-interest" to the WGN-TV LLC and Cunningham divestitures, (*id.* ¶¶ 82, 85). Between July 16, 2018, and July 19, 2018, the price of Sinclair stock fell over 20 percent. (*Id.* ¶¶ 92). On August 9, 2018, Tribune withdrew from the Merger and filed a $1 billion breach of contract action against Sinclair in the Delaware Chancery Court (the "Tribune Complaint"). (*Id.* ¶ 93).

Several months later, on November 13, 2018, the DOJ filed a complaint against Sinclair, alleging that the company engaged in illegal anticompetitive activities. (Am. Compl. ¶ 115). The existence of the DOJ investigation had been revealed in a July 26, 2018, *Wall Street Journal* article, the publication of which corresponded with a 3.4 percent decline in Sinclair's stock price from July 26, 2018, to July 27, 2018. (*Id.* ¶¶ 126–27). In its complaint, the DOJ claimed that during its investigation of the Merger, the DOJ discovered evidence that Sinclair was colluding with its competitors in an effort to fix prices for spot advertising sales. (*Id.*). On the same day the complaint was filed, however, the DOJ announced that it had reached a settlement with Sinclair and the other participants in the alleged scheme. (*Id.* ¶ 128). The settlement did not impose sanctions, but required Sinclair and the other companies to cooperate in the DOJ investigation and adopt antitrust compliance and reporting measures. (*Id.*).

Atlanta P&F initiated this lawsuit on August 9, 2018, (ECF 1), and filed the Amended Complaint on March 1, 2019, (ECF 45). Atlanta P&F alleges violations of the Exchange Act by corporate defendant Sinclair, as well as by senior Sinclair executives Ripley, Rutishauser, Smith, and Marks (the "Individual Defendants"). Sinclair filed its motion to dismiss on May 3, 2019, (ECF 49), arguing that Atlanta P&F has failed to state any claims under the Exchange Act.

5

## STANDARD OF REVIEW

To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim. However, the complaint must allege sufficient facts to establish those elements." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted). "Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is 'probable,' the complaint must advance the plaintiff's claim 'across the line from conceivable to plausible.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). Additionally, although courts "must view the facts alleged in the light most favorable to the plaintiff," they "will not accept 'legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments'" in deciding whether a case should survive a motion to dismiss. *U.S. ex rel. Nathan v. Takeda Pharm. North Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013) (quoting *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012)). In ruling on a motion to dismiss, the court may rely on "documents attached or incorporated into the complaint," *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (citation omitted), as well as those "integral to and explicitly relied on in the complaint," where "the plaintiffs do not challenge [the document's] authenticity," *id.* at 606–07 (citations omitted) (alteration in original).

The Federal Rules of Civil Procedure further require a plaintiff alleging fraud to plead all elements of the fraud with particularity. Fed. R. Civ. P. 9(b). "To satisfy the rule, a plaintiff must identify with some precision the date, place and time of active misrepresentations or the

circumstances of active concealments." *In re Under Armour Sec. Litig.*, 342 F. Supp. 3d 658, 670

(D. Md. 2018) (quoting *Johnson v. Wheeler*, 492 F. Supp. 2d 492, 509 (D. Md. 2007)).

## ANALYSIS

### I.    Violations of § 10(b) and Rule 10b-5 (All Defendants)

Section 10(b) of the Exchange Act, codified at 15 U.S.C. § 78j(b), "prohibits the use of

'any manipulative or deceptive device or contrivance' in connection with the sale of a security in

violation of SEC rules." *Yates v. Mun. Mortg. & Equity*, LLC, 744 F.3d 874, 884 (4th Cir. 2014)

(quoting 15 U.S.C. § 78j(b)). Rule 10b-5, the SEC rule implementing § 10(b), makes it unlawful

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material
> fact necessary in order to make the statements made, in the light of the
> circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would
> operate as a fraud or deceit upon any person, in connection with the purchase or
> sale of any security.

17 C.F.R. § 240.10b-5. To state a claim under § 10(b),[4] a private plaintiff must show: "(1) a

material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between

the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

misrepresentation or omission; (5) economic loss; and (6) loss causation." *Yates*, 744 F.3d at 884

(citation omitted). Where, as here, a plaintiff relies on a fraud-on-the-market theory, "an

investor's reliance on any public material misrepresentations . . . may be presumed." *See Basic*

*Inc. v. Levinson*, 485 U.S. 224, 247 (1988).[5]

---

[4] "The scope of Rule 10b-5 is coextensive with the coverage of § 10(b)." *S.E.C. v. Pirate Inv'r LLC*, 580 F.3d 233, 237 n.1 (4th Cir. 2009) (quoting *S.E.C. v. Zandford*, 535 U.S. 813, 816 n.1 (2002)). For ease of analysis, the court will refer to alleged violations of § 10(b) and Rule 10b-5 collectively as "§ 10(b) claims."

[5] Sinclair does not appear to contest that this is a "fraud on the market" case. (Mot. at 44, ECF 49-1).

The Private Securities Litigation Reform Act ("PSLRA"), codified at 15 U.S.C. § 78u-4, imposes heightened pleading standards for private plaintiffs alleging violations of § 10(b). *See Yates*, 744 F.3d at 885. The PSLRA requires, in pertinent part, that a private plaintiff's complaint: (1) "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed" (the "falsity requirement"); and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" when he allegedly violated § 10(b) (the "scienter requirement"). *See* 15 U.S.C. § 78u-4(b)(1)–(2). Courts in this Circuit have reasoned that "group pleading," whereby corporate officers and directors are presumed to be responsible for a company's "group published" information, is insufficient to satisfy the PSLRA's scienter requirement for individual defendants. *In re Acterna Corp. Sec. Litig.*, 378 F. Supp. 2d 561, 572–73 (D. Md. 2005); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 370 (D. Md. 2004) (collecting cases); *see also Under Armour*, 342 F. Supp. 3d at 694.

The PSLRA also includes a "safe harbor" provision, which bars liability for "forward-looking statement[s] . . . accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," 15 U.S.C. § 78u-5(c)(1)(A)(i), and for forward-looking statements made without "actual knowledge . . . that the statement was false or misleading," 15 U.S.C. § 78u-5(c)(1)(B)(i)–(ii).

In its motion to dismiss, Sinclair argues that Atlanta P&F fails to state § 10(b) claims with respect to any of the alleged misstatements identified in the Amended Complaint. The court

will analyze each of the alleged misstatements, first addressing statements made in connection with the Merger, then turning to statements made in connection with the alleged price-fixing scheme.

## A. Merger Claims

i.   Actionability of alleged misstatements in FCC submissions

As a threshold matter, the court considers Sinclair's argument that several of the alleged misstatements, which appeared in submissions to the FCC, are not actionable because they constitute "legal advocacy." (Mot. at 28, ECF 49-1; Reply at 16–17, ECF 55). To establish a violation of § 10(b), a plaintiff must show that the defendant made a false statement or omission "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(2)(b). An alleged misstatement is made "in connection with the purchase or sale of any security" when, among other factors, it is "public[ly] disseminat[ed] in a document . . . on which an investor would presumably rely[.]" *S.E.C. v. Pirate Inv'r LLC*, 580 F.3d 233, 249 (4th Cir. 2009). Sinclair argues that "legal advocacy" does not qualify. (Reply at 17).

In determining whether an alleged misstatement meets the "in connection with" requirement, the Fourth Circuit applies a standard formulated by the Second Circuit in *S.E.C. v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968) (en banc). Under the *Texas Gulf* standard, as developed by later case law, "[w]here the fraud alleged involves public dissemination in a document . . . on which an investor would presumably rely, the 'in connection with' requirement is generally met by proof of the means of dissemination and the materiality of the misrepresentation or omission." *Pirate*, 580 F.3d at 249 (citing *S.E.C. v. Rana Research, Inc.*, 8

F.3d 1358, 1362 (9th Cir. 1993) and collecting cases).[6] "Under [the *Texas Gulf*] standard, it is irrelevant that the misrepresentations were not made for the purpose or the object of influencing the investment decisions of market participants." *Semerenko v. Cendant Corp.*, 223 F.3d 165, 176 (3d Cir. 2000).

Here, Sinclair's alleged misstatements to the FCC were contained in publicly available filings.[7] Sinclair offers no reason why a reasonable investor might not have relied on at least some of the representations in those filings. *See Levinson*, 485 U.S. at 246 n.24 ("[M]arket professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices."). Indeed, the statements contained in Sinclair's "legal advocacy" to the FCC was motivated, at least in part, by public opposition to the Merger. (Am. Compl. ¶¶ 66, 188–91). The court thus finds that Sinclair's alleged misstatements made in FCC filings meet the "in connection with" requirement and will analyze them under the same standard as it does Sinclair's alleged misstatements in other public materials.[8]

---

[6] In *Pirate*, the Fourth Circuit distinguished that case from *Texas Gulf* in holding that the SEC did not have to show that a "*reasonable* investor" would have relied on the document for it to meet the "in connection with" requirement. *See Pirate*, 580 F.3d at 250–51 (emphasis added). The Fourth Circuit reasoned that "[a]t its core, the *Texas Gulf* standard is about notice," and that its purpose was to protect from liability those speakers "who had no idea that their conduct might implicate Section 10(b)." *Id.* at 250. Accordingly, even though the Fourth Circuit determined that a reasonable investor would not have relied upon a mass email communication in making investment decisions, *id.* at 250, because the company "*knew* that they were directing their misstatements to particular investors who *did rely* on internet investment advice," the court found that the statements met the "in connection with" requirement, *id.* at 251 (emphasis in original).

[7] Some of the statements Sinclair describes as "legal advocacy" were contained in documents filed in response to comments opposing the Merger. (Mot. at 27–28 (citing Am. Compl. ¶¶ 148–50, 188–93)). The other statements identified as "advocacy," however, appeared in the following documents: (1) Sinclair and Tribune's joint application for approval of the Merger, (*id.* (citing Am. Compl. ¶¶ 141–44)); (2) Sinclair's response to an FCC request for information, (*id.* (citing Am. Compl. ¶¶ 153–54)); (3) Sinclair's application to assign the licenses of WPIX and WGN-TV to divestiture trusts, (*id.* (citing Am. Compl. ¶¶ 155–60)); and (4) Sinclair's updated application to assign the licenses to divestiture trusts, (*id.* (citing Am. Compl. ¶¶ 169–71)). Sinclair also cites paragraphs 172–75 of the Amended Complaint as examples of "legal advocacy" to the FCC, but the statements identified in those paragraphs were made in Sinclair press releases.

[8] Sinclair's reliance on *Bien v. LifeLock Inc.*, No. CV-14-00416-PHX-SRB, 2015 WL 12819154 (D. Ariz. July 21, 2015), for the proposition that legal advocacy does not meet the "in connection with" requirement, is misplaced. *Bien* involved alleged misstatements contained in advertisements, not legal filings. And in *Bien*, the fact that the misstatements appeared in a certain medium was not dispositive; the court dismissed the claims arising from the advertising statements in part because of the plaintiffs' failure to allege with particularity that the advertisements

ii.  Statements regarding station divestitures generally

Atlanta P&F first challenges a group of statements involving Sinclair's general

commitment to making station divestitures necessary for prompt regulatory approval of the

Merger. The statements Atlanta P&F identifies may be summarized as follows:

- Sinclair's statements in the Merger Agreement, filed publicly on May 8, 2017, that it would use "reasonable best efforts to take action to avoid or eliminate each and every impediment that may be asserted by any Governmental Authority," including by making "Station Divestitures" to secure prompt regulatory approval for the Merger. (Am. Compl. ¶¶ 138–39).

- Sinclair's statement in the Application for Approval of the Proposed Merger and Comprehensive Exhibit, filed with the FCC on June 26, 2017, that it would "take such actions to the extent required to comply with the terms of the Merger Agreement and the national television ownership limit . . . in order to obtain FCC approval of the Transaction[.]" and that, "[t]o the extent that divestitures may be necessary, applications will be filed upon locating appropriate buyers and signing appropriate purchase agreements." (*Id.* ¶ 141–42).

- Sinclair's statement in the Registration Statement, and in Amendment No. 1 of the Registration Statement (filed with the SEC on July 3, 2017, and August 16, 2017, respectively), that it "agreed to divest one or more television stations in certain specified markets as necessary" to obtain regulatory approval. (*Id.* ¶ 143–44, 147).

- Defendant Ripley's statement on Sinclair's Q2 2017 earnings call, held on August 2, 2017, that Sinclair "agree[d] to sell stations that we need to sell" in order to obtain regulatory approval, and that divestiture was "not going to stand in the way of us closing the transaction." (*Id.* ¶ 145–46).

- Sinclair's statement on August 22, 2017, in response to numerous petitions filed with the FCC seeking denial of the Merger, that Sinclair "ha[d] agreed to voluntarily divest as necessary to comply with the local and national ownership cap rules[,]" and that "[t]o the extent that divestitures may be necessary, applications will be filed upon locating appropriate buyers[.]" (*Id.* ¶ 148–50).

---

"appeared in publications *reasonably* used by market professionals to evaluate LifeLock stock." *See id.* at *9 (emphasis added). As the court explained in note 6, *supra*, the Fourth Circuit does not always require that a plaintiff show *reasonable* reliance in order to meet the "in connection with" requirement. *See Pirate*, 580 F.3d at 250–51.

According to Atlanta P&F, these statements were materially false and misleading because Sinclair had no intention of making station divestitures.[9] (Am. Compl. ¶¶ 138–40, 141–44, 145–46, 147, 148–50). Sinclair argues these statements regarding station divestitures cannot be false or misleading because they are simply descriptions of Sinclair's contractual obligations or promises to comply with those obligations. (Mot. at 13). Accurate statements of historical fact are not actionable under § 10(b), *see In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 210 (S.D.N.Y. 2004), nor are "forward-looking" promises contained in contracts, *see Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 691 (9th Cir. 2011). "The failure to carry out a promise made in connection with a securities transaction . . . does not constitute fraud unless, when the promise was made, the defendant secretly intended not to perform or knew that he could not perform." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993); *see also In re U.S. W., Inc. Sec. Litig.*, 201 F. Supp. 2d 302, 307 (D. Del. 2002) (recitation of a provision in a merger agreement was not misleading because it was "merely a representation that, on the date the parties entered the Merger Agreement, the parties agreed to be so bound").

The statements identified above were made between May 9, 2017, and August 22, 2017, and either describe Sinclair's obligations under the Merger Agreement or affirm Sinclair's commitment to complying with those obligations. Atlanta P&F does not allege sufficient facts to

---

[9] With respect to each of these statements, Atlanta P&F repeats the following allegations:

> As Tribune stated [in the Tribune Complaint], "from virtually the moment the Merger Agreement was signed, Sinclair . . . engaged in belligerent and unnecessarily protracted negotiations with DOJ and the FCC over regulatory requirements" and "refused to sell stations . . . required to obtain approval." Indeed, Sinclair "reject[ed] clear paths to regulatory approval" and instead "fought, threatened, insulted, and misled regulators in a misguided and ultimately unsuccessful attempt to retain control over stations that it was obligated to sell." Moreover, as alleged above and as confirmed by the FCC, Sinclair attempted to deceive regulators by proposing "sham" divestitures in which it sold stations in name only to related parties that served as fronts for Sinclair in an effort to evade federal broadcast ownership limits.

(Am. Compl. ¶¶ 140, 144, 146, 150).

show that Sinclair or Ripley "secretly intended" not to make station divestitures at the time these statements were made. Atlanta P&F makes the conclusory allegation that "Sinclair had no intention" of making legitimate station divestitures, (Am. Compl. ¶ 140), and broadly alleges that "from the start of the DOJ's review of the merger in the summer of 2017, Sinclair steadfastly refused to divest the stations the DOJ required to be sold," (*id.* ¶ 34). But Atlanta P&F's first *specific* allegation that Sinclair "refused" to divest arises from communications between AAG Delrahim and Sinclair in September 2017, (*id.* ¶ 35); the additional allegations stem from conduct in late 2017 and 2018. The court is not persuaded that Sinclair's subsequent actions give rise to a "strong inference" that the statements in May–August 2017 belied a secret intention not to comply with Sinclair's divestiture obligations under the Merger Agreement. *See Mills*, 12 F.3d at 1176; *cf. Powers v. British Vita, P.L.C.*, 57 F.3d 176, 185 (2d Cir. 1995) ("[I]ntent may be found when a defendant violates an agreement so maliciously and so soon after it is made that his desire to do so before he entered into the agreement is evident."). Indeed, Atlanta P&F's explanation of Sinclair's actions is no more plausible than Sinclair's explanation that it was the company's longstanding belief, stated publicly on the August 2, 2017, earnings call, that it did not need to sell any stations to be in compliance. *Cf. Twombly*, 550 U.S. at 554 (allegations of conduct that is "consistent with conspiracy, but just as much in line with [legal business activity,]" are insufficient to state a claim). Atlanta P&F thus fails to meet the scienter requirement for the alleged misstatements identified in this subsection. Accordingly, the § 10(b) claims arising from these statements will be dismissed as to all defendants.[10]

---

[10] Where, as here, the court finds that Atlanta P&F fails to establish the scienter of the issuer of an alleged misstatement, the court will also dismiss claims against the other defendants. *Cf. Acterna*, 378 F. Supp. 2d at 572–73.

<u>Statements regarding station divestitures in ten specified DMAs</u>

Atlanta P&F alleges that Sinclair made two materially false and misleading statements regarding its plan to divest from stations in the ten specified DMAs. First, Atlanta P&F identifies Sinclair's statement in its Prospectus, filed with the SEC on September 6, 2017, that "Sinclair agreed to divest one or more television stations" in ten specified DMAs "in order to obtain approval of and consummate the [Merger]." (Am. Compl. ¶¶ 151–52). Second, Atlanta P&F identifies Sinclair's October 5, 2017, statement to the FCC that it "intend[ed] to undertake license divestitures as necessary to comply with the Commission's Rules." (*Id.* ¶¶ 153–54). These statements were materially false and misleading, Atlanta P&F argues, because Sinclair had no intention of divesting the ten stations.[11]

First, Sinclair's statement in the Prospectus is a non-actionable statement of accurate historical fact. Like the statements made between May 2017 and August 2017, the statement in the Prospectus simply describes Sinclair's obligations under the Merger Agreement. *See supra* Part I.A.ii. Of course, "even a promise that is forward looking at the time it is made could conceivably become an inaccurate assertion as to a matter of past or existing fact . . . if its repeated filing create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." *Reese*, 643 F.3d at 692 (internal citations and quotation marks omitted). But Atlanta P&F has not alleged specific facts that by September 6, 2017, Sinclair's intentions

---

[11] As evidence of Sinclair's intentions, Atlanta P&F alleges that

> Sinclair flatly refused AAG Delrahim's clear offer to approve the merger if Sinclair divested stations in the ten overlap DMAs as agreed under the Merger Agreement and instead "became confrontational with and belittling of DOJ staff, and indeed, AAG Delrahim himself." Sinclair continued to repeatedly refuse the DOJ's request that it make these divestitures on numerous occasions over a period of ten months, despite the DOJ making clear to Sinclair that its position would not change. Sinclair therefore "reject[ed] clear paths to regulatory approval" and instead "fought, threatened, insulted, and misled regulators in a misguided and ultimately unsuccessful attempt to retain control over stations that it was obligated to sell."

(Am. Compl. ¶¶ 152, 154).

regarding the Merger Agreement had changed. Atlanta P&F suggests that Sinclair's refusal of AAG Delrahim's "clear offer to approve the merger" evidences fraudulent intent at the time Sinclair filed the Prospectus. (Am. Compl. ¶¶ 152; 154). The Prospectus, however, was filed on September 6, 2017, and AAG Delrahim could not have extended his alleged offer until—at the earliest—September 27, 2017, when he was confirmed as Assistant Attorney General for DOJ's Antitrust Division. (9/27/2017 DOJ Press Release, Mot. Ex. 14, ECF 49-16). Accordingly, Sinclair's refusal of an alleged offer in late September 2017, or subsequent rejections of "clear paths to regulatory approval," does not give rise to a strong inference that when the agreement was made—or even when the Prospectus was filed—Sinclair did not intend to comply with its obligations.

Second, Sinclair's October 5, 2017, statement to the FCC is a statement of Sinclair's intention to comply with FCC regulations, which is not actionable unless Sinclair contemporaneously harbored an intention *not* to comply. *See supra* Part I.A.ii. Atlanta P&F states that Sinclair's refusal of AAG Delrahim's offer is evidence of an intention not to comply with FCC rules. (Am. Compl. ¶ 154). The DOJ, however, sent Sinclair a letter on November 17, 2017, stating that "none of Sinclair's arguments had persuaded it that divestitures were unnecessary in any of the ten overlap DMAs." (*Id.* ¶ 36). According to Atlanta P&F's own timeline, then, Sinclair was attempting to negotiate with the DOJ about the terms of compliance between September 2017 and November 17, 2017. Negotiations did, in fact, continue, and on December 15, 2017, the DOJ informed Sinclair and Tribune that "it would pause its investigation if Sinclair agreed to make at least *seven* divestitures in the ten overlap DMAs." (*Id.* ¶ 38 (emphasis added)). The continued negotiations undercut Atlanta P&F's assertion that in October 2017, Sinclair had already decided it would not comply with FCC regulations. The court is thus

15

not persuaded that Atlanta P&F has raised a sufficiently strong inference that the October 5, 2017, statement to the FCC was false or misleading when made. Accordingly, claims arising from these statements will be dismissed as to all defendants.

### iv. February 2018 statements regarding WPIX and WGN divestitures

Atlanta P&F next challenges the following statements, made in February 2018 filings to the FCC, regarding Sinclair's proposals to divest from WPIX and WGN:

- Sinclair's statement that "[t]he Divestiture Trust Applications comply with the National Cap Rule," and they were filing a Divestiture Trust Application for WPIX "in order to facilitate the Transaction's compliance with the National Cap Rule." (Am. Compl. ¶ 155).

- Sinclair's statement that it had "executed asset purchase agreements with third parties" to divest WGN and WPIX to those third parties "in order to come into compliance with the National Cap Rule." (*Id.* ¶ 156).

- Sinclair's statement that "Sinclair will divest stations . . . to comply with the National Cap Rule. Upon divestiture of these stations . . . [Sinclair] will be in compliance with the National Cap Rule," and that "an agreement to sell WGN to a third party has been executed." (*Id.* ¶¶ 157–58).

According to Atlanta P&F, these statements were materially false and misleading because the proposed divestitures of WPIX and WGN to Cunningham and WGN-TV LLC, respectively, were "sham" divestitures. Specifically, Atlanta P&F contends that Sinclair's statements regarding the February 2018 Divestiture Plan's compliance with the National Cap Rule were false and misleading because it intended to flout, rather than comply with, FCC regulations by divesting to related parties with ties to Sinclair and the Smith family.[12] (Am. Compl. ¶ 160). Sinclair counters that these statements expressed Sinclair's *opinion* that the divestitures would bring it into compliance with the National Cap Rule, and that the FCC's suggestion in the HDO

---

[12] Atlanta P&F does not allege that Sinclair's references to Cunningham and WGN-TV as "third parties" in these statements were, on their own, materially false or misleading. Rather, the allegations stemming from these statements focus on the portion of the statements relating to Sinclair's ostensible intention to make divestitures in order to come into compliance with FCC rules. (Am. Compl. ¶¶ 160–61).

that the divestitures were "shams" does not render Sinclair's earlier-in-time opinion statements false or misleading. (Mot. at 29–31).

"The reasonable investor understands a statement of opinion in its full context." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 190 (2015).[13] Here, the challenged statements regarding Sinclair's compliance with FCC regulations were made to the FCC in connection with divestiture proposals. A reasonable investor would have understood that, notwithstanding Sinclair's own position, the final arbiter of FCC compliance is the FCC, not Sinclair. "Statements of opinion are generally actionable only if the plaintiff establishes that the statement was objectively false and the issuer lacked a rational belief in the veracity of the statement at the time it was made." *Hirtenstein v. Cempra, Inc.*, 348 F. Supp. 3d 530, 556 (M.D.N.C. 2018) (citation omitted).[14]

Even assuming the statements were objectively false, and the proposed divestitures would *not* have resulted in compliance with the National Cap Rule, Atlanta P&F does not meet its burden of showing that Sinclair lacked a rational belief that the divestitures would result in compliance. In the Amended Complaint, Atlanta P&F merely asserts that "the FCC informed Sinclair *in response* to these divestiture applications[] [that] the WGN-TV and WPIX divestitures were 'sham' divestitures to related parties that were intended to circumvent the FCC's national broadcast ownership rules." (Am. Compl. ¶ 160) (emphasis added). According to

---

[13] In *Omnicare*, the Supreme Court analyzed opinion statements in the context of an alleged violation of § 11 of the Securities Act, which prohibits a company from filing registration statements containing materially false or misleading statements, rather than in the context of an alleged violation of § 10(b). *Omnicare*, 575 U.S. at 175. The court is persuaded, however, by the reasoning of the Ninth and Second Circuits, which have held that Omnicare applies to § 10(b) claims as well. *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017); *Tongue v. Sanofi*, 816 F.3d 199, 209–10 (2d Cir. 2016).

[14] The Supreme Court in *Omnicare* set forth three circumstances under which a statement of opinion may be actionable: (1) the speaker "falsely describe[s] her own state of mind"; (2) the speaker makes a statement of opinion supported by an objectively untrue fact; and (3) the speaker omits facts that formed the basis of her opinion, rendering the statement materially misleading. *Omnicare*, 575 U.S. at 184–189; *accord Hirtenstein*, 348 F. Supp. 2d at 556–57.

Atlanta P&F's own version of the facts, then, negative feedback from the FCC came only after the alleged misstatements were made.[15] This is insufficient to support a strong inference, as required, that Sinclair acted with the requisite scienter. Accordingly, all claims arising from Sinclair's February 2018 statements regarding WPIX and WGN divestitures will be dismissed as to all defendants.

v. Statements on the February 28, 2018, earnings call

On Sinclair's February 28, 2018, earnings call with investors, defendant Ripley represented that the DOJ was "close" to concluding its approval process. Specifically, Ripley stated, "we feel it's close, close enough that we could move forward with [the February 2018 Divestiture Plan]." (Am. Compl. ¶ 163). Atlanta P&F claims that this statement was materially false and misleading because Ripley had no reasonable basis to believe that regulatory approval was "close," or that Sinclair would obtain approval of the February 2018 Divestiture Plan.

Ripley's statement that "we feel [approval is] close" was a statement of belief rather than fact. See Omnicare, 575 U.S. at 187 ("A reasonable person . . . recognizes the import of words like 'I think' or 'I believe,' and grasps that they convey some lack of certainty as to the statement's content."). According to Atlanta P&F, Ripley could not have reasonably believed the objectively false statement that Sinclair was "close" to obtaining regulatory approval, as the FCC

---

[15] The court also notes that it is not entirely accurate for Atlanta P&F to claim that the FCC determined that Sinclair's proposed divestitures were "shams." Atlanta P&F repeats this claim numerous times throughout the Amended Complaint, despite the fact that the HDO—the document upon which Atlanta P&F relies most heavily for this allegation—contains no such "determination." While the HDO states that "[t]he record raises significant questions as to whether those proposed divestitures were in fact 'sham' transactions," (HDO ¶ 2), the FCC did not decide the issue in the HDO. Instead, the FCC referred the matter to an ALJ. (HDO ¶ 29).

Relying on the Tribune Complaint, Atlanta P&F also claims that "the FCC viewed the divestitures [in the February 2018 Divestiture Plan] as "sham[s]." (Tribune Compl. ¶ 106, Mot. Ex. 33, ECF 49-35). Again, this stretches the evidence. According to the Tribune Complaint, the FCC staff merely held the opinion "that the station sales could *readily be viewed as* 'sham' transactions." (*Id.*) (emphasis added). Atlanta P&F cannot turn the FCC's *suggestions* that the proposed divestitures were "shams" into *conclusions* that they were.

had "emphatically rejected" the February 2018 Divestiture Plan. (Am. Compl. ¶ 164). The Amended Complaint thus implies that the FCC had already rejected the February 2018 Divestiture Plan by the time of the February 28, 2018, earnings call.

If an allegation regarding an allegedly misleading statement is "made on information and belief, the PSLRA requires that "the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Atlanta P&F states that the "particularized fact[]" that the FCC reacted unfavorably to the February 2018 Divestiture Plan "immediately upon its submission" is supported by the Tribune Complaint. (Opp'n at 28, ECF 54). But the Tribune Complaint does not support this timeline. Tribune does not allege that the FCC's reaction was "immediate"; rather, Tribune alleges that Sinclair was "begin[ning] the process of preparing" sales in connection with the February 2018 Divestiture Plan on February 27, 2018, (Tribune Compl. ¶ 104, Mot. Ex. 33, ECF 49-35), suggesting that on the day before the earnings call, Sinclair was acting as if the February 2018 Divestiture Plan was moving forward. Neither the Amended Complaint nor the Tribune Complaint state with particularity when the FCC expressed their negative opinion of the February 2018 Divestiture Plan. In fact, the only concrete date Atlanta P&F provides for the failure of the February 2018 Divestiture Plan is March 6, 2018, when Sinclair withdrew the plan. (Opp'n at 28).

Despite Atlanta P&F's suggestions to the contrary, the court finds that the Tribune Complaint does not support the contention that the FCC had "emphatically rejected" the February 2018 Divestiture Plan before February 28, 2018. As Atlanta P&F provides no other facts tending to show that Ripley "lacked a rational belief in the veracity of the statement at the time it was made," *see Hirtenstein*, 348 F. Supp. 3d at 556, his statements are not actionable.

Claims arising from Ripley's statements on the February 28, 2018, earnings call accordingly will be dismissed as to all defendants.

      vi.    <u>Sale of Cunningham's voting stock</u>

In Sinclair's 2017 Form 10-K, filed with the SEC on March 1, 2018, Sinclair stated that the voting stock of Cunningham had been sold to an unidentified "unrelated party." (Am. Compl. ¶ 166). Atlanta P&F contends that this statement was materially false and misleading because Sinclair had actually sold the voting stock to Michael Anderson, a man with multiple ties to the Smith family, and that the FCC had concluded that the sale to Anderson was a "sham." Sinclair counters that the allegation is insufficiently pled because (1) the FCC did not "conclude" that the transaction was a sham in the HDO, and (2) Atlanta P&F has not shown that Sinclair was required to refer to Anderson as a "related party."

The court agrees with Sinclair that the HDO does not conclude that the sale of Cunningham to Anderson was a sham transaction. The FCC's use of the word "sham" in the HDO was in reference to proposed divestitures of local stations, (HDO ¶¶ 2, 11), not the sale of Cunningham's voting stock to Anderson.[16] The question remains, however, whether Sinclair materially misled investors when it referred to Anderson as an "unrelated party." In assessing materiality, the court considers other information publicly available at the time the alleged misstatement was made, *see Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 617 (4th Cir. 1999), and notes that whether Anderson *actually was* an "unrelated party" is not the issue. Indeed, "even lies are not actionable when an investor possesses information sufficient to call the [mis]representation into question." *Id.* (quoting *Teamsters Local 282 Pension Trust Fund v.*

---

[16] Even if the FCC *had* used the word "sham" in connection with the sale to Anderson, as the court explained in note 15, *supra*, the FCC made no "conclusions" about the scrutinized transactions.

*Angelos*, 762 F.2d 522, 529 (7th Cir. 1985)) (internal quotation marks omitted).[17] Here, when

Sinclair stated on March 1, 2018, in the 2017 Form 10-K, that the voting stock of Cunningham

had been sold to an unidentified "unrelated party," the details of that transaction—including

Anderson's identity and details of his relationship to the Smith family—were already in the

public domain.[18] The Amended Complaint does not include any additional facts about the

relationship between Sinclair and Anderson that would have rendered Sinclair's description of

Anderson as an "unrelated party" materially false or misleading. In light of the "total mix of

information" available to a reasonable investor when the 2017 Form 10-K was issued, the court

finds that Sinclair's statement regarding the sale of Cunningham's voting stock to an "unrelated

party" was not materially misleading. *See Phillips*, 190 F.3d at 617; *see also Keeney v. Larkin*,

306 F. Supp. 2d 522, 530–33 (D. Md. 2003) (defendant's false statement that acquired

companies had been successfully integrated was not materially misleading where other public

information alerted the market that the companies had not been integrated). Accordingly, claims

arising from this alleged misstatement will be dismissed as to all defendants.

---

[17] Sinclair maintains that Anderson was, in fact, an "unrelated party." Sinclair argues that because Anderson did not meet the definition of "related person" as contained in Item 404 of Regulation S-K, *see* 17 C.F.R. § 229.404(a), Sinclair was not required to disclose the nature of the parties' relationship. (Mot. at 24 n.11). This, of course, does not mean that referring to Anderson as an unrelated party could *never* be misleading. *See Reese*, 643 F.3d at 692 ("[A] statement that is literally true can be misleading and thus actionable under the securities laws.") (internal citation omitted).

[18] In a public notice issued on December 7, 2017, the FCC disclosed its approval of a "Voluntary Transfer of Control" between Michael Anderson, as trustee of the Carolyn C. Smith Cunningham Trust, and Michael Anderson, in his personal capacity. (12/7/17 FCC Public Notice, Mot. Ex. 15, ECF 49-14). The filing number listed in the public notice corresponds to a publicly-filed application that details the terms of the transaction and Anderson's status as the sole trustee of a trust associated with the estate of the defendant Smith's late mother. (Anderson Transfer App., Mot. Ex. 1, ECF 49-3). The court notes that the details of the transaction were not included in the 2017 Form 10-K, and that a reasonable investor would have needed to conduct further research to discover the nature of Sinclair's relationship to Anderson. Nevertheless, this information was in the public domain, and Atlanta P&F does not respond to Sinclair's argument that the existence of this information negated any potentially misleading impression created from the reference to Anderson as an "unrelated party." Instead, Atlanta P&F simply re-states its allegation that Anderson was not, in fact, "unrelated." (Opp'n at 30).

vii.   Expected closing date of the Merger

Atlanta P&F challenges several of Sinclair's statements regarding the expected closing

date of the Merger. Atlanta P&F asserts that because Sinclair had no reasonable basis for its

projected timeline, the following statements were materially false and misleading:

- Sinclair's statement in the 2017 Form 10-K that it "expect[ed] the [Tribune] transaction will close in the second quarter of 2018, pending customary closing conditions, including antitrust clearance and approval by the FCC." (Am. Compl. ¶ 167).

- Sinclair's statement in a May 9, 2018, press release that "Sinclair anticipates closing [of the Merger] to occur near the end of the second quarter/beginning of the third quarter of 2018, pending customary closing conditions, including approval by the Federal Communications Commission ("FCC") and antitrust clearance, as applicable." (*Id.* ¶ 177).

- Sinclair's statement in the May 9, 2018, earnings press release that "[t]he Company expects to close its announced acquisition of 100% of the issued and outstanding stock of Tribune late in the second quarter or early in the third quarter of 2018, subject to customary closing conditions, including approval by the FCC and antitrust clearance." (*Id.* ¶ 179).

- Defendant Ripley's statement in Sinclair's May 9, 2018, earnings press release that the "acquisition of Tribune Media is now approaching the final stages with an anticipated closing in late second quarter/early third quarter of 2018, as we await governmental approvals." (*Id.* ¶ 179).

- Ripley's statement on the May 9, 2018, earnings call that "We are nearing the final stages on the Tribune closing . . . We have reached agreements on the divestitures and are awaiting government approvals. We expect to close the Tribune acquisition and related station divestitures in late Q2, early Q3. As previously announced, there will be a total of 23 stations sold, consisting of 14 Tribune stations and 9 stations that we own, operate or provide services." (*Id.* ¶ 180).

Sinclair argues that these statements are all "forward-looking statements" shielded from

liability under the PSLRA's safe harbor provision. Atlanta P&F counters that the statements are

not forward looking, as they related to the "then-present Merger status and history." (Opp'n at

24). Atlanta P&F correctly notes that where a challenged statement contains both forward-

looking and non-forward-looking statements, the PSLRA safe harbor provision protects only the

forward-looking portion of the statement. *See In re Quality Sys., Inc. Sec. Litig. (QSI)*, 865 F.3d 1130, 1141–42 (9th Cir. 2017) (citing cases from the First, Second, Third, Fifth, and Seventh Circuits). The Fourth Circuit, however, at least in an unpublished opinion, has rejected the argument that "statements of present belief regarding future events" are non-forward-looking statements. *See Marsh Grp. v. Prime Retail, Inc.*, 46 F. App'x 140, 147 (4th Cir. 2002). Accordingly, the fact that Sinclair's statements regarding the anticipated closing of the Merger contained statements of present belief does not render them non-forward looking. Moreover, the statements all reference pending regulatory approval, communicating to investors that Sinclair's expected timeline was not a guarantee. *See, e.g., TransEnterix Inv'r Grp. v. TransEnterix, Inc.*, 272 F. Supp. 3d 740, 757–58 (E.D.N.C. 2017) (statement of present intention that was "inextricably linked" to future FDA clearance was a forward-looking statement).

Still, forward-looking statements are protected under the PSLRA safe harbor provision only if they are "accompanied by meaningful cautionary statements." 15 U.S.C. § 78u-5(c)(1)(A)(i). "Cautionary language must be extensive, specific, and directly related to the alleged misrepresentation." *Julianello v. K-V Pharm. Co.*, 791 F.3d 915, 921 (8th Cir. 2015) (quoting *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 282 (3d Cir. 2010)) (alteration omitted). A forward-looking statement may incorporate by reference earlier cautionary statements made in SEC filings. *Aetna*, 617 F.3d at 282; *In re Humphrey Hosp. Tr., Inc. Sec. Litig.*, 219 F. Supp. 2d 675, 684 (D. Md. 2002) (citing cases).

In addition to a lengthy preamble detailing the limitations of forward-looking statements, the 2017 Form 10-K specifically warns investors that "[t]here can be no assurance that pending acquisitions will be approved by the FCC or other regulatory authorities, or that a requirement to divest existing stations or business will not have an adverse outcome on the transaction." (2017

23

Form 10-K at 23, Mot. Ex. 14, ECF 49-16).[19] The statements pertaining to the closing of the

Merger all include the caveat that Sinclair's expected timeline depends on regulatory approval,

and the language in the 2017 Form 10-K expressly communicates that approval is uncertain. The

court finds this language sufficiently cautionary. *See Humphrey Hosp.*, 219 F. Supp. 2d at 684

(cautionary statement in SEC filing, noting that certain factors may affect the company's

payment of dividends, placed the forward-looking statement that "we expect to maintain our

current dividend rate" within the PSLRA's safe harbor). The other statements identified in this

subsection all incorporated the cautionary statements in the 2017 Form 10-K by reference.[20]

Accordingly, the statements are shielded from liability under the PSLRA's safe harbor provision,

and claims arising from these statements will be dismissed as to all defendants.[21]

viii. Sinclair's April 24, 2018, press release

Atlanta P&F claims that several statements contained in a Sinclair press release, issued

April 24, 2018, were materially false and misleading. The challenged statements are as follows:

- Sinclair's statement that "it ha[d] entered into definitive agreements to sell television stations to . . . Cunningham Broadcasting Corporation . . . in order to obtain necessary governmental approval of the Tribune transaction." (Am. Compl. ¶ 172).

- Sinclair's statement that it had "entered into a purchase agreement to sell [two Texas stations previously owned by Tribune] to Cunningham . . . to comply with the National Cap Rule." (*Id.* ¶ 173).

- Sinclair's statement that "Tribune has entered into a purchase agreement and filed an application to sell WGN-TV to WGN TV LLC, a company controlled by Steven

---

[19] This disclaimer appears in a subsection of the 2017 Form 10-K entitled, "Item 1A. Risk Factors," which is cross-referenced to a subsection on forward-looking statements. (2017 Form 10-K at 4, 20).

[20] The two May 9, 2018, press releases incorporate the cautionary statements in 2017 Form 10-K by reference. (May 9, 2018, News Release, Mot. Ex. 22, ECF 49-24; May 9, 2018, Q1 2018 News Release, Mot. Ex. 21, ECF 49-23). On the May 9, 2018, earnings call, a Sinclair executive stated that "forward-looking statements . . . are subject to a number of risks and uncertainties," and directed investors to Sinclair's most recent SEC filings—including the 2017 Form 10-K—for more details on those risks. (May 9, 2018, Earnings Call Transcript at 4, Mot. Ex. 23, ECF 49-25).

[21] The court need not address Atlanta P&F's argument that Sinclair had "actual knowledge" that the statements were false or misleading, as a forward-looking statement accompanied by meaningful cautionary language falls within the safe harbor provision, irrespective of the speaker's state of mind. *See Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010); *In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 212 (1st Cir. 2005).

Fader" despite the fact that "Sinclair's other proposed divestitures will bring it into compliance with the National Cap Rule[.]" (*Id.* ¶ 174).

- Defendant Ripley's statements that "after a very robust divestiture process, with strong interest from many parties . . . [Sinclair has] achieved healthy multiples on the stations we are divesting," and that the divestiture plan was "a significant step forward" toward obtaining regulatory approval for the merger. (*Id.* ¶ 172).

Atlanta P&F alleges that these statements were materially false and misleading because the "FCC ultimately determined" that the proposed divestitures "were phony sales made to the exact same related parties that had caused the FCC to object to those transactions as 'shams' only two months prior." (Am. Compl. ¶ 175). Atlanta P&F erroneously states that the FCC made "determin[ations]" about the proposed divestitures. *See supra* note 15. But even if these statements were materially false or misleading, Sinclair argues that statements regarding compliance with FCC regulations were statements of opinion, and that Atlanta P&F has insufficiently pleaded scienter. The court agrees. As with the February 2018 statements regarding the WPIX and WGN divestitures, *see supra* Part I.A.iv, Atlanta P&F has failed to show that Sinclair had no rational basis for making these opinion statements.[22]

With respect to Ripley's statements about a "robust divestiture process" that had "achieved healthy multiples" and represented a "significant step forward," Sinclair argues that these statements were inactionable puffery. "Puffery" is generally defined as "loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." *See In re Cable & Wireless, PLC*, 321 F. Supp. 2d 749, 766–67 (E.D. Va. 2004) (citing *Hillson Partners Ltd. Partnership v. Adage, Inc.*, 42 F.3d 204, 213 (4th Cir.1994)). The

---

[22] As discussed in Part I.A.x, *infra*, Atlanta P&F also fails to allege with particularity any negative feedback Sinclair allegedly received from the FCC between its submission of the April 2018 Divestiture Plan and the issuance of the HDO.

court finds that a reasonable investor would not have relied on Ripley's vague description of the divestiture process as "robust" and a "significant step forward." *See, e.g., Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 585 n.15 (S.D.N.Y. 2016) (company's statement that the company was making "significant progress" toward FDA approval was inactionable puffery). Ripley's statement regarding "healthy multiples" is similarly vague; indeed, Atlanta P&F does not even define what "healthy multiples" means in this context. Accordingly, all claims arising from Sinclair's statements in the April 24, 2018, press release will be dismissed as to all defendants.

ix.   Ripley's statements at the JP Morgan Global Technology, Media and Communications Conference

Atlanta P&F challenges Ripley's statements at a May 15, 2018, conference regarding the timeline the closing of the Merger. At the conference, Ripley stated that "the divesture plan is complete on the Tribune acquisition . . . we would expect that to go out for public comment shortly for a 30-day comment period and close shortly after that. So as we indicated last week, timing for the close should be end of Q2, early Q3, and that is very much intact." (Am. Compl. ¶ 183). While these statements are largely forward looking, Ripley's claims that "the divestiture plan is complete" and that "timing for the close . . . is very much intact" are both representations of present fact. *See QSI*, 865 F.3d at 1141–42. The court will analyze the forward-looking and non-forward-looking portions of the statements in turn.

Even forward-looking statements unaccompanied by cautionary statements may fall under the PSLRA's safe harbor provision if a plaintiff cannot show that the forward-looking statement was made with actual knowledge that the statement was false or misleading. 15 U.S.C. § 78u-5(c)(1)(B)(i). Atlanta P&F alleges that Ripley's statements were false and misleading because Ripley had "no reasonable basis to believe that the Tribune merger would obtain regulatory approval and close by the first or second quarter of 2018, or at all." (Am. Compl. ¶

26

185). Atlanta P&F's only support for this claim about Ripley's state of mind, however, is the allegation that "the FCC ultimately determined" that Sinclair "attempted to deceive the FCC" through sham divestitures. (*Id.*). As the court has explained, however, the FCC did not so "determine." *See supra* note 15. Atlanta P&F thus supports the claim that Ripley had "no reasonable basis" for his forward-looking statement only by *implying* that Ripley knew the divestitures did not comply with FCC rules. This is not enough to raise a strong inference that Ripley acted with the requisite state of mind. *See Yates*, 744 F.3d at 887 (allegation that a defendant knew that the company was not in compliance with internal regulations did not support a strong inference of wrongful intent). Accordingly, the court cannot find that Atlanta P&F satisfied its requirement, under the PSLRA, to "state with particularity facts giving rise to a strong inference" that Ripley made the forward-looking statement with actual knowledge that it was false or misleading. *See* 15 U.S.C. § 78u–4(b)(2).

While Ripley's non-forward-looking statements at the May 15, 2018, conference do not fall under the PSLRA's safe harbor provision, *see QSI*, 865 F.3d at 1141–42, neither of them are actionable. First, Ripley's statement that "the divestiture plan is complete" is not materially false or misleading. According to the Amended Complaint, in response to the FCC's "emphatic rejection" of the February 2018 Divestiture Plan, Sinclair released an updated plan on April 24, 2018. (Am. Compl. ¶¶ 53, 55). The FCC began its formal review of the April 2018 Divestiture Plan on May 21, 2018. (*Id.* ¶ 63). It was thus not materially false or misleading for Ripley to state, on May 15, 2018, that the plan was complete, as the plan *was* complete and awaiting FCC review. Second, even assuming Ripley's statement that "timing for the close . . . is very much intact" was materially false and misleading, Atlanta P&F fails to "state with particularity facts giving rise to a strong inference" that Ripley made this statement with reckless or intentional

27

disregard for the truth. *See* 15 U.S.C. § 78u–4(b)(2); *Yates*, 744 F.3d at 884. As with Ripley's

forward-looking statements at the conference, Atlanta P&F supports its claim about Ripley's

state of mind only by implying that Ripley knew the April 2018 Divestiture Plan was a "sham."

(Am. Compl. ¶ 185). Here too, this allegation is insufficient to raise a strong inference that

Ripley acted with the requisite state of mind.[23]

     x.    July 2, 2018, *Bloomberg* Responses

    Atlanta P&F next claims that Sinclair's response to a *Bloomberg* report critical of the

April 2018 Divestiture Plan contained materially false and misleading statements. Specifically,

Sinclair stated that "ownership rules are not being evaded; they are being complied with," and

that "Cunningham is operated completely separately from Sinclair . . . Sinclair will have no

involvement in the operations of the Dallas and Houston stations being sold to Cunningham."

(Am. Compl. ¶ 186). According to Atlanta P&F, these statements were materially false and

misleading because "the FCC ultimately determined[] [that] Sinclair attempted to deceive the

FCC by proposing 'sham' divestitures to related parties who served as fronts for Sinclair—

including Cunningham—for significantly below-market prices in an effort to evade federal

ownership rules." (*Id.* ¶ 187) As court previously explained, the FCC did not make a

"determination" to this effect. *See supra* note 15. The question remains, however, whether

Sinclair's relationship with Cunningham rendered the statements in response to the *Bloomberg*

report materially false or misleading.

    Sinclair argues that the statement regarding compliance with FCC ownership rules was

not false or misleading because "investors would have understood Sinclair's statement as a good-

---

[23] Atlanta P&F points out that Sinclair's alleged misstatements on June 26, 2017, August 2, 2017, August 22, 2017, October 5, 2017, and May 15, 2018, were not accompanied by cautionary language. (Opp'n at 24 n.10). As the court has determined that these statements are not actionable under the securities laws, *see supra* Parts I.A.ii–iii, ix, it need not address this argument.

faith opinion." (Mot. at 26). Atlanta P&F objects to the characterization of this statement as an opinion, but argues that even if it *was* an opinion, it cannot have been sincerely made. (Opp'n at 33). As an initial matter, the court finds that the statement regarding FCC compliance was a statement of opinion. At the time the statement was made, the April 2018 Divestiture Plan was still under review. A reasonable investor would have understood that, notwithstanding Sinclair's own position, the FCC would have the final word on whether the proposed divestitures complied with FCC regulations. The statement regarding regulatory compliance, then, is actionable only if Atlanta P&F can show that "the statement was objectively false and the issuer lacked a rational belief in the veracity of the statement at the time it was made." *See Hirtenstein*, 348 F. Supp. 3d at 556.

Atlanta P&F contends that Sinclair lacked a rational belief that it was in compliance with FCC rules because the April 2018 Divestiture Plan was designed to deceive regulators. (Opp'n at 33). But Atlanta P&F fails to allege facts supporting such contemporaneous deceptive intent. In the Amended Complaint, Atlanta P&F merely repeats that the FCC "ultimately determined" that Sinclair attempted to deceive the FCC through proposed sham divestitures. Not only did the FCC not make such a determination, but the HDO was not issued until after Sinclair made the challenged statement. Although a statement regarding regulatory compliance may be misleading where a defendant is aware that "the federal government may have a differing opinion," *see Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 668 (D.S.C. 2016), Atlanta P&F does not allege that Sinclair received negative feedback from the FCC regarding the April 2018 Divestiture Plan until the issuance of the HDO.[24] *See In re Atossa Genetics Inc Sec. Litig.*, 868

---

[24] Nor does the FCC staff's opinion that the February 2018 Divesture Plan included transactions that "could readily be viewed as 'sham[s]'" render Sinclair's statement about the April 2018 Divestiture Plan intentionally deceptive. *See supra* note 15.

F.3d 784, 802 (9th Cir. 2017) (defendant's statement that its product complied with FDA regulations was misleading where the FDA had previously informed the defendant that the product did not comply); *Pub. Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 980–83 (8th Cir. 2012) (similar); *Epstein*, 203 F. Supp. 3d at 667–68 (defendant's statements to investors that its practices were legal were misleading where the defendant knew, based on the commencement of a federal investigation, that the government may have believed otherwise). The court does not find that the HDO's later suggestion that the divestitures may have been "shams" renders Sinclair's earlier statement intentionally deceptive. *See Hillson*, 42 F.3d at 213.[25]

The second challenged statement in response to the *Bloomberg* report—the claim that "Cunningham is operated completely separately from Sinclair"—is a statement of fact rather than opinion. Cunningham is an entity with close ties to Sinclair and the Smith family, and in SEC filings, Sinclair disclosed its "related party" status and the fact that Sinclair guaranteed $45 million of Cunningham debt. (2017 Form 10-K at F-39). Atlanta P&F, however, alleges that Cunningham was more than a related party. According to confidential witnesses ("CWs") cited in the Amended Complaint, Cunningham was a "shell" or "shadow" company, and "Sinclair and Cunningham were effectively the same entity." (Am. Compl. ¶ 204; Opp'n at 15–16).

A plaintiff relying on CWs "must describe the sources with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Yates*, 744 F.3d at 885 (quoting *Teachers' Ret. Sys. of LA v. Hunter*, 477 F.3d 162, 174 (4th Cir. 2007)). Atlanta P&F has met this burden. CW 1, who states that "Cunningham is a Sinclair property if not in name," worked for Sinclair from 1999 to 2017.

---

[25] In its Opposition, Atlanta P&F claims that the April 2018 Divestiture Plan included "renewed efforts to hide [] related-party transactions." (Opp'n at 33). As Atlanta P&F does not make this claim in the Amended Complaint, the court cannot evaluate it to determine whether Atlanta P&F has met its pleading requirements.

(Am. Compl. ¶ 101). As part of her job, CW 1 was sent to Cunningham affiliates, where "they were all Sinclair employees." (*Id.* ¶ 110). CW 1 also was tasked with interviewing candidates for jobs at Cunningham stations and was instructed to tell prospective candidates that their "technical" employer was Cunningham, even though Sinclair would be paying them. (*Id.*). CW 1 also stated that defendant Marks would tell LMA stations that "they were owned by someone else 'in name only.'" (*Id.* ¶ 103). CW 2, who identified Cunningham as a "shell company," was a Business Systems Coordinator at Sinclair from 2013 to 2016 who oversaw financials for LMAs like Cunningham. (*Id.* ¶¶ 111, 104). CW 7, a news anchor and political correspondent for Sinclair's WBFF station in Baltimore from 1991 to 2017, described Cunningham as a "shadow company," (*id.* ¶ 112), and CW 8, the Assistant News Director at WBFF from 2017 to 2018, described Cunningham as a "shell corporation," (*id.* ¶ 113). CW 9, who was the Director of Technical Operations at Tribune's KDAF station from 2009 to 2018, stated she did not take the "supposed distinction" between Sinclair and Cunningham seriously, especially considering that Sinclair planned to operate a morning show out of KDAF, using Cunningham equipment, after the station had been divested to Cunningham. (*Id.* ¶ 114). The court finds that these sources are described with sufficient particularity to support the probability that they would have possessed information regarding Sinclair's relationship with Cunningham.

A reasonable investor would have found Sinclair's statement that "Cunningham is operated completely separately from Sinclair" material, especially in light of media reports questioning the legitimacy of proposed divestitures to Cunningham. If Sinclair exercised *de facto* control over Cunningham, its statement assuring investors that Cunningham was operated "completely separately" from Sinclair would have been misleading. *See Reese*, 643 F.3d at 692

("[A] statement that is literally true can be misleading and thus actionable under the securities laws.") (internal citation omitted).[26]

For a materially misleading statement to be actionable, a plaintiff also must satisfy the scienter requirement. Atlanta P&F impermissibly relies on group pleading to hold the Individual Defendants responsible for Sinclair's statement in response to the Bloomberg report. *See Acterna*, 378 F. Supp. 2d at 572–73; *Under Armour*, 342 F. Supp. 3d at 694. Accordingly, the claims against the Individual Defendants will be dismissed. The court finds, however, that Atlanta P&F has adequately alleged scienter as to corporate defendant Sinclair. The CW statements describe a widespread understanding among Sinclair and Cunningham employees that, despite Cunningham's "technical" independence, Sinclair was in charge. These allegations are sufficient to satisfy the scienter requirement. *See Epstein*, 203 F. Supp. 3d at 667–68 (CW statements describing a "corporate culture of looking the other way" from illegal lending practices supported a "compelling inference" that the defendant intentionally made false or misleading statements about legal compliance).

Having determined that Atlanta P&F has adequately alleged that Sinclair's statement that "Cunningham is operated completely separately from Sinclair" was materially false and misleading, and made with the requisite scienter, the court next considers Sinclair's argument that Atlanta P&F fails to allege loss causation. Loss causation must be pled with "sufficient specificity . . . [to] enable the court to evaluate whether the necessary causal link exists." *Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011) (quoting *Teachers' Ret.*, 477 F.3d

---

[26] This statement differs from the challenged statement regarding the sale of Cunningham's voting stock. *See supra* Part I.A.vi. There, Atlanta P&F objected to Sinclair's characterization of Anderson as an "unrelated party," but alleged no facts—other than those already in the public domain—suggesting that Sinclair's description would have misled a reasonable investor. Here, however, the CW accounts directly contradict Sinclair's representations about Cunningham's independence. While *some* information about Sinclair's relationship to Cunningham was publicly available, the *extent* of that relationship was not.

at 186). While a plaintiff "need not conclusively show that the securities' decline in value is attributable solely to the alleged fraud rather than to other intervening factors," she must show "that the misrepresentation or omission was one substantial cause of the investment's decline in value." *Id.* at 472 (internal citation and quotation marks omitted). A plaintiff may plead loss causation by showing (1) that disclosure of the fraud[27] resulted in stock price deflation, *id.*; (2) "by pleading that a previously concealed risk materialized, causing the plaintiff's loss," *Teachers' Ret.*, 477 F.3d at 187 n.3; or (3) an "amalgam" of these two theories, *see Singer v. Reali*, 883 F.3d 425, 447 (4th Cir. 2018).

Atlanta P&F states that, following the revelations that the FCC was referring the proposed Merger to an ALJ due to concerns that "certain station divestitures that have been proposed to the FCC would allow Sinclair to control those stations in practice, if not in name, in violation of the law," Sinclair's stock price fell over 20 percent. (Am. Compl. ¶¶ 223–24, 229). Sinclair argues that because these disclosures did not reveal any information not already publicly available, the stock price deflation cannot be attributed to the fraud. The court disagrees. As previously discussed, while Cunningham's status as a "related party" to Sinclair had been publicly disclosed, Sinclair's alleged *de facto* control of Cunningham had not.[28] Indeed, Sinclair's assertion that "Cunningham is operated completely separately from Sinclair" was made in response to a news report that questioned the amount of control Sinclair exercised over Cunningham. The referral of the Merger to an ALJ suggests that the FCC disbelieved Sinclair's assertion, and the CW statements allege that the relationship between Sinclair and Cunningham

---

[27] So-called "corrective disclosures" revealing the fraud may come from sources other than the defendant. *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 264 n.32 (5th Cir. 2009) (collecting cases).

[28] In the HDO, the FCC noted its previous finding that Sinclair had exercised *de facto* control over an entity called Glencairn, which it stated was "now called Cunningham." (HDO ¶ 11 n.22). Sinclair, however, does not argue that the FCC's previous finding on Glencairn impacted the materiality of the challenged statements regarding Cunningham's independence.

went beyond what had been publicly disclosed. Moreover, the FCC's referral of the Merger to an ALJ can be characterized as the materialization of a previously-concealed risk. Of course, Sinclair warned investors that the Merger might not be approved. But, taking the allegations in the Amended Complaint as true, Sinclair concealed the risk that its *de facto* control of Cunningham could result in FCC rejection of Merger. Accordingly, the court finds that Atlanta P&F has adequately alleged that at least "one substantial cause" of Sinclair's stock price deflation was the revelation that it materially misrepresented the nature of its relationship with Cunningham.

The court thus finds that, with respect to Sinclair's statement that "Cunningham is operated completely separately from Sinclair," Atlanta P&F has adequately stated a claim that corporate defendant Sinclair violated the securities laws.[29] Accordingly, Sinclair's motion to dismiss will be denied as to this claim.

xi.    July 5, 2018, statements to the FCC

Atlanta P&F next claims that Sinclair made several materially false and misleading statements in its Second Consolidated Opposition to Petitions to Deny, filed with the FCC on July 5, 2018. Atlanta P&F challenges the following statements regarding Sinclair's compliance with FCC rules:

- "Each of the agreements at issue here mirrors those the Commission has approved in multiple transactions over the last decade for a variety of broadcasters." (Am. Compl. ¶ 188).

---

[29] In addition to the elements of falsity, scienter, and loss causation, a private plaintiff alleging violations of the securities laws must show "a connection between the misrepresentation or omission and the purchase or sale of a security," reliance upon the misstatement, and economic loss. *Yates*, 744 F.3d at 884 (citation omitted). Sinclair's public statement in response to the Bloomberg report easily satisfies the "in connection with" standard articulated in *Pirate*. *See supra* Part I.A.i. Reliance is presumed where, as here, a plaintiff relies on a fraud-on-the-market theory. *See Levinson*, 486 U.S. at 992. Atlanta P&F also satisfies the requirement of pleading economic loss, as it claims that revelation of the fraud caused Sinclair's stock price to lose more than 20 percent of its value. (Am. Compl. ¶ 229).

- "[T]he shared services arrangements to be entered into in connection with four of the transaction's 21 proposed divestitures (or options relating to these stations and two additional divestiture stations) comply with current law and are consistent with precedent," and that it had "disclosed the details of [the] proposed divestitures to ensure compliance with the Commission's existing national and local ownership rules and have filed all the applications necessary to effectuate those divestitures—each of which also complies with the Commission's rules." (*Id.* ¶ 189).

- Sinclair's statement that claims that Sinclair divested stations for below-market prices were "unsubstantiated" and "without merit or support." (*Id.* ¶ 190).

Atlanta P&F claims that these statements were materially false and misleading because the FCC "determine[d]" that Sinclair proposed sham divestitures for below-market prices. (Am. Comp. ¶ 192). As stated above, the FCC made no such determination. *See supra* note 15. A reasonable investor would have understood that the statements regarding compliance with FCC rules, made in a legal filing to the FCC, were opinions, *see supra* Part I.A.iv. As with the February 2018 statements regarding the WPIX and WGN divestitures, *see id.*, Atlanta P&F has failed to show that Sinclair made these opinion statements without rational belief in their veracity.[30] Accordingly, claims arising from these statements will be dismissed as to all defendants.

Atlanta P&F also challenges Sinclair's statement, made in the same FCC filing, that "Sinclair does not control or hold any attributable interest in Cunningham, nor do any of the Smith brothers own any stock, voting or non-voting, in Cunningham. Rather, Michael E. Anderson holds 100% of the voting shares of Cunningham." (Am. Compl. ¶ 191). The court finds that the portions of this statement regarding stock ownership of Cunningham are not false or misleading; indeed, these facts are literally true and consistent with Sinclair's public disclosures. *See supra* Part I.A.vi. The portion of the statement regarding "control" of

---

[30] As discussed in Part I.A.x, Atlanta P&F also fails to allege with particularity any negative feedback Sinclair allegedly received from the FCC between its submission of the April 2018 Divestiture Plan and the issuance of the HDO.

Cunningham, however, is less straightforward. As the court analyzed in Part I.A.x, *supra*, Atlanta P&F has adequately stated a § 10(b) claim stemming from Sinclair's materially misleading claim that Cunningham was "operated completely separately from Sinclair." The court finds that the same conclusion is warranted here. Even though this statement regarding Sinclair's control of Cunningham appeared in an FCC filing, a reasonable investor would have assumed that Sinclair's descriptions of its own business operations were statements of fact rather than opinion. Following the analysis in Part I.A.x, *supra*, the court also finds that Atlanta P&F has adequately stated a claim as to corporate defendant Sinclair, but not as to the Individual Defendants. Accordingly, all claims against the Individual Defendants arising from statements made in the July 5, 2018, FCC filing will be dismissed. All claims against corporate defendant Sinclair will be dismissed, except for the claim arising from Sinclair's statement that "Sinclair does not control or hold any attributable interest in Cunningham."

xii.   Sinclair's Code of Business Conduct and Ethics

Finally, Atlanta P&F claims that, it light of Sinclair's attempts to deceive the FCC, it was materially false and misleading for Sinclair to state, in its Code of Business Conduct and Ethics, that it "aim[ed] to succeed through fair and honest competition" and "never through unethical or illegal business practices." (Am. Compl. ¶ 194). Sinclair argues that aspirational statements in Sinclair's code of conduct are not actionable under the securities laws. The court agrees. Statements in corporate codes of conduct can be characterized as inactionable "puffery": statements of a company's ideals rather than representations of past or present fact. *See, e.g., Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1277 (9th Cir. 2017); *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 490 (6th Cir. 2015); *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583, 625–26 (S.D. Tex. 2018).

Accordingly, the court will dismiss claims against all defendants arising from statements made in Sinclair's code of conduct.

## B. Price-fixing claims

Another group of statements Atlanta P&F claims were materially false and misleading pertain to Sinclair's alleged involvement in an illegal price-fixing conspiracy. The challenged statements are as follows:

- Defendant Marks's statement on a February 22, 2017, earnings call that Sinclair was "beating our peer group" and "beating our competition." (Am. Compl. ¶ 131).

- Sinclair's statements in the 2016 Form 10-K and the 2017 Form 10-K that Sinclair's "sales and programming strategies allow us to compete effectively for advertising revenues" and that Sinclair "compete[s] favorably against other television stations because of our management skill and experience[.]" (*Id.* ¶¶ 133–34, 165).

- Sinclair's statement in its Code of Business Conduct and Ethics that it it "aim[ed] to succeed through fair and honest competition" and "never through unethical or illegal business practices." (Id. ¶ 194).[31]

Atlanta P&F's claim that these statements violated the securities laws is premised on its allegation that Sinclair illegally conspired with competitors to fix advertising prices. For the statements to be actionable, Atlanta P&F must allege with particularity the basis for the illegality. *See In re Mirant Corp. Sec. Litig.*, No. CIV.A. 1:02-CV-1467R, 2009 WL 48188, at *17 (N.D. Ga. Jan. 7, 2009) (citing *In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 585 (S.D.N.Y. 2006)).[32] Atlanta P&F relies on the November 13, 2018, DOJ complaint and three CW statements to demonstrate that Sinclair engaged in an illegal price-fixing scheme. Sinclair contends that neither the DOJ complaint nor the CW statements allege illegal conduct with particularity.

---

[31] As Atlanta P&F challenges the statements in the code of conduct as materially false and misleading for two reasons, (Am. Compl. ¶¶ 194–95), the court analyzes these statements twice.

[32] Unpublished cases are cited for the persuasiveness of their reasoning, not for any precedential value.

The court agrees that Atlanta P&F has failed to allege the underlying illegal scheme with sufficient particularity. The unproven allegations in the DOJ complaint do not establish illegality, *see Highfields Capital I, LP v. SeaWorld Entm't, Inc.*, 365 F. Supp. 3d 1050, 1057 (S.D. Cal. 2019), nor does the fact that Sinclair reached a non-punitive settlement with the DOJ, *see Nolte v. Capital One Fin. Corp.*, 390 F.3d 311, 316 (4th Cir. 2004) ("The fact that Federal Regulators require a company to change the way it does business in the future does not show . . . that the business violated federal guidelines in the past.").

The CW statements similarly fail to sufficiently support the allegation of illegal conduct. CW 10, who worked as an outside consultant for Sinclair, states that a proposed joint venture called "OxMyx Media Group" was abandoned in March 2017 because of "fear" that regulators might suspect "[c]ollusion." (Am. Compl. ¶ 119). CW 11, who worked as a Director of National Digital Sales Strategy at Tribune, states that shortly after the Merger was announced, she attended an "awkward and weird coffee conversation," also attended by several unidentified Sinclair employees and representatives from a digital sales vendor, that "didn't feel right." (*Id.* ¶ 120). CW 12, a former senior account executive for Sinclair, stated that, prior to the Merger, Tribune and Sinclair "might have shared the revenue from [a] shared sale . . . It was casually discussed." (*Id.* ¶ 121). None of these CWs, however, describe any concrete examples of conduct consistent with an illegal price-fixing scheme. The court thus finds that Atlanta P&F has failed to establish that Sinclair's statements regarding competition were materially false or misleading. Accordingly, claims arising from these statements will be dismissed as to all defendants.

## II.     Violations of § 20(a) (Individual Defendants)

Section 20(a) of the Securities Exchange Act, codified at 15 U.S.C. § 78t(a), provides that:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . , unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). Atlanta P&F alleges that the Individual Defendants violated § 20(a) because they were "controlling person[s]" who, due to their positions of authority within Sinclair, managed the company's day-to-day operations and controlled the content of Sinclair's public statements, including the alleged misstatements identified in the Amended Complaint. (Am. Compl. ¶¶ 259–60). A plaintiff alleging violations of § 20(a) "must allege a predicate violation of Section 10(b)" for the claim to be viable. *In re Mun. Mortg. & Equity, LLC, Sec. & Derivative Litig.*, 876 F. Supp. 2d 616, 647 (D. Md. 2012); *see also Yates*, 744 F.3d at 894 n.8.

In its Motion, Sinclair argues that the § 20(a) claims should be dismissed, as Atlanta P&F fails to allege predicate violations with respect to any of the alleged misstatements. (Mot. at 50). The court agrees that, where Atlanta P&F has failed to state a claim under § 10(b), the § 20(a) claims against the Individual Defendants should also be dismissed. The court, however, has determined that two of the statements identified in the Amended Complaint give rise to a claim under § 10(b), *see* Parts I.A.x–xi, and Sinclair offers no additional arguments that the § 20(a) claims should be dismissed. Accordingly, the court will not dismiss the claims against the Individual Defendants arising from Sinclair's statements that "Cunningham is operated completely separately from Sinclair," (Am. Compl. ¶ 186), and that it "does not control or hold any attributable interest in Cunningham," (*id.* ¶ 191).

## CONCLUSION

For the foregoing reasons, the court will grant in part and deny in part Sinclair's motion to dismiss. All claims will be dismissed except for: (1) the § 10(b) claim against corporate

defendant Sinclair arising from its July 2, 2018, statement that "Cunningham is operated completely separately from Sinclair"; (2) the § 10(b) claim against corporate defendant Sinclair arising from its July 5, 2018, statement that it "does not control or hold any attributable interest in Cunningham,"; and (3) the § 20(a) claims against the Individual Defendants arising from those two statements. A separate order follows.

2/4/20

Date

Catherine C. Blake
United States District Judge