**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

IN RE SINCLAIR BROADCAST GROUP,   *
INC. SECURITIES LITIGATION      *       Civil No. CCB-18-2445
                              *

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

This is a class action securities case brought by lead plaintiffs City of Atlanta Police Pension Fund and the City of Atlanta Firefighters' Pension Fund (collectively "Atlanta P&F") against Sinclair Broadcast Group, Inc., Christopher S. Ripley, Lucy A. Rutishauser, Steven M. Marks, and David D. Smith (collectively "Sinclair"). On behalf of itself and all persons or entities that acquired Sinclair common stock between February 22, 2017, and July 26, 2018, Atlanta P&F alleged numerous violations of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78a *et seq.*, stemming from a failed merger between Sinclair and Tribune Media ("Tribune"). (Am. Compl. ¶ 1, ECF 45).

On February 4, 2020, the court dismissed all claims based on 66 of the 68 statements alleged to have been materially false or misleading. (ECF 58, 59). Now pending is Atlanta P&F's motion for reconsideration or, in the alternative, to certify dismissal as final and appealable pursuant to Federal Rule of Civil Procedure 54(b). (ECF 66). Atlanta P&F has also filed a motion for leave to file a supplemental memorandum in further support of the motion for reconsideration. (ECF 71). Both motions are fully briefed, and no hearing is necessary.

For the reasons explained below, Atlanta P&F's motion for leave to file a supplemental memorandum will be granted, and the motion for reconsideration will be denied. As the court lacks jurisdiction over the remaining claims in the case, the claims will be dismissed, and Atlanta P&F's request for Rule 54(b) certification will be denied as moot.

1

**BACKGROUND**

I.

The facts of this case are more fully set out in the court's February 4, 2020

Memorandum, (*see* 2/4/20 Memo., ECF 58), and the court will recite the minimum facts

necessary to resolve the pending motions.

On May 8, 2017, Sinclair, a large telecommunications conglomerate, announced its plan

to acquire Tribune, another large media company, for $3.9 billion dollars (the "Merger"). (Am.

Comp. ¶ 3). As part of its merger agreement with Tribune (the "Merger Agreement"), Sinclair

agreed to divest its ownership in television stations as necessary to obtain regulatory approval of

the Merger. (*Id.* ¶ 27). Regulatory approval of the Merger required compliance with the Federal

Communications Commission's ("FCC") National Cap (or "National Ownership") Rule, the

FCC's Duopoly Rule, and Department of Justice ("DOJ") antitrust regulations. (*Id.* ¶ 26). In

public statements and filings throughout the summer and fall of 2017, Sinclair repeated its

commitment to make station divestitures as required by the Merger Agreement. But, according to

Tribune in its complaint filed after the Merger failed, "from virtually the moment the Merger

Agreement was signed," Sinclair was engaged in an effort to obtain regulatory approval without

making station divestitures. (*Id.* ¶ 33; see also Tribune Compl. ¶ 7, ECF 49-35).

On February 21, 2018, Sinclair announced a plan to divest stations in order to comply

with the National Cap Rule (the "February 2018 Divestiture Plan"). (Am. Compl. ¶¶ 46, 155).

The February 2018 Divestiture Plan included proposals to divest stations to entities with close

ties to the family of Sinclair's founder (the "Smith family"): Cunningham Broadcast Corporation

("Cunningham") and WGN-TV LLC. (*Id.* ¶ 47). According to Tribune, the FCC reacted

negatively to the February 2018 Divestiture Plan, (*id.* ¶¶ 47–48), and ultimately decided not to

put the February 2018 Divestiture Plan out for public comment. (*Id.* ¶ 53).

On April 24, 2018, Sinclair announced another plan to divest stations in order to obtain regulatory approval of the Merger (the "April 2018 Divestiture Plan"). (Am. Compl. ¶ 55). While the proposed divestitures in this plan differed somewhat from those proposed in the February 2018 Divestiture Plan, Sinclair still proposed divesting certain stations to Cunningham and WGN-TV LLC. (*Id.*). The FCC did, however, put the April 2018 Divestiture Plan out for public comment and began its formal review process of the Merger on May 21, 2018. (*Id.* ¶ 63).

The proposed divestitures drew scrutiny from media outlets and from outside commenters who petitioned the FCC to deny approval of the Merger. (Am. Compl. ¶¶ 63–64). In response to a July 2, 2018, *Bloomberg* report questioning the legitimacy of the divestitures, Sinclair stated that its proposals complied with FCC regulations, adding that "Cunningham is operated completely separately from Sinclair." (*Id.* ¶ 65). On July 5, 2018, Sinclair filed with the FCC an opposition to the petitions to deny, arguing that the proposed divestitures complied with FCC regulations and noting that "Sinclair does not control or hold any attributable interest in Cunningham." (*Id.* ¶ 66).

On July 16, 2018, FCC Chairman Ajit Pai issued a statement expressing "serious concerns about the Sinclair/Tribune transaction." (Am. Compl. ¶ 67). News outlets also reported that Chairman Pai was circulating a draft Hearing Designation Order ("HDO") referring the question of whether to approve the Merger to an FCC Administrative Law Judge ("ALJ"). (*Id.*). On July 18, 2018, the FCC announced its final decision to send the Merger to an ALJ hearing. (*Id.* ¶ 78). The next day, the FCC released the HDO, which stated in part that "[t]he record raises significant questions as to whether [the proposed divestitures to Cunningham and WGN-TV LLC] were in fact 'sham' transactions." (*Id.* ¶¶ 79–80; *see also* HDO, ECF 49-33). On August 9,

2018, Tribune withdrew from the Merger and filed a $1 billion breach of contract action against Sinclair in the Delaware Chancery Court (the "Tribune Complaint"). (*Id.* ¶ 93; *see also* ECF 49-35).

## II.

Atlanta P&F's class action complaint alleged violations of §§ 10(b)[1] and 20(a)[2] of the Exchange Act based on 68 statements alleged to be materially false and misleading. But in the 2/4/20 Memorandum and Order, the court dismissed all claims based on 66 of those statements. The remaining clams are (1) the § 10(b) claim against corporate defendant Sinclair arising from its July 2, 2018, statement that "Cunningham is operated completely separately from Sinclair"; (2) the § 10(b) claim against corporate defendant Sinclair arising from its July 5, 2018, statement that it "does not control or hold any attributable interest in Cunningham"; and (3) the § 20(a) claims against Ripley, Rutishauser, Marks, and D. Smith (the "Individual Defendants") arising from those two statements. (2/4/20 Memo. at 39–40). Accordingly, the class period, which initially spanned 17 months, was shortened to two weeks. (Mot. for Reconsideration at 3–4, ECF 66-1). Atlanta P&F states that it "did not purchase shares of Sinclair common stock during the approximately two-week Class Period that remains following the Court's Order," thus calling into question its standing to pursue the remaining claims. (*Id.* at 27–28). Further, Atlanta P&F asserts that "no investor has come forward who is able or willing to prosecute the limited remaining claims." (Reconsideration Reply at 13, ECF 70).

---

[1] Section 10(b), codified at 15 U.S.C. § 78j(b), "prohibits the use of 'any manipulative or deceptive device or contrivance' in connection with the sale of a security in violation of SEC rules." *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 884 (4th Cir. 2014). Atlanta P&F also alleged violations of Rule 10b-5, the Securities and Exchange Commission ("SEC") rule implementing § 10(b), *see* 17 C.F.R. § 240.10b-5, but as "[t]he scope of Rule 10b-5 is coextensive with the coverage of § 10(b)," *S.E.C. v. Pirate Inv'r LLC*, 580 F.3d 233, 237 n.1 (4th Cir. 2009) (quoting *S.E.C. v. Zandford*, 535 U.S. 813, 816 n.1 (2002)), the court analyzed the claims together.
[2] Section 20(a), codified at 15 U.S.C. § 78t(a), imposes liability for § 10(b) violations on "controlling persons" within the meaning of the statute.

Atlanta P&F seeks reconsideration of the court's 2/4/20 Memorandum and Order, arguing that (1) the court applied the incorrect standard for pleading scienter with respect to the claims based on Sinclair's May–August 2017 statements regarding station divestitures; (2) the court improperly discounted the HDO in contravention of *Singer v. Reali*, 883 F.3d 425 (4th Cir. 2018); and (3) the court's finding that Atlanta P&F had adequately pled that two of Sinclair's statements were materially false or misleading compel a finding that several other statements were false or misleading. In the alternative, Atlanta P&F asks the court to enter a final judgment and certify the dismissed claims for immediate appeal under Rule 54(b). Sinclair opposes both reconsideration and Rule 54(b) certification.

Atlanta P&F also filed a supplemental memorandum containing "powerful new evidence that directly bears on Lead Plaintiffs' motion for reconsideration, and in particular this Court's decision that the HDO was merely a 'suggestion' of wrongdoing." (Supp. Mot. at 2, ECF 71-1). Sinclair opposes Atlanta P&F's motion to file this supplemental memorandum, and also argues that Atlanta P&F's proffered "new evidence" is belied by even *newer* evidence that supports Sinclair's position that the motion for reconsideration should be denied. (Supp. Mot. Opp'n at 1–2, ECF 73).

## STANDARD OF REVIEW

Motions for reconsideration of an interlocutory order are governed by Federal Rule of Civil Procedure 54(b), under which "any order . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). Accordingly, when appropriate, a district court retains the power to reconsider and modify its interlocutory judgments at any time before final judgment. *Am. Canoe Ass'n v. Murphy Farms, Inc*., 326 F.3d 505, 514–15 (4th Cir. 2003). Resolution of the motion is "committed to

the discretion of the district court," *id.* at 515, and "the goal is to reach the correct judgment

under law," *Lynn v. Monarch Recovery Mgmt., Inc.*, 953 F. Supp. 2d 612, 618 (D. Md. 2013)

(citation and quotation marks omitted). "In considering whether to revise interlocutory decisions,

district courts in this Circuit have looked to whether movants presented new arguments or

evidence, or whether the court has 'obviously misapprehended a party's position or the facts or

applicable law.'" *Id.* at 619–20 (quoting *United States v. Duke Energy Corp.*, 218 F.R.D. 468,

474 (M.D.N.C. 2003) (further citations omitted)).

"Nevertheless, the discretion afforded by Rule 54(b) is not limitless . . . such discretion is

subject to the caveat that where litigants have once battled for the court's decision, they should

neither be required, nor without good reason permitted, to battle for it again." *U.S. Tobacco*

*Coop. Inc. v. Big S. Wholesale of Virginia*, LLC, 899 F.3d 236, 256–57 (4th Cir. 2018) (citation

and quotation marks omitted). Accordingly, a motion for reconsideration is "not the proper place

to relitigate a case after the court has ruled against a party, as mere disagreement with a court's

rulings will not support granting such a request." *Lynn,* 953 F. Supp. 2d at 620 (citation and

quotation marks omitted).

With respect to certification of the dismissed claims for immediate appeal, Rule 54

provides:

> When an action presents more than one claim for relief . . . or when multiple parties
> are involved, the court may direct entry of a final judgment as to one or more, but
> fewer than all, claims or parties only if the court expressly determines that there is
> no just reason for delay.

Fed. R. Civ. P. 54(b).

## DISCUSSION

**I.     Leave to file supplemental memorandum**

The Court "has broad discretion to grant leave to file supplemental materials." *Pelino v.*

*Ward Mfg.*, LLC, No. RDB-14-02771, 2015 WL 4528141, at *1 n.3 (D. Md. July 27, 2015).[3]

Here, Atlanta P&F filed the supplemental memorandum in order to alert the court to new factual

developments that it argues bear on the motion for reconsideration. Sinclair responded on the

merits of Atlanta P&F's supplemental motion and presented new evidence of its own. (*See* Supp.

Mot. Opp'n at 5–7). Mindful that the goal on motions for reconsideration of interlocutory orders

is "to reach the correct judgment under law," *Lynn,* 953 F. Supp. 2d at 618 (citation and

quotation marks omitted), the court will grant Atlanta P&F's motion for leave to file the

supplemental memorandum and will consider the arguments therein.[4]

## II.   Scienter standard

Atlanta P&F argues that the court applied the wrong scienter standard in dismissing a

group of claims in the 2/4/20 Memorandum and Order. This group of claims arose from several

of Sinclair's statements, made between May 9, 2017, and August 22, 2017, either describing

Sinclair's obligations under the Merger Agreement or affirming Sinclair's commitment to

complying with those obligations. (*See* 2/4/20 Memo. at 11–13 (analyzing statements set forth in

Am. Compl. ¶¶ 138–39, 141–50)). Atlanta P&F asserts that "[t]he court dismissed Defendants'

alleged false statements between May and August 2017 regarding Sinclair's commitment to

make station divestitures to obtain regulatory approval of the Tribune merger based on its finding

that the Complaint's allegations that Sinclair harbored a 'secret intention' to never comply was

'no more plausible than' the opposing inference of nonfraudulent intent," (Mot. for

Reconsideration at 6), and that "the Court found that these competing inferences were <u>equal</u>,"

---

[3] Unpublished opinions are cited for the soundness of their reasoning, not for any precedential value.
[4] In the supplemental memorandum, Atlanta P&F asked for permission to amend the complaint, but only "[i]n the event that the Court decides not to grant their motion for leave to file this supplemental memorandum[.]" (Supp. Mot. at 4 n.2, ECF 71-1). As the court will grant the motion and consider the supplemental memorandum, this request is denied as moot. In any event, amendment would be futile. As explained in Part III, *infra*, the new factual developments presented in the supplemental memorandum do not provide a basis for reconsideration of certain claims, and do not change the court's conclusion that those claims were properly dismissed.

(*id.* at 7–8 (emphasis in original)). Atlanta P&F argues that this was clear error under *Tellabs Inc. v. Makor Issues and Rights, Ltd.*, in which the Supreme Court held that the allegations of a complaint need only raise an inference of scienter that is "at least as likely as any plausible opposing inference." 551 U.S. 308, 328 (2007). But Atlanta P&F's argument fails for two reasons: (1) Atlanta P&F mischaracterizes the court's conclusion by reading in isolation one sentence of the court's analysis of Sinclair's May–August 2017 statements regarding station divestitures; and (2) the allegations of the Amended Complaint fail to meet the scienter requirement prescribed in *Tellabs*.

First, the court's observation that "Atlanta P&F's explanation of Sinclair's action is no more plausible than Sinclair's explanation that it was the company's longstanding belief . . . that it did not need to sell any stations to be in compliance," was not the conclusion upon which the court based its decision to dismiss the claims based on the statements at issue. By failing to read this sentence in context with the rest of the court's analysis of Sinclair's May–August 2017 statements regarding station divestitures, Atlanta P&F misunderstands why the court dismissed the claims based on those statements. As the court explained regarding scienter, "[t]he failure to carry out a promise made in connection with a securities transaction . . . does not constitute fraud unless, when the promise was made, the defendant secretly intended not to perform or knew that he could not perform." (2/4/20 Memo. at 12 (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993)). The court found that with respect to the May–August 2017 statements,

> Atlanta P&F does not allege sufficient facts to show that Sinclair or Ripley "secretly intended" not to make station divestitures at the time these statements were made. Atlanta P&F makes the conclusory allegation that "Sinclair had no intention" of making legitimate station divestitures, (Am. Compl. ¶ 140), and broadly alleges that "from the start of the DOJ's review of the merger in the summer of 2017, Sinclair steadfastly refused to divest the stations the DOJ required to be sold," (*id.*

¶ 34). But Atlanta P&F's first *specific* allegation that Sinclair "refused" to divest arises from communications between AAG Delrahim[5] and Sinclair in September 2017, (*id*. ¶ 35); the additional allegations stem from conduct in late 2017 and 2018. The court is not persuaded that Sinclair's subsequent actions give rise to a "strong inference" that the statements in May–August 2017 belied a secret intention not to comply with Sinclair's divestiture obligations under the Merger Agreement.

(*Id*. at 12–13 (emphasis in original)). In this section of the analysis, the court identified the lack of specific, contemporaneous factual allegations upon which the court could draw *any* inference, let alone a strong one, that Sinclair's May–August 2017 statements belied a secret intention not to make station divestitures. It was on this basis that the court found that Atlanta P&F had failed to raise a "strong inference" of scienter, not based on a finding of equality between two competing inferences.

The court acknowledges, however, that a citation to *Tellabs* at the end of this analysis, rather than *Twombly*, would have clarified the court's conclusion. But *Tellabs* does not save Atlanta P&F's claims. In *Tellabs*, the Supreme Court held that "[t]o qualify as 'strong' . . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." 551 U.S. at 314. While the inference of scienter must be "strong in light of other explanations," *id*. at 324, at a more basic level, the inference must also be supported by facts pled "with particularity," *id*. at 323. Atlanta P&F's allegations fail at this basic level.

Because the statements at issue "either describe Sinclair's obligations under the Merger Agreement or affirm Sinclair's commitment to complying with those obligations," (2/4/20 Memo. at 12), they do "not constitute fraud unless, when the promise was made, the defendant

---

[5] According to the Amended Complaint, in the fall of 2017, Assistant Attorney General ("AAG") Makan Delrahim told Sinclair that divestitures in the ten DMAs specified in the Merger Agreement would facilitate a path to regulatory approval. (Am. Compl. ¶ 35). In response, according to Tribune, Sinclair became "confrontational" with DOJ staff and AAG Delrahim. (*Id*.).

secretly intended not to perform or knew that he could not perform," *see Mills*, 12 F.3d at 1176.

To establish the required contemporaneous intent, Atlanta P&F relied principally on the

allegation in the Tribune Complaint that "[f]rom virtually the moment the Merger Agreement

was signed, Sinclair repeatedly and willfully breached its contractual obligations in spectacular

fashion." (*See* Mot. for Reconsideration at 6 (quoting Tribune Compl. ¶ 7, ECF 49-35); Opp'n to

Mot. to Dismiss at 22, ECF 54 (same); Am. Compl. ¶¶ 140, 144, 146 (same)). The other

allegations regarding contemporaneous intent were either conclusory (e.g., "Sinclair had no

intention to make station divestitures") or based on conduct in late 2017 and 2018 (e.g., the "sue

me" statement, allegedly made in January 2018),[6] which the court deemed insufficiently

probative of contemporaneous intent. (2/4/20 Memo. at 13 (citing *Powers v. British Vita, P.L.C.*,

57 F.3d 176, 185 (2d Cir. 1995) ("[I]ntent may be found when a defendant violates an agreement

so maliciously and so soon after it is made that his desire to do so before he entered into the

agreement is evident."))).

      The allegations of the Tribune Complaint, then, formed the only factual basis upon which

the required inference of scienter—that Sinclair harbored a "secret intention" not to comply with

the Merger Agreement when it made the May–August 2017 statements—could be built. This

factual basis was, and is, insufficient to meet the pleading standard described in *Tellabs*. While

Tribune alleged that Sinclair was in breach of contract "from virtually the moment the Merger

Agreement was signed," Tribune's *specific* allegations regarding Sinclair's alleged breach of

contract date no earlier than September 2017. (*See* Tribune Compl. ¶¶ 61–63). Moreover, as told

by the Tribune Complaint, beginning in September 2017, "Sinclair . . . continued to try, without

---

[6] According to the Amended Complaint, on January 25, 2018, Defendant Fader told AAG Delrahim to "sue [him]" in response to AAG Delrahim's offer to end its investigation and approve the Merger in exchange for certain divestitures. (Am. Compl. ¶ 43).

success, to persuade DOJ that divestitures in most of the ten Overlap DMAs should not be required." (*Id*. ¶ 63). All this suggests is that in the fall of 2017, Sinclair's position was that its obligations under the Merger Agreement did not require significant divestitures. It does not suggest that in May–August 2017, Sinclair harbored a "secret intention" not to comply with the Merger Agreement.

If the court was unclear in the 2/4/20 Memorandum, it will clarify now: Even if *any* inference of the required scienter could be drawn from the above facts, it would be a comparatively weak one. Such an inference requires imputing to Sinclair a "secret intention," in May–August 2017, not to comply with its obligations under the Merger Agreement based on its *later* position on the *scope* of those obligations. Under *Tellabs*, "[a] complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." 551 U.S. at 324. Based on the allegations of the Amended Complaint, as well as the allegations of the Tribune Complaint, the *more compelling inference* drawn from the factual allegations regarding the May–August 2017 statements is that Sinclair believed it could comply with the Merger Agreement without making certain station divestitures. Accordingly, the court will not reconsider its dismissal of the claims based on those statements.

## III.    Discounting of the HDO

Atlanta P&F suggests that the court's dismissal of claims based on Sinclair's statements pertaining to the February and April 2018 Divestiture Plans—specifically, the statements set forth in ¶¶ 155–58, 172–74, and 186–90 of the Amended Complaint—was due to the court's "discount[ing]" of the HDO. (Mot. for Reconsideration at 12). As the court observed in the 2/4/20 Memorandum,

> [I]t is not entirely accurate for Atlanta P&F to claim that the FCC determined that Sinclair's proposed divestitures were "shams." Atlanta P&F repeats this claim numerous times throughout the Amended Complaint, despite the fact that the HDO—the document upon which Atlanta P&F relies most heavily for this allegation—contains no such "determination." While the HDO states that "[t]he record raises significant questions as to whether those proposed divestitures were in fact 'sham' transactions," (HDO ¶ 2), the FCC did not decide the issue in the HDO. Instead, the FCC referred the matter to an ALJ. (HDO ¶ 29).
>
> Relying on the Tribune Complaint, Atlanta P&F also claims that "the FCC viewed the divestitures [in the February 2018 Divestiture Plan] as "sham[s]." (Tribune Compl. ¶ 106, Mot. Ex. 33, ECF 49-35). Again, this stretches the evidence. According to the Tribune Complaint, the FCC staff merely held the opinion "that the station sales could readily be viewed as 'sham' transactions." (*Id*.) (emphasis added). Atlanta P&F cannot turn the FCC's *suggestions* that the proposed divestitures were "shams" into *conclusions* that they were.

(2/4/20 Memo. at 18 n.15 (emphasis in original)). According to Atlanta P&F, the court's observation amounted to a "discount[ing]" of the HDO, in contravention of *Singer v. Reali*, 883 F.3d 425 (4th Cir. 2018).

*Singer* involved a fraudulent reimbursement scheme by which a medical device company instructed surgeons, when submitting reimbursement claims for a procedure using the defendants' medical device, to mis-code the procedure to ensure insurance reimbursement. 883 F.3d at 430. As part of their securities fraud class action complaint, the plaintiffs relied on the complaint and settlement in a qui tam action, which "alleged in detail the fraud scheme," but ultimately resulted in a settlement where the medical device company did not admit liability. *Id*. at 434–35. The defendants argued that the plaintiffs' securities fraud complaint did not properly allege the illegality of the reimbursement scheme, "as no court or other adjudicative body has found the Company's reimbursement practices to be illegal[.]" *Id*. at 441. The Fourth Circuit rejected that argument, holding that "the duty to disclose may extend to uncharged and unadjudicated illegal conduct," and that "even if the Complaint insufficiently describes how the scheme contravenes the False Claims Act and other statutes, the judicially noticed qui tam

complaint fully explains the scheme's alleged illegality." *Id*. (citation omitted).

The court's observation about Atlanta P&F's characterization of the HDO does not contravene *Singer*. The court did not "discount" the *substance* of the HDO, but rather took issue with Atlanta P&F's characterization of that substance. A plain reading of the Amended Complaint alongside the HDO reveals that Atlanta P&F overstated the contents of the HDO. Atlanta P&F repeatedly claimed throughout the Amended Complaint that the FCC "determined" in the HDO that Sinclair's proposed divestitures were "shams," which it did not. Indeed, the very purpose of the HDO was to refer the matter to an ALJ, who would be tasked with determining whether the proposed divestitures were "shams." (*See* HDO ¶ 29). Of course, the HDO's detailed explanations of why the transactions *may* have been "shams" certainly support Atlanta P&F's allegation that they *were* shams, and a finding that the HDO was irrelevant to Atlanta P&F's claims may well have contravened *Singer*. But at no point in the 2/4/20 Memorandum did the court suggest that the HDO—which contains similar information as the Amended Complaint— was irrelevant. The court simply refused to give the HDO more weight than it was due.

In its supplemental memorandum, Atlanta P&F further argues that a May 6, 2020, FCC press release "further—and conclusively—establishes that the Court's Order erred" in finding that the HDO contained suggestions, rather than conclusions, of misconduct by Sinclair. (Supp. Mot. at 1, ECF 71-1). In the press release, the FCC announced that it was imposing on Sinclair a $48 million civil penalty, the largest ever paid by a broadcaster. (Press Release, ECF 71-1 at 9). The penalty was part of an agreement to close three open investigations, including the "investigation into the company's disclosure of information relating to its proposed acquisition of stations owned by Tribune Media." (*Id*.). The press release included a statement by FCC Chairman Pai that "Sinclair's conduct during its attempt to merge with Tribune was completely

unacceptable." (*Id*.).

In its opposition to the supplemental motion, however, Sinclair points out that the terms of the FCC's agreement with Sinclair—the "Consent Decree," released publicly on May 22, 2020—actually supports the court's earlier decision  not to treat the HDO as containing "conclusions" that Sinclair's proposed divestitures were "shams." (Supp. Mot. Opp'n at 2). By its terms, the Consent Decree "resolves the Commission's investigations of [] real party-in-interest issues originally designated for hearing in Sinclair's proposed acquisition of stations owned by Tribune Media Company," i.e., the issues raised in the HDO. (*See* Consent Decree, ECF 73-2). The FCC stated as follows:

> With respect to the real-party-in-interest issue involving the proposed acquisition of Tribune Media Company, the Commission raised concerns that Sinclair did not disclose all the information that could bear on a potential real-party-in-interest determination and that this could have constituted a violation of section 1.65 of the Rules. Following the *HDO*, Sinclair filed additional information with the Commission on July 31, 2018, and also filed on July 11, 2019 a response to a staff letter of inquiry. In the July 2018 post-designation information filing, Sinclair described in detail the transaction agreements and the specific understanding of the parties regarding Fader's responsibilities for oversight and control of WGN-TV. In so doing, Sinclair provided information not previously disclosed regarding the relationship between Mr. Fader and Sinclair and how the sales price of WGN-TV was determined. Similarly, Sinclair disclosed additional and clarifying information about its relationship with Cunningham. Following review of this subsequent information, we find that Sinclair structured its transaction based upon a good faith interpretation of the Commission's rules and precedent regarding sharing agreements and the requirements for disclosure on the application form. Sinclair thus believed it was unnecessary to disclose further information regarding the relationships between Sinclair and both Fader and Cunningham.

(*Id*.) (emphasis added).

Two things are made clear by the Consent Decree: (1) at the time the HDO was released, the FCC had "concerns"—but had not yet concluded—that Sinclair's proposed divestitures were "shams"; and (2) at the conclusion of its investigation, the FCC found that the proposed divestitures were made in good faith. The Consent Decree thus undercuts Atlanta P&F's

assertion that the court improperly "discounted" the HDO in the 2/4/20 Memorandum. The FCC's own characterization of the HDO was that it "raised concerns" meriting further investigation, suggesting that any interpretation of the HDO as "concluding" or "determining" that the proposed divestitures were "shams" was, and is, incorrect. More damningly, unlike the HDO, the Consent Decree *does* contain conclusions, including the FCC's "find[ing] that Sinclair structured its transaction based upon a good faith interpretation of the Commission's rules and precedent[.]"

Atlanta P&F argues that the court should not credit this finding of good faith because the Consent Decree was not unanimous, accompanied by "scathing public dissents," and is "directly contradicted by the facts and entitled to no weight." (Supp. Mot. Reply at 2–3, ECF 74). But Atlanta P&F cannot have it both ways. Either the FCC's statements regarding the proposed divestitures are relevant to this case, or they are not. Indeed, a large portion of Atlanta P&F's motion for reconsideration is based on the notion that the court did not give *enough* weight to the FCC's prior "concerns" that the proposed divestitures *may* have been shams, and filed a supplement to that motion based on a press release Atlanta P&F believed supported its argument. Now, when the FCC has clearly stated its finding that the proposed divestitures were made in good faith, Atlanta P&F asks the court to ignore that finding. Atlanta P&F's position is untenable, and does not provide grounds for reconsideration of the court's prior decision to dismiss certain claims in the Amended Complaint. Accordingly, the court will not reconsider its dismissal of the claims based on the statements set forth in ¶¶ 155–58, 172–74, and 186–90 of the Amended Complaint.

IV.     **Compelled findings based on the Cunningham Statements**

A.   Additional statements

Atlanta P&F argues that the court's upholding of claims based on two statements regarding Sinclair's proposed divestiture to Cunningham compels a finding that several other statements were false or misleading. In the 2/4/20 Memorandum, the court concluded that Atlanta P&F had adequately alleged violations of the securities laws with respect to (1) Sinclair's statement that "Cunningham is operated completely separately from Sinclair," (Am. Compl. ¶ 186), and (2) Sinclair's statement that it "does not control or hold any attributable interest in Cunningham," (*id*. ¶ 191) (the "Cunningham Statements"). Because of the court's finding that these statements were materially false or misleading, Atlanta P&F argues that it was clear error to dismiss claims based on the statements set forth in the following portions of the Amended Complaint: ¶¶ 155–158 and 172–74 (February and April 2018 statements regarding divestiture proposals); 166 (statement that Michael Anderson was an "unrelated party"); and 163, 167, and 177–80 (statements regarding Sinclair's belief that it was "close" to regulatory approval).

The court's conclusion on the Cunningham Statements does not compel a finding that these other statements were materially false or misleading. Key to the court's analysis of the Cunningham Statements was that they were "statement[s] of fact rather than opinion." (2/4/20 Memo. at 30, 36). By contrast, the statements set forth in ¶¶ 155–158 and 173–74 were statements of opinion regarding the proposed divestitures' compliance with FCC rules, and the court found that Atlanta P&F had not met its burden of showing that Sinclair lacked a rational belief in the veracity of the statements when they were made, (2/4/20 Memo. at 16–17, 24–25); the statement set forth in ¶ 172 was inactionable "puffery,"[7] (*id*. at 25–26); and the statements set

---

[7] "Puffery" is generally defined as "loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total

forth in ¶¶ 163, 167, and 177–80 were statements of Sinclair's belief regarding the expected closing date of the Merger, and the court found that Atlanta P&F had not met its burden of showing that Sinclair lacked a rational belief in the veracity of the statements when they were made, (*id*. at 18–20, 22–24). While the statement that Michael Anderson was an "unrelated party," (Am. Compl. ¶ 166), is also a statement of fact, following an analysis of the "total mix of information" available to a reasonable investor when the statement was made, the court found that it was not materially false or misleading. (2/4/20 Memo. at 20–21).[8]

Much of Atlanta P&F's argument for reconsideration of the statements identified above appears to stem from the mistaken belief that the court concluded, in the 2/4/20 Memorandum, that Sinclair violated FCC rules, thus rendering all statements regarding proposed divestitures to Cunningham materially false or misleading. (*See, e.g.,* Mot. for Reconsideration at 17 ("[I]t was false and misleading for Sinclair to claim its divestiture to Cunningham was compliant when, as the Court found, Sinclair knew it had *de facto* control over Cunningham in violation of FCC rules[.]"). But even if the court had determined that Sinclair violated FCC rules—which it did not—the claims based on the statements identified above were dismissed for failure to allege actionable misstatements or omissions under the securities laws. The Private Securities Litigation Reform Act ("PSLRA"), codified at 15 U.S.C. § 78u-4, imposes stringent pleading standards for private plaintiffs alleging violations of § 10(b). *See Yates v. Mun. Mortg. & Equity, LLC*, 744

---

mix of information available." *See In re Cable & Wireless, PLC*, 321 F. Supp. 2d 749, 766–67 (E.D. Va. 2004) (citing *Hillson Partners Ltd. Partnership v. Adage, Inc.*, 42 F.3d 204, 213 (4th Cir. 1994)).

[8] Sinclair asserted in the Motion to Dismiss that the details of the transaction with Anderson—and details of Anderson's relationship to the Smith family—were in the public domain at the time of the "unrelated party" statement. (*See* 2/4/20 Memo. at 21 n.18). Accordingly, Sinclair argued, the existence of this information negated any potentially misleading impression created from the reference to Anderson as an "unrelated party." (*Id*.). As the court noted in the 2/4/20 Memorandum, Atlanta P&F did not respond to this argument. (*Id*.). Atlanta P&F attempts to respond now, (*see* Mot. for Reconsideration at 18–19), but its argument amounts to a disagreement with the court about whether the statement was material. A motion for reconsideration, however, is "not the proper place to relitigate a case after the court has ruled against a party, as mere disagreement with a court's rulings will not support granting such a request." *Lynn*, 953 F. Supp. 2d at 620 (citation and quotation marks omitted).

F.3d 874, 885 (4th Cir. 2014). As explained in the 2/4/20 Memorandum, Atlanta P&F failed to

meet those standards. Accordingly, the court will not reconsider its dismissal of the claims based

on the statements identified above.

> B. Claims against the Individual Defendants

Relatedly, Atlanta P&F argues that it was clear error for the court to dismiss the claims

against the Individual Defendants arising from the Cunningham Statements. As the court

explained in the 2/4/20 Memorandum, "[c]ourts in this Circuit have reasoned that 'group

pleading,' whereby corporate officers and directors are presumed to be responsible for a

company's 'group published' information, is insufficient to satisfy the PSLRA's scienter

requirement for individual defendants." (2/4/20 Memo. at 8 (citing cases)). Accordingly, the

court found that even though the claims based on the Cunningham Statements would proceed

against corporate defendant Sinclair, they would be dismissed as to the Individual Defendants.

(*Id*. at 32). Atlanta P&F argues, however, that the Fourth Circuit's holding in *Singer* renders the

court's finding clear error.

As explained above, *Singer* involved a fraudulent reimbursement scheme by which a

medical device company instructed surgeons, when submitting reimbursement claims for a

procedure using the defendants' medical device, to mis-code the procedure to ensure insurance

reimbursement. 883 F.3d at 430. In holding that the plaintiffs had adequately alleged scienter

with respect to the individual corporate officer defendants, the *Singer* court noted that "the

Complaint is premised on the proposition that the Officers directed the fraudulent reimbursement

scheme," which was "clearly illegal, and fundamental to [the medical device company's]

financial success." *Id*. at 444. Accordingly, "the Complaint establishes that the Officers' failure

to disclose the scheme presented a danger of misleading Singer and other investors—a danger

that was also known to the Officers, or so obvious that the Officers must have been aware of it."
*Id*.

   But *Singer* is distinguishable. There, the Fourth Circuit's finding of liability as to the
individual defendants was based on their own "false and misleading statements about the
Company's reimbursement practices that omitted the fraudulent reimbursement scheme." *Singer*,
883 F.3d at 444. Here, by contrast, Atlanta P&F asks the court to hold the Individual Defendants
liable based on the Cunningham Statements, which were "group published" information. Indeed,
any claims based on alleged misstatements or omissions by the Individual Defendants
themselves were dismissed for other reasons as explained in the 2/4/20 Memorandum. As the
court previously concluded, the "group published" doctrine is insufficient to satisfy the PSLRA's
scienter requirement for individual defendants. As Atlanta P&F has provided no compelling
reason for the court to change its conclusion, the court will not reconsider its dismissal of the
claims against the Individual Defendants arising from the Cunningham Statements.

## V.    Entry of a final judgment pursuant to Rule 54(b)

   Having found unpersuasive Atlanta P&F's arguments for reconsideration, the court
considers Atlanta P&F's request for entry of a final judgment pursuant to Federal Rule of Civil
Procedure 54(b) so it may immediately appeal dismissal of certain claims. In its argument for
54(b) certification, however, Atlanta P&F draws the court's attention to a jurisdictional issue that
may preempt a Rule 54(b) analysis. The court's dismissal of most claims in the case "resulted in
the elimination of all but 17 days out of the 502-day Class Period." (Mot. for Reconsideration at
23). Lead plaintiff Atlanta P&F states that it "did not purchase shares of Sinclair common stock
during the approximately two-week Class Period that remains following the Court's Order," (*id*.
at 27–28), and that "no investor has come forward who is able or willing to prosecute the limited

remaining claims," (Reconsideration Reply at 13). According to Atlanta P&F, then, it does not have standing to pursue this matter further and should be permitted to pursue relief at the appellate level.

The court is thus presented with the unusual situation where the plaintiff is arguing that the court is without jurisdiction to hear its remaining claims, while the defendant is arguing otherwise. In opposing Rule 54(b) certification, Sinclair cites to several cases where courts have allowed the plaintiffs to add additional named plaintiffs to cure standing issues in securities litigation. But those cases are distinguishable. In *Mortimer v. Diplomat Pharmacy Inc*., the court allowed the plaintiffs to add additional named plaintiffs to cure standing issues in a securities fraud case. No. 19 C 1735, 2019 WL 4934602, at *4 (N.D. Ill. Oct. 7, 2019) (citing cases). In *Mortimer*, however, the lead plaintiff had standing to pursue at least *some* of the claims remaining in the case. *See id*. (noting that the dispute was whether the lead plaintiff needed standing for *every* claim in the class action case). And in *City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc. HQ*, where the court found that two lead plaintiffs could remain in the case even though they had not purchased stock during the class period, the court expressly noted that it had not made "any *final determinations*" with respect to the actionability of any alleged statements, and that the class period was subject to change. 322 F. Supp. 3d 676, 682 (D. Md. 2018) (also noting that one lead plaintiff remained who was eligible to be appointed class representative) (emphasis in original).

The court finds more persuasive the reasoning of *Hering v. Walgreens Boots All., Inc*., in which the court found that the lead plaintiff lacked standing to pursue the remaining claims in a securities fraud case (where a class had not yet been certified) because he did not purchase stock during the amended class period. 341 F. Supp. 3d 412, 414, 418 (M.D. Pa. 2018). The *Hering*

court found that even though the lead plaintiff initially had standing, his loss of standing after the dismissal of certain claims was incurable, as he was the only plaintiff in the case. *Id*. at 419 (where "there is no viable claim for the only plaintiff in the case," there is "no 'case' or 'controversy' before the Court."). Here, Atlanta P&F is currently the only plaintiff in the case and, by its own admission, is unaware of any parties that could prosecute the remaining claims. The court thus agrees with Atlanta P&F that it no longer has standing.

"Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy. The doctrine developed in our case law to ensure that federal courts do not exceed their authority as it has been traditionally understood." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citation omitted). Although neither party has moved for dismissal of the remaining claims, both sides have addressed the issue, and "it is well settled that a federal court is obligated to inquire into subject matter jurisdiction *sua sponte* whenever it may be lacking." *Univ. of S. Alabama v. Am. Tobacco Co*., 168 F.3d 405, 410 (11th Cir. 1999) (collecting cases). Accordingly, the court will dismiss the remaining claims in this action.

## CONCLUSION

For the reasons explained above, Atlanta P&F's motion for reconsideration will be denied. As Atlanta P&F no longer has standing, the remaining claims in the case will be dismissed, and Atlanta P&F's request for Rule 54(b) certification will be denied as moot. A separate order follows.

7/20/20
_____
Date

/S/
_____
Catherine C. Blake
United States District Judge